**No. 15-1886**

**CORRECTED**

---

# United States Court of Appeals
# for the Federal Circuit

---

KICKSTARTER, INC.,

Plaintiff-Appellee,

v.

FAN FUNDED, LLC, ARTISTSHARE, INC.,

Defendants-Appellants.

---

Appeal from the United States District Court
for the Southern District of New York
in 11-CV-06909-KPF, Judge Katherine Polk Failla

---

**BRIEF OF DEFENDANTS-APPELLANTS
FAN FUNDED, LLC AND ARTISTSHARE, INC.**

Craig R. Smith
*Counsel of Record*
LANDO & ANASTASI, LLP
1 Main Street
Cambridge, MA 02142
Tel:   617-395-7000
Fax:  617-395-7070

*Attorney for Defendants-Appellants
Fan Funded, LLC and ArtistShare, Inc.*

Date: September 29, 2015

# CERTIFICATE OF INTEREST

Counsel for the Defendants-Appellants, ArtistShare, Inc. and Fan Funded, LLC, certifies the following:

1.      The full name of every party represented by me is ArtistShare, Inc. and Fan Funded, LLC;

2.      The name of the real parties in interest represented by me is ArtistShare, Inc. and Fan Funded, LLC;

3.      There are no parent companies, subsidiaries, or affiliates of the parties represented by me that have issued shares to the public; and

4.      The names of all law firms whose partners or associates have appeared for the parties now represented by me in the proceedings are: Craig R. Smith, William J. Seymour, Eric P. Carnevale (Lando & Anastasi, LLP, 1 Main Street, Cambridge, MA  02142); Theodore Cheng, (Fox Horan & Camerini LLP, 825 Third Ave., New York, NY  10022) (Proskauer Rose, LLP, 11 Times Square, New York, NY  10036) (Yoon & Kim LLP, 11 East 44th Street, New York, NY 10017), Stephanie Su Spangler (Yoon & Kim LLP).

# TABLE OF CONTENTS

Certificate of Interest ................................................................. i

Table of Contents .................................................................... ii

Table of Authorities ..................................................................v

Statement of Related Cases ..........................................................1

Jurisdictional Statement ............................................................2

Statement of Issues...................................................................3

Statement of the Case Setting out  the Facts Relevant to the Issues ........................5

    I.      The Parties and the Dispute.................................................5

    II.     The Litigation .................................................................6

    III.    The '887 Patent ...............................................................6

        A.     The Written Description of the '887 Patent................................6

        B.     The Claims of the '887 Patent .................................................11

    IV.    The Claim Construction Order..............................................13

    V.     Motion to Dismiss ...........................................................15

    VI.    The Summary Judgment Order .........................................15

    VII.   Final Judgment And notice of appeal..................................19

Summary of the Argument...........................................................20

Argument.................................................................................24

    I.      The District Court Misconstrued the Claims of the '887 Patent ................................................................24

        A.     The Standard of Review for Claim Construction ....................24

        B.     Legal Standards of Claim Construction...................................24

C.      The District Court Incorrectly Construed the
Claims of the '887 Patent ................................................... 25

     1.      The District Court Misconstrued "Patron(s)" ................ 25

     2.      The District Court Misconstrued "Patron
Database" ...................................................................... 27

     3.      The District Court Misconstrued
"Entitlement Including at Least One of a
Product, a Service, and Patronage" ............................... 29

     4.      The District Court Misconstrued "Software
Tools" ............................................................................. 32

     5.      The District Court Misconstrued "Software
Tools … to Manage At Least One Project" ................... 34

     6.      The District Court Misconstrued "Software
Tools . . . to Manage Communications,
Through Said Patron Database" ..................................... 36

II.      The District Court Erred in Granting Summary Judgment
of Patent Invalidity ............................................................... 39

     A.      The Standard of Review for Summary Judgment .................... 40

     B.      Legal Standards for Patent Eligibility ...................................... 40

     C.      The District Court Erred by Failing to Apply 35
U.S.C. § 282 and Failing to Apply any
Presumption of Patent Validity ................................................. 42

     D.      The District Court Erred by Failing to Consider
Each Claim Separately ............................................................. 48

     E.      The District Court Erred by Failing to Apply its
Own Claim Constructions to Determine Subject
Matter Eligibility ...................................................................... 50

     F.      The District Court Erred by Incorrectly Applying
the Supreme Court's Decision in *Alice* ................................... 51

1. The District Court Erred in Finding that the Claims of the '887 Patent Are Drawn to an Abstract Concept ........................................................... 52

2. The District Court Erred in Finding that the Claims of the '887 Patent Fail to Include "Something More" to Impart Eligibility ........................ 59

Conclusion ........................................................................................ 65

Addendum

Certificate of Compliance with Fed. R. Civ. P. 32(e)(7)(B)

Certificate of Service

# TABLE OF AUTHORITIES

## Cases

*3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315 (Fed. Cir. 2013) ...................................................................................................39

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318 (Fed. Cir. 2013) ............................................................................................ 30, 33

*Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000 (Fed. Cir. 2006) ...................................................................................................40

*AIA Eng'g Ltd. v. Magotteaux Int'l. S/A*, 657 F.3d 1264 (Fed. Cir. 2011) ...................................................................................................26

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l.*, 134 S. Ct. 2347 (2014).................... passim

*Assoc. for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107 (2012) ...........................................................................................41

*Bancorp Services, L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266 (Fed. Cir. 2012)........................................................................50

*Bilski v. Kappos*, 130 S. Ct. 3218 (2010)................................................................50

*CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269 (Fed. Cir. 2013) .............................48

*CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225 (Fed. Cir. 2005) ...................................................................................................25

*Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264 (Fed. Cir. 1991)................48

*DDR Holdings, LLC v. Hotels.Com, LP*, 773 F.3d 1245 (Fed. Cir. 2014) ...................................................................................... 40, 59, 62

*Diamond v. Chakrabarty*, 447 U.S. 303 (1980)......................................................40

*Diamond v. Diehr*, 450 U.S. 175 (1981)................................................................53

*Dillon v. Morano*, 497 F.3d 247 (2d Cir. 2007)......................................................40

*Exergen Corp. v. Brooklands Inc.*, --- F.Supp.3d ----, 2015 WL 5096464 (D. Mass. Aug. 28, 2015)...........................................................43

*Fujifilm Corp. v. Motorola Mobility* LLC, No. 12-cv-03587, 2015 WL 1265009 (N.D. Cal. March 19, 2015) ....................................................32

*GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304 (Fed. Cir. 2014) ...........................................................................................25

*Gottschalk v. Benson*, 409 U.S. 63 (1972) ........................................ 52, 53

*Grober v. Mako Prods, Inc.*, 686 F.3d 1335 (Fed. Cir. 2012) ................................25

*Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776 (Fed. Cir. 2010) ...........................................................................................29

*In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008) ................................ 50, 53, 56

*In re Tanaka*, 640 F.3d 1246 (Fed. Cir. 2011) ........................................30

*Inline Plastics Corp. v. EasyPak, LLC*, --- F.3d ---, 2015 WL 5058248 (Fed. Cir. Aug. 27, 2015) .............................................................24

*Internet Pat. Corp. v. Active Network, Inc.*, 790 F.3d 1343 (Fed. Cir. 2015) ...........................................................................................53

*Jones v. Hardy*, 727 F.2d 1524 (Fed. Cir. 1984) ....................................48

*Kickstarter, Inc. v. Fan Funded, LLC*, No. 11-cv-6909, 2013 WL 214313 (S.D.N.Y. Jan. 18, 2013)............................................................13

*Kickstarter, Inc. v. Fan Funded, LLC*, No. 11-cv-6909, 2015 WL 3947178 (S.D.N.Y. June 29, 2015)........................................................16

*Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352 (Fed. Cir. 2011) ...........................................................................................40

*Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363 (Fed. Cir. 2009) ...........................................................................................27

*MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*, 731 F.3d 1258 (Fed. Cir. 2013)..........................................................................48

*Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011) ........................... 42, 44

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ...........................................................................................25

*Parker v. Flook*, 437 U.S. 584 (1971) .................................................................53

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)............ 24, 28, 30

*Radio Corp. of Am. v. Radio Eng'g Labs., Inc.*, 293 U.S. 1 (1934) .......................42

*Sinorgchem Co. v. I.T.C.*, 511 F.3d 1132 (Fed. Cir. 2007)....................................27

*SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d. 870 (Fed. Cir. 2004) ......................................................................................................................31

*Teva Pharm. USA v. Sandoz, Inc.*, 135 S. Ct. 831 (2015) .....................................24

*Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358 (Fed. Cir. 2012)..........................35

## Statutes

35 U.S.C. § 101 ............................................................................................... 40, 43

35 U.S.C. § 282 ................................................................................................ passim

35 U.S.C. § 282(a) ...................................................................................... 39, 48, 51

## Other Authorities

2014 Interim Guidance on Patent Subject Matter Eligibility, 79 Fed. Reg. 74,618 (Dec. 16, 2014) ...................................................................................56

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellants state:

A.    There have been no other appeals from this civil action before this or any other court.

B.    Appellants are not aware of any case that will be directly affected by the Court's decision in this case.

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and the Declaratory Judgment Act, 28 U.S.C. § 2201 and 2202, because the asserted claims arise under the laws of the United States, and specifically an Act of Congress relating to patents. On January 18, 2013, the district court issued a Claims Construction Order (A00034-A00048). On June 29, 2015, the district court issued a Summary Judgment Order (A00003-A000033) granting summary judgment to Plaintiff-Appellee Kickstarter, Inc. ("Kickstarter"). On June 30, 2015, the district court entered judgment in this matter in favor of Kickstarter. A00001-A00002. On July 29, 2015 Defendants-Appellants ArtistShare, Inc. and Fan Funded, LLC (collectively "ArtistShare") timely filed a Notice of Appeal (A06707-A06709) from the Claims Construction Order, Summary Judgment Order, and from the Final Judgment. The judgment and orders appealed from are final. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUES

1.      Whether the district court erred in its construction of the term "patron" in the claims of United States Patent No. 7,885,887 ("the '887 Patent") by failing to apply the patentee's clear definition in the patent.

2.      Whether the district court erred in its construction of the term "patron database" by not applying the plain and ordinary meaning for this term and instead limiting it to disclosures contained within the specification.

3.      Whether the district court erred in its construction of the term "entitlement including at least one of a product, a service, and patronage" by requiring a conjunctive interpretation despite the fact that the '887 Patent claims and specification call for a disjunctive interpretation of this term.

4.      Whether the district court erred in its construction of the term "software tools" by reading out the preferred and claimed embodiment of web-based applications.

5.      Whether the district court erred in its construction of the term "software tools . . . to manage at least one project" by reading in 11 functional limitations from one figure.

6.      Whether the district court erred in its construction of the term "software tools . . . to manage communications, through said Patron database" by limiting the term based on statements made during prosecution before this term

was included in the claims.

7.     Whether the district court erred in granting Kickstarter's motion for summary judgment of invalidity, and denying ArtistShare's motion for summary judgment of validity, by finding that the '887 Patent claims subject matter that is ineligible for patent protection under 35 U.S.C. § 101.

a.     Whether the district court erred by failing to apply 35 U.S.C. §282 and refusing to apply a presumption of patent validity.

b.     Whether the district court violated § 282 by invalidating 25 claims without considering the eligibility of each claim separately.

c.     Whether the district court erred by failing to consider patent eligibility based on the claims, as construed.

d.     Whether the district court erred in determining that the claims of the '887 Patent are directed to an abstract idea where the claims cover significantly more than the mere concept of "patronage."

## STATEMENT OF THE CASE SETTING OUT
## THE FACTS RELEVANT TO THE ISSUES

## I.    THE PARTIES AND THE DISPUTE

In 2002, Brian Camelio, the founder of ArtistShare and the inventor of the

inventions of the '887 Patent, recognized that a substantial number of artists were

unable to produce and profit from their creative works due to a lack of funding or

oppressive contracts.  A01096.  In response, Mr. Camelio developed a novel way

for artists to market and fund their projects directly to the public through an online

"fan funding" platform.  This platform allows artists to create and control a

marketing campaign to help them obtain the funding they need to generate creative

works.  *Id*.

ArtistShare has been in operation for over ten years with great success.  *Id*.

Nine recordings funded through ArtistShare have won Grammy Awards and 18

recordings have received nominations, including three Grammy-winning

recordings in 2014.  *Id*.

Kickstarter began operations in 2009, nearly six years after ArtistShare.

A01097.  Like ArtistShare, Kickstarter is an online platform for creative projects

that allows artists to market their projects to fans.  *Id*.  Fans may pledge money to

help an artist reach a funding goal in return for rewards associated with the project.

*Id*.

In 2009, Mr. Camelio offered to help Kickstarter with its system before the

5

'887 Patent even issued.  A01095; A01097.  After the '887 Patent issued,

Kickstarter and ArtistShare began exploring a potential business relationship,

whereby ArtistShare would license its proprietary fan funding software along with

the '887 Patent to Kickstarter.  A01095.  Kickstarter and ArtistShare discussed the

terms of their relationship for four months, culminating with Kickstarter's offer to

purchase the '887 Patent.  *Id*.  When ArtistShare declined, Kickstarter initiated this

lawsuit.  *Id*.

## II.    THE LITIGATION

On September 30, 2011, Kickstarter, Inc. filed a complaint against

ArtistShare, seeking declaratory judgments that the claims of the '887 Patent were

invalid and that Kickstarter does not infringe.  A00053.  ArtistShare

counterclaimed, asserting that Kickstarter infringed the '887 Patent.  A00056.

## III.    THE '887 PATENT

The '887 Patent was applied for on March 31, 2003 and issued on February

8, 2011.  A00071.  It is directed to various systems for helping artists create and

manage a database driven fan funding project on the Internet through a fan funding

platform.

### A.    The Written Description of the '887 Patent

The '887 Patent describes a fan funding platform that allows artists to create,

market, and get their projects funded.  In some embodiments, an artist is provided

online software tools to implement an online fan funding project.  As shown in

6

Figure 18, an Artist may log into a fan funding system, select to create a new fan funding project, and may then be prompted to describe project information, such as a "start date," a "finish date," a "release date," a "project name," a "project type," a "revenue goal," and a "project description."  *See* A00090, Fig. 18; A05907-09, Monroe Rept. at ¶¶ 51-52.



From these, and potentially other inputs, the inventions of the '887 Patent may help an artist, who might not have any computer skills, launch an online fan funding project, which may take the form of a system-generated web page describing a project. *See* A05909, Monroe Rept. at ¶ 53.

The inventions of the '887 Patent also help artists raise funds for a project by

allowing artists to define and offer entitlements or "sales containers" associated

with their creative projects.  These database driven sales containers may be offered

for sale in support of the creative project through various web-based applications

for creating, categorizing, and managing inventory items.  *See, e.g.* A00143 at col.

15, lines 33-44; A00140-141, col. 10, line 35 – col. 12, line 67; A00081 (Fig. 9);

A05909-10, Monroe Rept. at ¶ 54.



8

Inventory items may also be used to define entitlements that may be offered at pre-determined levels of patronage on a project web page. *See* A00142 at col. 13, line 24 – col. 14, line 19. The '887 Patent gives examples of such entitlements. *See, e.g.,* A00142 at col. 13, line 45 – col. 14, line 14.



A fan may navigate to the fan funding site, view the artists' projects, and may register with an artist and/or contribute to the project, as shown, for example,

in Fig. 41.  A00114 (Fig. 41) (above).  On an artist's project page, the fan may

view details about the project that were previously defined by the artist and may

choose to "join" the project by navigating to a "Join" page.  *Id.*  There, the fan may

view the entitlements or sales containers that may be purchased in order to support

the project.  *Id.*  Entitlements may be offered at predefined patron levels.  *Id.*; *see*

*also* A05910, Monroe Rept. at ¶55.



Fig. 16.

Artists may also manage their communications with patrons through a patron database. As fans register with an artist or contribute to an artist's project, fans may be registered in a database. *See* A00141 at col 12, lines 44-46. As shown in Figure 16, an artist may navigate to a "Mailing" web page on the fan funding platform where they may access various software tools for communicating with their patrons through the patron database. A00088 (Fig. 16) (above). For example, an artist may access mailing list dropdowns, create a mailing, or send an announcement to their fans or patrons. *Id.*

**B.    The Claims of the '887 Patent**

ArtistShare asserted independent system claims 1, 17, 18, 35 and 36 of the '887 Patent with the relevant claim terms that were construed by the district court emphasized.

**<u>Claim 1</u>**

Claim 1 of the '887 Patent covers:

> 1. A system for marketing and funding one or more projects of an artist comprising a server having applications programs operable from a remote site for:
>
> providing ***software tools*** to an artist or Account Manager ***to manage at least one project,*** the project comprising at least one creative work;
>
> receiving information from the artist or Account Manager regarding at least one Sales Container associated with the at least one project, each ***Sales Container including at least one of a product, a service, and a patronage***, while the artist retains outright ownership of the project and the creative work;
>
> transmitting offer data from a server to a client via a network,

the offer data comprising an offer to Fans concerning the at least one Sales Container associated with at least one project, wherein the offer is for a Sales Container at a predetermined level of patronage in exchange for funds for the project;

receiving at the client such offer data and presenting the offer to the Fan;

transmitting acceptance data back to the server from the client accepting the offer;

processing the acceptance data by the server;

registering contact and marketing information regarding Patrons in a database; and

providing the artist or Account Manager *software tools to manage communications, through said Patron database*, to *Patrons* regarding the sales and marketing of one or more projects.

A000146.

## Claim 17

Claim 17 of the '887 Patent covers:

17. A system for raising funds for and marketing one or more of an *artist's* projects to *Patrons* through the internet, without the necessity of a recording contract with a recording company and without the necessity of a production company, comprising a server having application programs operable from a remote site for:

allowing *Patrons* to demonstrate interest in one or more projects prior to, during, and after creation and publication of the project's artistic work;

registering contact information regarding interested *Patrons* in a searchable database;

providing to the artist or Account Manager *software tools* to design, create, and implement an artist-specific web page for the purpose of marketing said artist's projects to existing and new *Patrons* without the necessity of a contract with a recording company and without the necessity of a production company;

*managing communications, through said patron database*, from the artist or Account Manager to *Patrons* regarding sales and marketing of one or more projects; and

managing and viewing financial and marketing information

12

relative to projects supported through the system.

A000147.

### Claim 18

Claim 18 of the '887 Patent covers:

> 18. System for funding and marketing at least one project of an *artist* comprising:
> a server having application programs operable for:
> receiving data from an artist or Account Manager regarding at least one project by an Artist;
> providing tools for the artist or Account Manager to present the at least one project to at least one of Fans and ***Patrons***;
> receiving data from the artist or Account Manager regarding at least one entitlement associated with at least one of the Artist and the project, said ***entitlement including at least one of a product, a service, and patronage***, but not ownership in the project;
> transmitting offer data to said Fans or ***Patrons***, the offer data comprising an offer for said at least one entitlement at a predetermined level of patronage in exchange for funds for the project, the project comprising at least one creative work; and
> receiving acceptance data for an entitlement at a predetermined level of patronage from a ***Patron***.

A000147; *see also* Independent Claims 35 and 36 (A00147-148).

## IV.    THE CLAIM CONSTRUCTION ORDER

On January 18, 2013, the district court issued an Opinion and Order

construing six claim terms from the '887 Patent that are relevant to this appeal.

A00034-48; *see also Kickstarter, Inc. v. Fan Funded, LLC*, No. 11-cv-6909, 2013

WL 214313 (S.D.N.Y. Jan. 18, 2013).  The court construed the disputed claim

terms as follows:

- "**Patron(s)**" means "a fan who registers with an artist . . . and who provides a monetary contribution to a project of an artist." A00039-40.

- "**Patron Database**" means "an artist-specific database that contains contact, marketing, sales, and demographic information of the artist's patron gathered from an artist's projects." A00040-41.

- "**Entitlement including at least one of a product, a service, and patronage**" means "an 'entitlement that includes at least one product, and at least one service, and at least one patronage.'" A00042-44.

- "**Software tools**" and "**tools**" mean "computer programs." A00044.

- "**Software tools . . . to manage at least one project**" mean "computer programs that consist of a suite of features, including project information, inventory, auctions, patrons, subscriptions, licensing, personnel, news, mailings, media shows and images." A00044-45.

- "**Software tools . . . to manage communications, through said Patron Database**" mean "computer programs that enable and control the exchange of information with a patron wherein the patron receives the information directly from the Patron database." A00045-46.

## V.    MOTION TO DISMISS

Based on the court's claims construction Order, ArtistShare stipulated that Kickstarter would not infringe the claims of the '887 Patent, as construed by the court. *See* A05593-95. ArtistShare also moved to dismiss Kickstarter's invalidity claim, without prejudice, and to have the court enter final judgment in order to seek an immediate appeal of the court's Claim Construction order. *See id*; *see also* A01381-83. Kickstarter opposed this approach, arguing instead that the district court should allow it to pursue its invalidity claim before allowing ArtistShare to appeal the potentially case-dispositive claim construction order. *See* A01381-83. The district court denied ArtistShare's motion. *Id*.

## VI.    THE SUMMARY JUDGMENT ORDER

On September 10, 2014, the Parties filed cross-motions for summary judgment regarding the validity of the '887 Patent. A00066-69. Kickstarter sought summary judgment of invalidity based on alleged obviousness, incorrect inventorship, indefiniteness, and patent eligibility. A01384-85. While Kickstarter sought to invalidate all 25 of the asserted claims of the '887 Patent, it only presented arguments regarding claim 1. ArtistShare sought summary judgment of validity of all claims. A01467-68. The Parties submitted 120 pages of briefing, and 94 exhibits, including extensive documentary evidence, fact witness testimony and expert reports. *See* A01743-48,

On June 29, 2015, Judge Failla granted Kickstarter's Motion for Summary Judgment, finding that "the '887 Patent claims *only* the abstract and time-honored concept of *patronage*…" A00003; *see also Kickstarter, Inc. v. Fan Funded, LLC*, No. 11-cv-6909, 2015 WL 3947178, at *1 (S.D.N.Y. June 29, 2015).[1] *The district court did not apply any presumption of validity to the claims of the '887 Patent*. *See* A00013 n. 7. According to the district court, the presumption of validity and the attendant "clear and convincing" standard apply only to "*factual* determinations" and "to the extent that the Court is drawing legal conclusions (e.g., whether the subject matter is patent-eligible under Section 101), no such standard applies." *Id*. (emphasis in original).

The district court selected claim 1 as a representative claim, with only a cursory explanation as to why it was supposedly representative. *See* A00005 n. 3:

> [T]he Court agrees with Plaintiff that Claim 1 is representative. … [W]here, as here, the claims are "substantially similar and linked to the same abstract idea," the Court may dispose of the other claims in less detail.

*Id*. The district court did not further explain its basis for holding that claim 1 was representative of all 25 asserted claims of the '887 Patent.

Under the first step of the two-step framework described in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l.*, 134 S. Ct. 2347 (2014) ("*Alice*"), the district court held that

---

[1] All emphasis in this brief has been added unless otherwise indicated.

"[t]he '887 Patent's claims are directed to the concept of crowd-funding or fan-funding, i.e., raising funds for a project from interested individuals in exchange for incentives."  A00027.  The court made only two citations to the '887 Patent under *Alice*, step 1.  First, the court cited to the ***preamble*** of claim 1, which "recites a 'system for marketing and funding one or more projects of an artist.'"  A00027.  Second, the court quoted from the "***Field of the Invention***" portion of the ***specification***, which describes the field of the invention as being related to "methods and systems for obtaining financing from interested individuals to produce a creative work in exchange for an entitlement from the author of the work."  *Id*. (quoting col. 1 lines.15-20).  From these two citations, the court concluded that "these claims are squarely about patronage — a concept that is 'beyond question of ancient lineage.'"  A00027.

Under *Alice*, step 2, the district court held that the individual system components recited in claim 1 were "well-understood, routine, conventional activities previously known to the industry."  A00029.  However, the court did not provide any explanation as to where the court found such components in the prior art or in general use prior to the '887 Patent.  *See id*.  For example, the court found that "'application programs' providing 'software tools' to manage projects" were "well-understood, routine, conventional activities previously known to the industry," but did not cite to any evidence to substantiate this factual

17

determination.  *Id*.  Nor did the court cite to any argument or clear and convincing

evidence submitted by Kickstarter.  *Id*.

Under step 2 of *Alice,* the court focused its analysis on the **written

description** of the '887 Patent, not the claims. *See* A00031 ("the '887 Patent

**specification** expressly does not limit the invention to any particular system,

software, or hardware").  At no point in the district court's decision did it assess

whether the **limitations** of claim 1 (or any other claim) represent "something more"

than the concept of "raising funds for a project from interested individuals in

exchange for incentives."  *See Alice*, 134 S. Ct. at 2354 ("we must distinguish

between patents that **claim** the 'buildin[g] block[s]' of human ingenuity and those

that **integrate** the building blocks into **something more**").

The court also did not apply its claim constructions to claim 1.  The court

did note that "the construction of 'entitlement' to include 'at least one product and

at least one service and at least one patronage,' might add some degree of

particularity..." A00030.  Yet, the court failed to consider whether its

constructions for the disputed claim terms, or any of the claim limitations

themselves, bring the claims of the '887 Patent outside the realm of an abstract

idea.  For example, the district court did not apply its narrow construction for the

terms "software tools … to manage at least one project," or "software tools to

manage communications, through said Patron database…"

## VII.  FINAL JUDGMENT AND NOTICE OF APPEAL

On June 30, 2015, the district court entered Final Judgment in favor of

Kickstarter.  A00001.

On July 29, 2015, ArtistShare filed a timely Notice of Appeal.  *See* A06707-

A06709.

## SUMMARY OF THE ARGUMENT

The district court's decisions on claim construction and summary judgment should be reversed because of multiple legal errors. First, the court misconstrued several disputed claim terms. Second, the district court granted summary judgment of invalidity while ***expressly disregarding the statutory presumption of validity and disregarding*** binding Supreme Court precedent.

The court was led astray by Kickstarter, who argued for a misapplication of this Court's decisions regarding claim construction and subject matter eligibility. The end result was a series of opinions that adopted incorrect legal arguments and analysis.

First, the district court misconstrued several claim terms by improperly narrowing them and should be reversed because of the following errors:

1. The district court failed to apply the patentee's definition of the term "Patron." Rather, the court applied a narrower interpretation that conflicts with patentee's expressed definition.

2. The district court disregarded the plain and ordinary meaning of "patron database" – a straightforward term that the claims themselves define. Instead, the court imported unnecessary limitations by requiring that a specific set of information be stored in the database, which the claims do not require.

3. The court construed "entitlements, including at least one of a product, a service, and a patronage" conjunctively thereby excluding the preferred embodiment and creating conflicts with the dependent claims.

4. The court construed "software tools" as "computer programs," despite the fact that this construction would potentially rule out web-based applications which are the preferred embodiment and recited in the claims.

5. The district court improperly imported eleven limitations from a single figure into the term "software tools … to manage at least one project," based on an alleged prosecution history disclaimer that occurred before the claims included this limitation.

6. The district court failed to account for the understanding of one of ordinary skill in the art in its construction of "software tools … to manage communications through said database."  One of ordinary skill would not interpret this claim as requiring messages to be sent "***from*** the patron database," itself.

Second, the district court's summary judgment decision contained multiple errors.  ***The district court expressly ignored the statutory presumption of validity***, failed to consider its own claim constructions, and misapplied the Supreme Court's decision in *Alice*.

1. The district court erred by refusing to apply the statutory presumption of validity, as required by 35 U.S.C. § 282. Rather, the district court held that its patent-eligibility determination was purely a legal determination and therefore the clear and convincing standard does not apply.

2. The district court further violated § 282 by failing to consider the eligibility of each claim separately. The district court provided no basis for invalidating 25 separate claims, each with their own, separate presumption of validity based on its analysis of claim 1, alone.

3. The district court failed to consider patent eligibility based on the claims, as construed. Rather, the district court ignored its own, narrow claim constructions. Where, as here, the claims have been construed, the court should consider such constructions while determining patent eligibility.

4. The district court erred in its determination of patent eligibility because the claims of the '887 Patent are not directed to an abstract idea and claim significantly more than the mere concept of "crowdfunding" or "patronage."

   a. Under step 1 of the Supreme Court's *Alice* framework, the district court failed to properly determine, by clear and convincing evidence, whether "crowdfunding" qualifies as an abstract idea.

b. Under step 1 of *Alice*, the system claims are not "directed" to "crowdfunding" or "patronage" because the claims do not recite, describe, or set forth either of these concepts.

c. Under step 2 of *Alice*, the district court failed to appreciate the inventive concepts underlying the system claims.  The claim limitations embody a particular fan funding platform, which had never before existed.  The inventions of the '887 Patent provided specific web-based tools for creating and managing a fan funding project, and generating a project page for marketing creative works.  The inventions also provide for a single unified fan funding platform, yielding a searchable database of artists and projects that fans and patrons may search, follow, and support.  Thus, the claims of the '887 Patent do significantly more than claim an instruction to perform patronage or crowdfunding on a computer.

ArtistShare respectfully requests that this Court ***reverse*** the district court's claim construction order and construe the disputed claim terms as proposed by ArtistShare.  ArtistShare also respectfully requests that the Court ***reverse*** the district court's order granting summary judgment of invalidity.

# ARGUMENT

## I.    THE DISTRICT COURT MISCONSTRUED THE CLAIMS OF THE '887 PATENT

### A.    The Standard of Review for Claim Construction

"[W]hen the district court reviews only evidence intrinsic to the patent …, the judge's determination will amount solely to a determination of law, and the Court of Appeals will review that construction *de novo*." *Teva Pharm. USA v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). "Relevant factual determinations based on extrinsic evidence, such as prior art and expert testimony, are reviewed under the standard of clear error." *Inline Plastics Corp. v. EasyPak, LLC*, --- F.3d ---, 2015 WL 5058248, at *2 (Fed. Cir. Aug. 27, 2015).

### B.    Legal Standards of Claim Construction

"[T]he words of a claim 'are generally given their ordinary and customary meaning' ... that the term would have to a person of ordinary skill in the art in question at the time of the invention..." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (*en banc*). When the ordinary meaning of a claim term is readily apparent from the claims themselves, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314.

"[T]he specification and prosecution history ***only*** compel departure from the plain meaning in two instances: lexicography and disavowal." *GE Lighting*

*Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).  Therefore, it is improper to "import limitations from the specification into the claims." *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005).

"The standards for finding lexicography and disavowal are exacting." *GE Lighting Solutions*, 750 F.3d at 1309. "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term,' and 'clearly express an intent to define the term.'" *Id.*  Similarly, disavowal requires that "the specification [or prosecution history] make[] clear that the invention does not include a particular feature." *Id.*

The bar for finding prosecution disclaimer is similarly high and applies only "where the patentee has unequivocally disavowed a certain meaning to obtain his patent." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) "[T]the doctrine of prosecution disclaimer ***only applies to unambiguous disavowals***." *Grober v. Mako Prods, Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012).

### C.    The District Court Incorrectly Construed the Claims of the '887 Patent

#### 1.    The District Court Misconstrued "Patron(s)"

The district court erred by construing the term "patron" as "a fan who registers with an artist ***and*** who provides a contribution to a project of an artist in exchange for certain entitlements."  The '887 Patent defines a Patron as "a fan … that registers with ArtistShare ***and/or*** contributes to or purchases an Artist's

project, work, or the actual Artist." A00138 at col. 6, lines 64-67. The presence of the term "and/or" in this definition dictates that a Patron can be *either* (1) a fan who registers with the system, *or* (2) any individual who contributes to or purchases an artist's project. *See AIA Eng'g Ltd. v. Magotteaux Int'l. S/A*, 657 F.3d 1264, 1276 (Fed. Cir. 2011) ("the inventor's lexicography governs"). Here, the patentee's definition controls, and "Patron(s)" should be construed as a Fan "who contributes to one or more projects *or* is registered to do so." *See* A01106-07; A01266-01267.

The district court rejected the patentee's clear lexicography in favor of a narrower definition. According to the district court, another passage of the specification (outside the terminology section) states that a patron registers *and* makes a contribution to an artist's project, in one example:

> However, members of ArtistShare may be able to *sign-up with various artists to become patrons* of the artists. *A patron is a fan who registers with an artist* (for example through the ArtistShare system) *and who provides a monetary contribution to a project* of an artist …

A00144 at col. 18, lines 54-59. This passage is entirely consistent with the *definition* for Patron provided in the terminology section of the patent because it is an example of one type of Patron.

"When the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term." *Sinorgchem Co. v. I.T.C.*, 511 F.3d 1132, 1138 (Fed. Cir.

2007).  Here, the patentee's definition controls, and "Patron(s)" should be

construed as a Fan "who contributes to one or more projects or is registered to do

so."  *See* A01106-07; A01266-01267; *see also Martek Biosciences Corp. v.*

*Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009) ("When a patentee explicitly

defines a claim term in the patent specification, the patentee's definition

controls.").

### 2.    The District Court Misconstrued "Patron Database"

The district court erred by construing the term "patron database" as "an

***artist-specific*** database that contains contact, marketing, sales, ***and*** demographic

information of the artist's patron ***gathered from an artist's projects***."  Instead,

"patron database" should have been construed according to its plain and ordinary

meaning as "a database containing information relating to one or more Patrons."

*See* A01107-08; A01267-69.  The district court adopted this narrow definition

despite the absence of any lexicography or disclaimer of claim scope in the

specification or prosecution history.  The meaning of this claim term is readily

apparent from reading the claims themselves and the district court unnecessarily

imported limitations from the specification and the prosecution history into the

claims.

The plain and ordinary meaning of "patron database" is readily understood

based on its context within the claims.  For example, claim 1 requires "registering

contact and marketing information regarding Patrons in ***a database***.”  A00146 at col. 21, lines 58-59.  The claim later includes “providing … software tools to manage communications, through ***said Patron database***.”  *Id*. at lines 60-63; *see also* claim 17 (“registering contact information regarding interested Patrons in a searchable database … managing communications, through ***said*** patron database…”); claim 36 (“registering the Fan as a Patron in a Patron database and storing contact information regarding the Patron…”).

   ***None*** of the claims of the ’887 Patent requires “sales” or “demographic” information within the patron database.  In each instance, the claims indicate that the “patron database” is simply “a database” with no other modifiers.  *See Phillips*, 415 F.3d at 1314.

   The claims, themselves, dictate what information may be stored in the patron database for that particular claim.  Claim 1 specifies that “contact ***and*** marketing information regarding Patrons” is stored in the database, A00146 at col. 21, lines 58-59; whereas claims 17 and 36 indicate that only “contact information” is stored in the database.  In either case, the district court did not need to set forth a complete list of other information potentially stored in the patron database because the claims include no such limitations.  Thus, “patron database” should have been construed according to its plain and ordinary meaning as “a database containing information relating to one or more Patrons.”  *See* A01107-08; A01267-69.

### 3. The District Court Misconstrued "Entitlement Including at Least One of a Product, a Service, and Patronage"

The district court improperly limited "entitlement including *at least one of* a product, a service, and patronage" as an "entitlement that includes at least one product, *and* at least one service, *and* at least one patronage." A00042-44. However, the claims, the specification, and the prosecution history all show that this claim term is supposed to be construed in the disjunctive as "an entitlement that includes at least one product or service or patronage." *See* A01115-17; A01273-74.

Claims 18, 36 and 37 each define an entitlement as potentially including a single entitlement. For example, in claim 18, the limitation reads "receiving data … regarding *at least one entitlement* associated with at least one of the Artist and the project, *said entitlement* including at least one of a product, a service, and patronage…" A00147 at col. 23, lines 47-51. The language "at least *one entitlement*" is the antecedent basis for "*said* entitlement including at least one of a product, a service, and patronage." When the district court construed this language in the conjunctive, it ignored the antecedent basis for "said entitlement" as being "at least *one* entitlement." *See Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 782 (Fed. Cir. 2010) ("the district court … ignore[d] the antecedent basis for 'the centrifugal unit'"). Here, the antecedent basis for "entitlement" controls. The "entitlement" need only be "at least one entitlement" and therefore

the district court's conjunctive construction requiring at least *three* entitlements is incorrect.

The dependent claims also show that this claim term was intended to be disjunctive. For example, dependent claim 32 requires "converting the received entitlement into a digital format …" A00147 at col, 24, lines 39-42. Because neither a service nor a patronage can be converted into a digital format, this dependent claim contemplates an entitlement that includes only a product. *See In re Tanaka*, 640 F.3d 1246, 1250 (Fed. Cir. 2011) ("Claims of narrower scope can be useful to clarify the meaning of broader, independent claims under the doctrine of claim differentiation.") (citing *Phillips*, 415 F.3d at 1314).

"Entitlement" is also a defined term within the specification, which states that "[e]ntitlements may be any product, service *and/or* benefit conferred from the artist or other party to the user." A00140 col. 9, line 67 – col. 10, line 2. Because the specification unambiguously defines this term in the disjunctive, the claims should not be interpreted so as to read out embodiments that include products, services, and patronages either alone *or* in combination. *See Accent Packaging, Inc. v. Leggett & Platt, Inc*., 707 F.3d 1318, 1326 (Fed. Cir. 2013) ("We have held that 'a claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.'").

The specification also describes some entitlements as consisting of a single

30

item.  The only example of entitlements in the specification does not include a

product and a service and a patronage.  Rather, it describes a list of possible

entitlements: 1) "First to download the artist's latest release" (a product); 2) "A

listing on the album page as making the recording possible, personalized

correspondence from the band" (services); 3) "Discounted CDs" (products); 4)

"Auto email notification of artist concerts near you" (a service).  A00142 at col.

13, line 41 – col. 14, line 14.  Notably, this example does not include a patronage.

The prosecution history of the '887 Patent also confirms that this claim term

should be construed in the disjunctive.  When ArtistShare amended the claims to

include the "at least one of" limitation, it simultaneously deleted the word

"entitlements" (plural) and replaced it with "at least one entitlement" (singular).

*See* A01220.  The district court improperly disregarded the patentee's deliberate

choice to broaden this claim limitation with "at least one entitlement" instead of

"entitlements" during prosecution.

Construing a claim term beginning "at least one of" to require a selection

from each and every category that follows is only appropriate where "***[e]very***

***disclosed embodiment*** teaches that the user must choose a value for ***each***

designated category."  *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d. 870,

887 (Fed. Cir. 2004).  In *SupertGuide*, this Court construed "at least one of

program start time, program end time, program service, and program type" as

31

requiring a selection from each category under the facts of that case. Such a construction does not apply here because it yields a result that is inconsistent with the claims, the specification, and the purpose of the invention. *See, e.g.*, *Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-cv-03587, 2015 WL 1265009, at *7-*9 (N.D. Cal. March 19, 2015) ("*SuperGuide* did not erect a universal rule of construction for all uses of 'at least one of' in all patents") (collecting cases).

The district court improperly disregarded all of the intrinsic evidence when construing this claim term in the conjunctive. The claims, the patentee's definition, the specification, and the prosecution history all compel a disjunctive interpretation of this claim term as "an entitlement that includes at least one product or service or patronage." *See* A01115-17; A01273-74.

### 4.    The District Court Misconstrued "Software Tools"

The district court incorrectly limited "software tools" to "computer programs." A00044. However, this term should have been construed according to its plain and ordinary meaning as "computer aided features." *See* A01108-10; A01269-71. By adopting a narrower construction, the district court improperly excluded the preferred web-based applications disclosed and claimed in the '887 Patent.

The preferred embodiment and claims describe web-based applications. Web-based applications are the primary type of "software tools." *See, e.g.*,

32

A00136 at col. 2, lines 40-44; A00141 at col. 11, lines 42-43 ("Accordingly,

embodiments of the invention center around the ArtistShare web-based

application."); A00140 at col. 10, lines 11-14 ("these embodiments … are detailed

below with reference to a web-based system for providing the offers for different

entitlements to clients."); A00140 at col. 9, lines 15-19 ("The ArtistShare system

may be setup and run on the World-Wide-Web, thus using a plurality of websites

and web pages, ….").

Furthermore, Figures 6-62 of the '887 Patent depict users logging into a

web-based application to perform the functions associated with the inventions,

such as managing projects, managing entitlements, managing patrons, or

communicating with patrons.  *See* A00078-A000135.

Finally, the claims themselves show that "software tools" encompass web-

based applications.  The preambles of the claims describe "a server having

***applications programs operable from a remote site*** for" providing a series of

capabilities.  A00146 at col. 21, lines 34-36 (claim 1); *see also* the preambles for

claims 17, 18, 35 and 36. The claims are directed to web-based applications.

Thus, the district court's construction of "software tools" did more than

exclude the preferred embodiment from the claims.  *See Accent Packaging*, 707

F.3d at 1326 ("a claim interpretation that excludes a preferred embodiment from

the scope of the claim is rarely, if ever, correct.").  The district court's construction

also excluded the explicit requirements of the claims themselves.  As such, the

district court's construction should be reversed.  A more appropriate construction

is "computer aided features."  *See* A01108-10; A01269-71.

### 5.     The District Court Misconstrued "Software Tools … To Manage At Least One Project"

The district court erred by construing "software tools . . . to manage at least

one project" as "computer programs that *consist of a suite of features, including*

*project information, inventory, auctions, patrons, subscriptions, licensing,*

*personnel, news, mailings, media shows and images*."  A00044-45.  The district

court incorrectly limited the scope of this claim term to the complete set of 11

specific tools disclosed in one figure.  *See* A00045 ("Accordingly, the software

tools for the management of projects are *limited to those enumerated in Figure 7*

of the Patent itself.").  According to the district court *all* eleven tools, and *only*

these eleven tools, must be present in order to constitute "software tools . . . to

manage at least one project."  *Id.* ("computer programs that *consist of* a suite of

features…").  However, no such restriction or limitation appears in the claims or

specification and this claim term should have been construed (if at all) so as to

preserve its full, intended scope as "computer aided features to manage at least one

description of a creative work."  *See* A01108-10; A01269-71.

ArtistShare never disclaimed the full breadth of this claim term during

prosecution.  In a December 29, 2009 Response to an Office Action, the patentee

34

amended some of the claims of the application to refer to "a server having

application programs operable from a remote site" in the preambles.  *See* A00638.

Notably, as of December 2009, ***none of the pending claims included the claim***

***term at issue here***– "software tools to manage at least one project."  *See* A00638-

641.  In the remarks section, the applicant provided a general background

discussion of the ***preferred embodiment*** of the invention, not any particular claim

or claim term:

> [A]s depicted in **Figures 7** through **22**, the ***Applicant's system and***
> ***computer programs*** offer to an artist a unique suite of software tools,
> including tools to manage an artist's own homepage, tools to manage
> projects to create artistic works, tools to generate reports regarding
> Patron support and sales of sales containers offered within projects,
> and tools to manage the artist's ArtistShare account.  This suite of
> tools is novel, and the functionality to an Artist (See, e.g., Figure 7) is
> not anticipated by Wilk or Massey or any combination thereof.

A00643-A00644. The district court held that this single passage represented a

prosecution history disclaimer limiting "software tools … to manage at least one

project" to the eleven tools shown in Figure 7.

However, the above passage does not discuss any particular claim or

limitation and represents background discussion at a time when ***the limitation at***

***issue was not yet part of the claims***.  A mere discussion of examples within the

specification during prosecution history "is not a clear and unambiguous disavowal

of claim scope."  *See Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1370 (Fed.

Cir. 2012) (discussion of an example within a figure during prosecution was not a

clear and unambiguous disclaimer).

Here, there is no "clear and unmistakable" disavowal of claim scope at least because the claim term at issue was not yet even part of the application. As such, there was no unambiguous disclaimer during prosecution and ArtistShare is entitled to the full scope of this claim term. "Software tools … to manage at least one project" should be construed to mean "computer aided features to manage at least one description of a creative work." *See* A01108-10; A01269-71.

### 6. The District Court Misconstrued "Software Tools . . . to Manage Communications, through said Patron Database"

The district court erred by construing "software tools . . . to manage communications, through said Patron database" as "computer programs that enable and control the exchange of information with a patron ***wherein the patron receives the information directly from the Patron database***." A00045-46. However, one of ordinary skill in the art would understand that the plain and ordinary meaning of this term is "computer-aided features to enable and/or facilitate the exchange of information with the aid of the Patron database." *See* A01111-12; A01271-72. First, the district court incorrectly concluded that the meaning of managing communications "***through***" a patron database "suggests that the Patron database should play a larger role than mere facilitation." A00045. However, one of ordinary skill in the art would understand that "software tools . . . to manage communications, ***through*** said Patron database" simply means software tools for

36

sending communications using the contact information in the database, such as the

mailing list features described in the specification:

> FIG. 16 illustrates attributes one or more web-pages and/or one or
> more links for mailing list management, where the Manager can
> import and export names for a mailing list, direct announcements and
> also create different mail list categories. The ability to manage such
> information may be performed using dropdown menus and the like.

A00143 at col. 16, lines 34-39.

Second, the district court misinterpreted the prosecution history of the '887

Patent. During prosecution, the claims previously recited "software tools to

manage communications *directly* to Patrons..." *See* A00674. In a June 21, 2010

Office Action, the Examiner alleged that this limitation was disclosed in a

reference referred to as "Massey," which disclosed posting film synopses on a web

page. *See* A00675. According to the Examiner, the web page of Massey, itself,

was a software tool for communicating directly with Patrons who could view the

film synopsis on the web page. *Id*.

In response, the applicant amended the claims to reflect the fact that the

claimed software tools did more than simply post information on a web page.

Rather, the applicant's software tools "manage communications, through said

Patron database, ~~directly~~ to Patrons…" A00699. In the remarks, the applicant

stated that this feature of the invention was distinct from Massey which merely

discloses that "the production company controls communications to current and

prospective investors."  A00708; *see also* A01027 (U.S. Patent No. 6,792,411

("Massey") at Abstract) ("A method for funding the production of a movie by

presenting a storyboard synopsis of a yet-to-be-produced movie on a production

company's Internet Web site…").

From this prosecution history, the district court held that ArtistShare had

limited the claim to systems in which the database, itself, sends communications.

The court reasoned that "[t]he specific choice of words, namely '***through a Patron***

***database***,' was thus used to distinguish the instant patent from one in which

software tools, ***such as a database***, might be used to facilitate direct

communications with patrons."  A00046.[2]  However, the district court's

interpretation of the prosecution history is misplaced.  Here, the applicant added

"***through said patron database***" to distinguish the references raised by the

Examiner, which ***did not*** disclose using contact information in a patron database to

communicate with patrons.  The prior art at issue simply communicated to the

public, generally, by posting film synopses on a web page.

The only reasonable interpretation of the prosecution history is that "through

---

[2] Contrary to the district court's statement, Massey does not disclose using a
database to facilitate communications, nor did the Examiner make that assertion.
*See* A01027; *see also* A00675 ("Massey discloses providing the artist … software
tools (company's Internet Web site) to manage communications directly to
Patrons…").

said Patron database" was added to the claims to distinguish the claims from prior art that did not use a patron database to aid communications at all. *See 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013) ("Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable."). Here, the plain and ordinary meaning of the claim term controls and it should be construed as "computer-aided features to enable and/or facilitate the exchange of information with the aid of the Patron database." *See* A01111-12; A01271-72.

## II.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF PATENT INVALIDITY

The district court erred by granting Kickstarter's Motion for Summary Judgment of Patent Invalidity and denying ArtistShare's Motion for Summary Judgment of Validity. First, the district court did not apply the correct standard of review and ***refused to apply a presumption of validity*** to the claims of the '887 Patent. *See* 35 U.S.C. § 282(a). Second, the court selected independent claim 1 as the "representative" claim of the '887 Patent, without explanation, and failed to address validity of each claim independently. *See id.* Third, the court disregarded its own claim constructions when deciding validity. Finally, the court misapplied the relevant precedents regarding subject matter eligibility. Each of these errors in the district court's analysis represents reversible error.

## A.    The Standard of Review for Summary Judgment

"This court reviews the district court's grant or denial of summary judgment under the law of the regional circuit" in which the district court sits. *Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1358 (Fed. Cir. 2011). The Second Circuit reviews summary judgment decisions "*de novo* …, viewing the record in the light most favorable to the non-moving party." *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007).

However, the Federal Circuit applies its "own law with respect to issues of substantive patent law." *Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000, 1016 (Fed. Cir. 2006).  Patent eligibility under § 101 is subject to *de novo* review.  *See DDR Holdings, LLC v. Hotels.Com, LP*, 773 F.3d 1245, 1255 (Fed. Cir. 2014).

## B.    Legal Standards for Patent Eligibility

Patent protection is available to "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35 U.S.C. § 101.  Thus, patentable subject matter broadly includes "anything under the sun that is made by man." *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980).  However, the Patent Act contains an implicit exception for "[l]aws of nature, natural phenomena, and abstract ideas." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116

(2012). This narrow exception is intended to "distinguish patents that claim the 'buildin[g] block[s]' of human ingenuity, … from those that integrate the building blocks into something more, … thereby 'transform[ing]' them into a patent-eligible invention." *Id*. at 1294.

In *Alice*, the Supreme Court applied a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible ***applications*** of those concepts." *Alice*, 134 S. Ct. at 2355. First, courts must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id*. The Court cautioned that "[a]t some level, 'all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas'" and warned that "an invention is not rendered ineligible for patent simply because it ***involves*** an abstract concept." *Id*. at 2354. "'***[A]pplication[s]***' of such concepts 'to a new and useful end,' … remain eligible for patent protection." *Id*.

Second, if the claims are directed to an ineligible concept, courts must "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application.'" *Id*. at 2357. The second step asks whether the "additional features" of the claim ensure that it "is more than a drafting effort designed to monopolize the [abstract idea]." *Id*.

**C.     The District Court Erred by Failing to Apply 35 U.S.C. § 282 and Failing to Apply any Presumption of Patent Validity**

Under § 282 of the Patent Act, "[a] patent shall be presumed valid" and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."  35 U.S.C. § 282.  "[Section] 282 creates a presumption that a patent is valid and imposes the burden of proving invalidity on the attacker. *That burden is constant and never changes and is to convince the court of invalidity by clear evidence*."  *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2243 (2011) (affirming the clear and convincing standard of proof). Section 282 sets forth a *burden of persuasion*, not merely a standard of proof.  *See id*. at 2245 ("[O]ne otherwise an infringer who assails the validity of a patent fair upon its face *bears a heavy burden of persuasion*, and fails unless his evidence has more than a dubious preponderance.") (quoting *Radio Corp. of Am. v. Radio Eng'g Labs., Inc.*, 293 U.S. 1, 8 (1934)).

According to the Supreme Court, Congress, alone, may alter the presumption of validity under 35 U.S.C. § 282 and its attendant burdens of persuasion and standard of proof.  *See Microsoft*, 131 S. Ct. at 2252:

> Congress specified the applicable standard of proof in 1952 when it codified the common-law presumption of patent validity. Since then, it has allowed the Federal Circuit's correct interpretation of § 282 to stand. Any re-calibration of the standard of proof remains in its hands.

This Court has traditionally assessed subject matter eligibility under § 101

with a presumption of validity. When *Alice* was reheard *en banc* by the Federal Circuit, prior to being affirmed by the Supreme Court, five judges cited *Microsoft* in stating that the "statutory presumption of validity" of § 282 "applies when § 101 is raised as a basis for invalidity in district court proceedings." *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1284 (Lourie, J., concurring). Also citing *Microsoft*, an opinion joined by four other judges stated that "any attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence." *Id.* at 1304–05 (Rader, J., concurring-in-part and dissenting-in-part). Thus, a clear majority of Federal Circuit judges held that the clear and convincing evidence standard applies to questions of patent eligibility under 35 U.S.C. § 101. No Supreme Court or Federal Circuit majority has disavowed the presumption of validity for § 101 since this Court's decision in *CLS Bank*.

Multiple district courts addressing § 101 have continued to apply a presumption of validity since the Supreme Court decided *Alice. See, e.g., Exergen Corp. v. Brooklands Inc.*, --- F.Supp.3d ----, 2015 WL 5096464, at *2 (D. Mass. Aug. 28, 2015) ("Given the plain language of 35 U.S.C. § 282 which codifies a general presumption of validity and the fact that no Supreme Court or Federal Circuit majority has disavowed the presumption of validity for § 101, I will apply the heightened standard to all three validity sections").

43

In this case, the district court eschewed any presumption of patent validity, despite ArtistShare's arguments in favor of the presumption. *See* A01486; A01718-19. Kickstarter encouraged this incorrect approach and led the court astray by arguing that "Section 101 patentability is a matter of law for which there is no burden of proof" and characterizing the debate regarding the presumption of validity as a "sideshow." A01604-05. Unfortunately, the district court accepted Kickstarter's request to suspend the presumption of validity under § 282, reasoning that the presumption of validity only applies to factual determinations:

> While it is true that, to the extent the Court as factfinder must make ***factual*** determinations, the "clear and convincing" standard applies (e.g., whether a patent's elements existed in prior art), ***to the extent that the Court is drawing legal conclusions (e.g., whether the subject matter is patent-eligible under Section 101), no such standard applies***.

A00013 n. 7. According to the court, in asserting the presumption of validity, ArtistShare "conflate[d] an evidentiary burden with legal analysis." *Id*.

The district court was incorrect to dispense with the presumption of validity. To begin with, the Supreme Court and this Court's decisions make clear that 35 U.S.C. § 282 is not merely an evidentiary standard, but an assignment of the burden of persuasion. *See Microsoft Corp.*, 131 S. Ct. at 2245. Thus the "clear and convincing" standard applies, not only to "factual" determinations, as asserted by the district court, but to any invalidity challenge, including subject matter eligibility. *See CLS Bank Int'l*, 717 F.3d at 1284 (Lourie, J. concurring). In

44

addition, no appellate court has ever overruled the majority position in *CLS Bank*

that the clear and convincing standard applies to eligibility challenges.  As such,

*CLS Bank* continues to control district court and Federal Circuit panel proceedings

on this point.

Second, the Supreme Court's eligibility framework under *Alice* may include

factual determinations, such as whether a concept represents a "fundamental

economic practice," the extent to which claims would preempt the use of a

fundamental principle, whether claims are "directed" to an abstract idea at all,

whether claim limitations represent "known and routine" components, and whether

the claims include "something more" to render them patent-eligible.  While the

ultimate conclusion of eligibility is rendered "as a matter of law," it is a conclusion

that is based on factual determinations.

Even applying 35 U.S.C. § 282 to just "factual determinations," the district

court would nevertheless still be in error.  While the court dismissed § 282, finding

that "it does not have occasion to weigh facts using the 'clear and convincing'

evidentiary standard," A00014 n. 7 (continued), the district court's decision shows

otherwise.  In fact, the district court made several factual determinations in

connection with summary judgment, none of which was supported by clear and

convincing evidence.

- The court found that "[t]hese claims are squarely about patronage — a

45

concept that is 'beyond question of ancient lineage,'" A00027.[3]  In

support of this contention, the district court cited only to the report of

Kickstarter's expert, Ethan Mollick.

- The district court concluded that "incentive-based funding is

  ***incontestably*** similar to other 'fundamental economic concepts,'" for

  which the court cited no factual authority whatsoever, only case law.

  A00028.

- The district court concluded that all of the components of claim 1

  were "well-understood, routine, conventional activities," but again

  cited only cases, not any evidence.  A00029.  Notably, Kickstarter did

  not even assert on summary judgment that any prior art anticipates the

---

[3] The district court used several terms interchangeably in reference to "crowdfunding," including "patronage," in places. *See, e.g.* A00027:

> The '887 Patent's claims are directed to the concept of crowd-funding or fan-funding, i.e., raising funds for a project from interested individuals in exchange for incentives. Whether the abstract idea in play here is defined as "crowd-funding," "crowd-based funding," "fan-funding," "incentive-based patronage," "incentivized crowd-funding," or some other combination of these words is of no moment: the abstract concept at play in the Patent remains the same.

The district court's inconsistent phraseology makes it difficult to determine what underlying concept or idea was allegedly abstract and being applied to claim 1 of the '887 Patent.

claims of the '887 Patent.  *See* A01384-85; *see also* A01726-27.

Each of these determinations represents findings of fact that were not made by the court based on clear and convincing evidence.  Had the district court done so, it would have found that there was no evidence to support the notion that a specific Internet-based system for fan funding is a fundamental economic principle.  Rather, it is a new system and the term "crowdfunding" wasn't even coined until 2006, three years *after* Mr. Camelio applied for the '887 Patent.  A01485.  Furthermore, the court would have found that there was no evidence, let alone clear and convincing evidence, that the components of claim 1 were "known and routine" at the time of the inventions of the '887 Patent, given the complete absence of several claimed components in the prior art references identified by Kickstarter.  *See* A05939-A05946, Monroe Rept. at ¶¶ 115-118.  For example, none of the prior art introduced by Kickstarter disclosed any "application programs operable from a remote site for … managing at least one project" or "application programs operable from a remote site for …providing … software tools to manage communications through said Patron database…"  *See id*.

The district court never grappled with the prior art and did not analyze whether the components of claim 1 were truly "known and routine" because the district court applied the wrong standard.  Instead, the district court invalidated the claims of the '887 Patent based on a mere preponderance of evidence.  The district

court denied ArtistShare the presumption of validity, to which *all* issued patents are entitled, by order of Congress. Therefore, the district court's order should be reversed.

### D. The District Court Erred by Failing to Consider Each Claim Separately

Section 282 states that "*[e]ach claim* of a patent (whether in independent, dependent, or multiple dependent form) *shall be presumed valid independently of the validity of the other claims*." 35 U.S.C. § 282. It is well settled that "each claim must be considered as defining a separate invention." *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984). Furthermore, "[e]ach claim carries an independent presumption of validity … and stands or falls independent of the other claims." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1266-67 (Fed. Cir. 1991). It is similarly well settled that grounds of invalidity "must be analyzed on a claim-by-claim basis." *MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*, 731 F.3d 1258, 1264 (Fed. Cir. 2013). The statute and these cases "urge a flexible, claim-by-claim approach to subject-matter eligibility that avoids rigid line drawing." *CLS Bank*, 717 F.3d at 1281 (Lourie, J. concurring), *aff'd Alice*, 134 S. Ct. 2347 (2014).

In its motion for summary judgment and supporting papers, Kickstarter only discussed the eligibility of claim 1 of the '887 Patent and then simply asserted that all other claims are similar to claim 1. *See* A01403 n. 4 ("The other asserted

independent claims (claims 17, 18, 35, 36) and their associated dependent claims are generally rearrangements of claim 1 and its dependent claims, with minor variations."). Kickstarter failed to address the eligibility of all the asserted claims.

The district court similarly failed to perform the requisite claim-by-claim analysis. Instead, the district court concluded that "where, as here, the claims are 'substantially similar and linked to the same abstract idea,' the Court may dispose of the other claims in *less detail*." A00005. Yet, no analysis whatsoever was performed by either Kickstarter or the district court to reach this conclusion. Thus, on the basis of a single conclusory footnote the district court held that 25 claims of the '887 Patent, including five independent claims and 20 dependent claims, were ineligible for patent protection.

Here, the challenged claims were sufficiently distinct to require claim-by-claim consideration. Each of the independent claims include unique system components that should have been considered separately. For example, claim 17 includes two components not found in claim 1: "application programs operable from a remote site for … allowing Patrons to demonstrate interest in one or more projects …" and "application programs operable from a remote site for … managing and viewing financial and marketing information relative to projects supported through the system" A00147 at col. 17, lines 16-38. The unique components of each claim should have been considered by the district court before

taking the extraordinary step of finding them ineligible.  The district court's failure to consider each claim individually was clear error requiring reversal.

### E.    The District Court Erred by Failing to Apply its Own Claim Constructions to Determine Subject Matter Eligibility

While claim construction is not always necessary to determine patent eligibility, "it will ordinarily be desirable—and ***often necessary***—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012); *see also In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008) ("[C]laim construction … is an important first step in a § 101 analysis…"), *aff'd Bilski v. Kappos*, 130 S. Ct. 3218 (2010).

In this case, the district court had already construed the claims of the '887 Patent.  Yet it failed to consider its own, narrow claim constructions at all in the context of its decision regarding eligibility.  In the background section, the court stated that "[t]he Court assumes familiarity with Judge Paul A. Crotty's January 18, 2013 Opinion and Order … construing disputed terms of this and other claims."  A00007 n. 4.  The background section also quotes the construction of "fans."  *Id*.  Yet, in the section analyzing eligibility, the court makes a single reference to claim construction.  *See* A00030:

And ***while limitations*** like "operable from a remote site" and the

construction of "entitlement" to include "at least one product and at least one service and at least one patronage," *might add some degree of particularity*, the concept embodied by *the majority of the limitations* describes only the abstract idea of incentive-based funding or patronage implemented online.

The district court's failure to fully consider its own claim constructions prejudiced ArtistShare. For example, the district court *acknowledges* that at least some claim limitations are more than a mere instruction to implement patronage online. A00030. Where, as here, a district court has already construed the claims, it should fully consider those claim constructions when determining eligibility. In this instance, the court's failure to consider the claims, as construed, was in error.

## F.   The District Court Erred by Incorrectly Applying the Supreme Court's Decision in *Alice*

The district court's analysis under the two-step *Alice* framework was legally flawed. Under the first step of *Alice*, the district court failed to determine whether the claims of the '887 Patent simply describe "crowdfunding," and whether crowdfunding is a fundamental economic practice. Under the second step of *Alice*, the district court failed to properly assess the inventive merit of the claims of the '887 Patent.

Here, the claims of the '887 Patent "stand apart because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." *See DDR Holdings,* 773 F.3d at 1257. The claims represent the first fan funding platform

ever devised, with no analogous pre-Internet, real world counterpart. As such, the

inventions are "necessarily rooted in computer technology in order to overcome a

problem specifically arising in the realm of computer networks." *See id.* The

claimed inventions are patent-eligible because they "improved an existing

technological process…" *Alice*, 134 S. Ct. at 2358; *see also Gottschalk v. Benson*,

409 U.S. 63, 67 (1972) (holding that applications of an abstract concept "to a new

and useful end" remain eligible for patent protection).

### 1.    The District Court Erred in Finding that the Claims of the '887 Patent Are Drawn to an Abstract Concept

Under the first step of *Alice*, courts must "determine whether the claims at

issue are ***directed to*** [a] patent-ineligible concept[]." *Alice*, 134 S. Ct. at 2357.

However, the Supreme Court cautioned that "[a]t some level, 'all inventions ...

embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or

abstract ideas'" and warned that "an invention is not rendered ineligible for patent

simply because it ***involves*** an abstract concept." *Id.* Thus, the first step of *Alice*

*Corp.*'s analysis is intended to distinguish those claimed inventions that simply

"***involve***" an abstract idea from those that are "***directed to*** [a] patent-ineligible

concept[]." *Id.*

Because the Supreme Court has chosen not to "delimit the precise contours

of the 'abstract ideas' category," *Alice*, 134 S. Ct. at 2357, "it is not always easy to

determine the boundary between abstraction and patent-eligible subject matter."

*Internet Pat. Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1347 (Fed. Cir. 2015). However, the Supreme Court's decision in *Bilski v. Kappos* sets guideposts for what constitutes an abstract idea. There, the Court held that an abstract idea may take the form of a mathematical algorithm, a "fundamental economic practice long prevalent in our system of commerce," or "a fundamental truth." *Id*. at 609-611.

The *Alice* Court explained that a claim is "directed" to an abstract idea when it merely "*describes*" the abstract idea, itself. For example, the Court cited to *Bilski*, where the claims merely "*described* a method for hedging against the financial risk of price fluctuations." *Alice*, 134 S. Ct. at 2355. The Court also held that the claims at issue in *Alice* merely "*describe* intermediated settlement." *Id*. at 2356; *see also Gottschalk*, 409 U.S. at 67 (the challenged claim *included* an algorithm as a limitation); *Parker v. Flook*, 437 U.S. 584, 588 (1971) (same); *Diamond v. Diehr*, 450 U.S. 175, 182 (1981) (same).

### (a) The District Court Failed to Properly Determine Whether "Crowdfunding" Constitutes an Abstract Idea

The district court failed to properly analyze step 1 of *Alice* because it failed to properly address whether "crowdfunding" is truly an abstract concept. In its opening summary judgment brief, Kickstarter ignored the question of whether crowdfunding is an abstract idea. *See* A01402-04. Instead, Kickstarter simply *presumed* that it was, without any analysis. *Id.*; *see also* A01487-89; A01720-22. In its decision, the district court followed this same approach, holding that "[t]he

'887 Patent's claims are directed to the concept of crowd-funding or fan-funding, i.e., raising funds for a project from interested individuals in exchange for incentives."  A00027 ("[t]hese claims are squarely about patronage — a concept that is 'beyond question of ancient lineage.'").  Yet, the alleged "ancient lineage" of Internet crowdfunding was clearly contested by ArtistShare and the district court provided no reasons for holding that "crowdfunding" was at all abstract.  *See* A01485; A05911-12, Monroe Rept. at ¶¶ 56-58,

Internet crowdfunding is ***not*** an abstract concept, but a new technological field of invention.  For example, the term "crowdfunding" was not even coined until 2006, four years after the inventor applied for the '887 Patent.  *See* A01485 (citing D. Glass, *Crowd Funding: How to Raise Money with the Online Crowd*, (2011)).  Internet crowd funding is a new technological field of invention that did not, and could not, have existed prior to the popular adoption of the Internet.  *See* A01877 (Monroe Depo. Tr. at 197:24-199:15).  As such, it is fundamentally new technical art that is rooted in computer and network technology.  While the idea of crowdfunding may have become ***popular*** in recent years, that is not a basis for holding it to be "fundamental economic practice" at the time of the inventions of the '887 Patent.  Because "crowdfunding" is not an abstract idea, the district court's order should be reversed.

> **(b) The District Court Failed to Properly Determine Whether the *Claims* of the '887 Patent are *Directed* to an Abstract**

**Idea**

Even assuming that "crowdfunding" or "patronage" is an abstract idea, the district court nevertheless failed to apply the correct analysis under *Alice*, step 1. Rather than evaluating whether the limitations of the challenged claims ***describe, recite, or set forth*** patronage, the district court improperly analyzed only the ***preamble*** of claim 1 and a single passage within the "field of invention" section of the '887 patent. *See* A0027:

> Claim 1 broadly recites a "system for marketing and funding one or more projects of an artist" ('887 Patent col.21 l.35-36 [***preamble***]) and the ***specification*** describes the invention as "methods and systems for obtaining financing from interested individuals to produce a creative work in exchange for an entitlement from the author of the work" (id. at col.1 l.15-20 [***Field of the Invention***]).

The court did not determine whether the substantive limitations of a single claim are actually "directed" to the asserted ineligible concept. Both this Court and the Supreme Court require more than a cursory analysis before declaring 25 separate patent claims are "directed" to an abstract idea as opposed to simply "involving" underlying concepts, as all valid patents do.

The district court expressly declined to apply the correct analysis under *Alice*, step 1. In a footnote, the district court stated that it was not required to find that the claims "describe" an abstract idea:

> Defendants' semantic sleight-of-hand that the claims do not "describe" an abstract idea … has no basis in the law and will not be addressed further.

A00030 n. 14.  But the district court was wrong to dismiss ArtistShare's

arguments.  The Supreme Court's reasoning in *Alice* emphasized the need to

determine whether the claims "describe" the underlying abstract idea.  *See Alice*,

134 S. Ct. at 2355 ("The claims at issue in *Bilski **described*** a method for

hedging…"); *id*. at 2356 (the "claims ***describe*** intermediated settlement").

Based on the Supreme Court's guidance, the U.S. Patent and Trademark

Office has also interpreted *Alice*, step 1, as requiring a showing that an abstract

idea is actually "recited (i.e. set forth or described) in the claim."  2014 Interim

Guidance on Patent Subject Matter Eligibility § I.1., 79 Fed. Reg. 74,618, 74,622

(Dec. 16, 2014).  According to the PTO, "the overall analysis is based on claims

***directed*** to judicial exceptions (defined as claims reciting the exception, i.e., set

forth or ***described***), rather than claims merely '***involving***' an exception."  *Id*. at

74619 n. 2.

Clearly, step 1 of *Alice* is intended to ask more than whether the claims

"***involve***" any underlying concepts, as all claims do.  Instead, the *Alice* framework

is reserved for claims that are actually "***directed to***" such concepts, in an attempt to

claim them.  The district court failed to appreciate this distinction under *Alice*, and

thus its analysis was incorrect.

The claims of the '887 Patent do not cover an abstract idea.  Nor do they

recite the fundamental steps of "patronage" at a high level of abstraction.  Rather,

the claims cover particular systems for managing, marketing and financing a creative work with a database driven fan funding system. For example, claim 1 of the '887 Patent claims a particular system that allows users to create, manage and fund their own projects through a novel fan funding platform, using a novel collection of software tools that are "operable from a remote site." *See, e.g.*, A00146 at claim 1. In addition, a patron database is used for managing information relating to a project. None of these features describes the basic concept of patronage – i.e. providing financial support to an artist.

Claim 1 also requires that the claimed server system provide "application programs operable from a remote site for" providing a series of capabilities:

- "**receiving information … regarding at least one sales container…**" This aspect of the invention allows users to define what rewards they intend to offer within the system databases.

- "**providing software tools … to manage at least one project,**" which allows artists to manage an online fan funding project without having advanced skills in web-development or the resources to construct a stand-alone web page by defining project information in a database.

- "**transmitting offer data from a server to a client … receiving such offer data and presenting the offer to the Fan … [and] transmitting**

**acceptance data back to the server…**" These software tools allow the transmission, presentation, and acceptance of offer data, based on the sales container information defined by the user in the database.

- "**processing acceptance data by the server.**" This allows the system to organize and maintain the acceptance data by storing the information in the database, including the fan accepting the offer, the sales container they selected, the amount of funds they contributed to the project, or any changes to the Artist's inventory.

- "**providing … software tools to manage communications, through said Patron database to Patrons…**" This element of the claim allows the artist to communicate with his or her patrons, by using the information stored in the database.

None of these components of the invention merely describes (i.e., recites or sets forth) patronage either in whole or in part. Rather, they describe a particularized and novel system.

To hold that the claims of the '887 Patent are drawn to an abstract idea would mean that any invention that in any way involves fan funding is ineligible for patent protection. Such a far-reaching holding would be contrary to the law and run afoul of the Supreme Court's guidance under § 101. *See Alice*, 134 S. Ct.

at 2354:

> At the same time, we tread carefully in construing this exclusionary principle lest it swallow all of patent law. … At some level, "all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." … Thus*, an invention is not rendered ineligible for patent simply because it involves an abstract concept*. …

The claims of the '887 Patent are not highly generalized and no portion of the claims simply describes patronage.  Instead, the claims are narrowly tailored database driven systems for marketing and funding creative works.  As such, the claims of the '887 Patent are eligible under Step 1 of the *Alice* framework.

### 2. The District Court Erred in Finding that the Claims of the '887 Patent Fail to Include "Something More" to Impart Eligibility

Under step 2 of *Alice*, the court "must distinguish between patents that claim the 'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into **something more**, thereby 'transform[ing]' them into a patent-eligible invention." *Alice*, 134 S. Ct. at 2354.  To do so, the court must "consider the elements of each claim—both individually and as an ordered combination—to determine whether the additional elements transform the nature of the claim into a patent-eligible application of that abstract idea." *DDR Holdings*, 773 F.3d at 1255.  "This second step is the search for an 'inventive concept,' or some element or combination of elements sufficient to ensure that the claim in practice amounts to 'significantly more' than a patent on an ineligible concept." *Id*.

The district court erred under the second step of *Alice* by failing to consider the claims, themselves, and by failing to appreciate that the claims of the '887 Patent set forth the "inventive concept" of a fan funding platform, that "is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id*. at 1257. Here, the inventions of the '887 Patent solved many of the problems associated with artists attempting to raise money for their projects on the Internet, such as automating the process for configuring and launching an online fan-funding project, as well as bringing multiple fan funding projects within a single fan-funding platform, allowing fans to search and review multiple projects and artists. *See* A01489-92.

To appreciate the inventive concepts of the '887 Patent, one need only consider the state of the prior art at the time of Mr. Camelio's invention. *See* A01722-24. At the time of the inventions of the '887 Patent, artists were only just beginning to use the Internet to promote and fund their artistic projects. *See* A05911-12, Monroe Rept. at ¶¶ 56-58. One band, called "Marillion," had constructed a web site by hand in order to offer a pre-order of their next album in or around 2000. *See* A05624. Marillion's website was created manually, either by direct coding or coding manually through the use of locally installed software, and without the aid of any online software tools. *See* A01973 (Nielsen Depo. Tr. at 82:18-84:14). Marillion also used a separate Mail-List.com website to prepare

newsletters to its fans and pre-order participants. *See* A01970 (*id.* at 69:21 – 70:18). Marillion also input contact information into a database manually. *See* A01972-73 (*id.* at 80:10-81:14). Marillion also used a third party shopping cart functionality to sell pre-orders of its album. A01973-74 (*id.* at 84:15-85:13).

Marillion's web page demonstrates the serious drawbacks associated with early efforts by artists to raise money on the Internet prior to the inventions of the '887 Patent. Marillion's web page was manually produced and required a level of skill to create that many creative artists may not have. The inventions of the '887 Patent were intended, in part, to obviate the need for any web development skills in order to develop a fan funding project. *See* A05913, Monroe Rept. at ¶ 60:

> Claim 1 of the '887 Patent does not simply claim a fan funding website. Rather, it claims a system for allowing artists to create, post and fund projects online using automated online software tools. The invention of the '887 Patent is intended to provide a set of online tools that an artist would need to create their own fan funding project, without the need to develop the components of a fan funding website manually or with the aid of a costly web development or software consultant.

Another drawback of the prior art was that separate websites attract only a narrow audience of pre-existing fans. Under the Marillion model, each attempt to fund a creative work required a separate website, isolated from one another on the Internet. While fans of Marillion may have become aware of the bands' pre-order campaign, the isolated nature of their web page precluded casual viewers from searching and discovering the pre-order offers on their own.

The inventions of the '887 Patent also solve this inherent problem with the prior art by creating a consolidated fan-funding platform, where any artist may register, open an account, and launch a project through the system. By providing the necessary software tools in an automated fan funding platform, artists are able to put the tools to use for a variety of projects and genres on a single site, culminating in a true marketplace of projects and artists seeking fan funding on the Internet. The specification of the '887 Patent describes this benefit of the claimed inventions:

> The method and system may also include searching, by an interested party, the centralized database, for the least one artist, registering, by the interested party, with the centralized database and accepting the offer by the interested party for the entitlement related to the project. The capital may then be forwarded to the artist and the entitlement provided to the interested party.

A00071 (Abstract). A searchable database of artists' projects would not be possible in the absence of the remotely operable tools of the claimed inventions and represents significantly more than an instruction to practice "crowdfunding" or "patronage" on the Internet.

In *DDR Holdings*, this Court considered claims directed to methods of serving web pages by an "outsource provider" that allowed for multiple, unrelated merchants to offer products on a single host website while the "outsource provider" supplied a standard web page format for the merchant's products. *See DDR Holdings*, 773 F.3d at 1248-1250. This Court held that the claims were

patent-eligible "because they do not merely recite the performance of *some business practice known from the pre- Internet world* along with the requirement to perform it on the Internet.  Instead, the claimed solution is *necessarily rooted in computer technology* in order *to overcome a problem specifically arising in the realm of computer networks*." *Id*. at 1257.  Specifically, the Court found that the claims addressed a problem specific to an online market, by allowing product merchandisers to control the "look and feel" of their products even when they are presented on multiple, unrelated merchant websites.

Likewise, the claims of the '887 Patent do not "merely recite the performance of *some business practice known from the pre- Internet world* along with the requirement to perform it on the Internet." *Id*.  The claims of the '887 Patent are intended to do "significantly more" than an instruction to seek "patronage" on the Internet.  Here, the claims of the '887 Patent, as a whole, are rooted in computer networks and could not exist in the absence of networked computers.  *See* A01724-25.  There is nothing similar to a platform for designing, launching, and managing a fan-funding project, as claimed in the '887 Patent outside of a network environment.  No real-world analog exists because the inventions of the '887 Patent simply have no application in the real world and were only ever intended to "overcome … problem[s] specifically arising in the realm of computer networks." *Id.*

The claims of the '887 Patent therefore represent a technological advance that is necessarily rooted in computer technology. Each of the claimed inventions defines a new server that is equipped with a novel set of software components. By providing remotely operable application programs for managing a creative project, the claimed inventions represent the first true fan-funding ***platform***, which provides all of the tools necessary for anyone with basic computer skills to successfully launch a fan-funding project on the Internet.

The inventions of the '887 Patent represent a particular system, with a unique set components for marketing and funding creative project in a way the world had never seen before Mr. Camelio's inventions. That Mr. Camelio's inventions represent a fundamental shift in the way creative projects are funded on the Internet is strong evidence that the claimed inventions are patent-eligible. *Id.*

Step 2 of *Alice* requires "a search for an 'inventive concept' … 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 134 S. Ct. at 2355. Here, the inventive concept of the first fan-funding platform is clear, and it represents a great deal more than a mere instruction to seek "patronage" on the Internet. Because the claims of the '887 Patent represent an ***invention***, and not a ***concept***, they are patent-eligible and the decision of the district court should therefore be reversed.

# CONCLUSION

For the reasons set forth above, ArtistShare respectfully requests that the Court **REVERSE** the district courts order on claim construction and construe the disputed claim terms as proposed by ArtistShare.  ArtistShare also requests that the Court **REVERSE** the district court's entry of summary judgment.


Dated:  September 29, 2015              Respectfully submitted,

                                       By:  */s/ Craig R. Smith*
                                            Craig R. Smith (*lead counsel*)
                                            William J. Seymour
                                            Eric P. Carnevale
                                            LANDO & ANASTASI, LLP
                                            Riverfront Office Park
                                            One Main Street – 11th Floor
                                            Cambridge, MA 02142
                                            Tel: (617) 395-7000
                                            Fax: (617) 395-7070
                                            csmith@lalaw.com
                                            wseymour@lalaw.com
                                            ecarnevale@lalaw.com

                                       *Attorney for Defendants-Appellants*
                                       *Fan Funded, LLC and ArtistShare, Inc.*

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

**Addendum Page**

Final Judgment of the Honorable Katherine
Polk Failla, Entered June 30, 2015, Entering
Final Judgment of Patent Invalidity in Favor of
Kickstarter, Inc. …………………………………………..………………ADD. 1

Opinion and Order of the Honorable Paul A.
Crotty, Entered January 18, 2013, Construing the
Disputed Claim Terms of U.S. Patent No. 7,885,887 ………………………ADD. 3

Opinion and Order of the Honorable Katherine Polk
Failla, Entered June 29, 2015, Granting Kickstarter, Inc.'s
Motion for Summary Judgment of Patent Invalidity………………………ADD. 18

U.S. Patent No. 7,885,887 …………………………………………………ADD. 49

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

KICKSTARTER, INC.,

                           Plaintiff,

            -against-

FAN FUNDED, LLC, et al.,

                         Defendants.

-----------------------------------------------------------X

11 **CIVIL** 6909 (KPF)

**JUDGMENT**

USDC SDNY

DOCUMENT

ELECTRONICALLY FILED 06/30/2015

Plaintiff Kickstarter, Inc. ("Kickstarter") having brought this action against Defendants Fan Funded, LLC ("Fan Funded") and Artist Share, Inc. ("ArtistShare"), seeking declaratory relief that U.S. Patent No. 7,855,887 for "Method and apparatuses for financing and marketing a creative work" (the "887 Patent") is invalid, and thus that Plaintiff does not (and, indeed, cannot) infringe it, and Plaintiff having moved for summary judgment (Doc. #96) and Defendant having cross-moved for summary judgment (Doc. #99), and the matter having come before the Honorable Katherine Polk Failla, United States District Judge, and the Court, on June 29, 2015, having rendered its Opinion and Order (Doc. #111) for the foregoing reasons, the '887 Patent is drawn to patent-ineligible subject matter; granting Plaintiff's motion for summary judgment of invalidity of the '887 Patent, and denying Defendants' motion for summary judgment of validity of the '887 Patent; and directing the Clerk of Court to terminate all pending motions, adjourn all remaining dates, and close this case, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Opinion and Order dated June 29, 2015, for the foregoing reasons, the '887 Patent is drawn to patent-ineligible subject matter. Plaintiff's motion for summary judgment of invalidity of the '887 Patent is granted, and Defendants' motion for summary judgment of validity of the '887 Patent is

denied; accordingly, the case is closed.

**Dated:**  New York, New York
         June 30, 2015

<div align="right">

**RUBY J. KRAJICK**

**Clerk of Court**

**BY:** _K. Mango_

**Deputy Clerk**

</div>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

KICKSTARTER, INC.,                                      :
                                                        :
     Plaintiff and Counterclaim Defendant         :
                                                        :
        -against-                              :
                                                        :
FAN FUNDED, LLC and ARTISTSHARE, INC.                   :
                                                        :
     Defendants and Counterclaim Plaintiffs        :
-------------------------------------------------------------- x

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: _January 18, 2013_ |

11 Civ. 6909

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

     Plaintiff Kickstarter, Inc. ("Kickstarter") brings this action against Defendants Fan

Funded, LLC and ArtistShare, Inc. (collectively, "ArtistShare"), seeking declaratory relief that

U.S. Patent No. 7,885,887 for "Methods and apparatuses for financing and marketing a creative

work," issued on February 8, 2011 (the "'887 Patent") is invalid and that Kickstarter does not

infringe it. Compl. at ¶ 1, Sept. 30, 2011, Dkt. No. 1. ArtistShare filed a Counterclaim for

patent infringement, seeking preliminary and permanent injunctive relief, as well as

compensatory damages. Answer & Countercl. at 9-10, Apr. 24, 2012, Dkt. No. 30 ("Ans."). The

parties now move for claim construction under <u>Markman v. Westview Instruments, Inc.</u>, 517

U.S. 370 (1996) and have extensively briefed the meaning of the relevant claim terms. <u>See</u> Dkt.

Nos. 42-45, 47, 52.

## BACKGROUND

     Brian Camelio ("Camelio") founded ArtistShare to develop novel ways for artists to

promote and obtain funding for their projects. Ans. at 6. In July 2002, ArtistShare Inc. filed a

patent application for its "fan-funding systems that allow artists to create a project, market the

project, and get the project funded." The '887 Patent was issued on February 8, 2011. <u>Id.</u>;

1

Def.'s Opening Claim Construction Br., Nov. 6, 2012, Dkt. No. 44 ("Def.'s Br."). ArtistShare, Inc. assigned the patent to Fan Funded LLC, its wholly owned subsidiary. Ans. at 6.

Kickstarter is the "largest funding platform for creative projects in the world." Compl. ¶ 9. In summer, 2011, Kickstarter and ArtistShare met to discuss ArtistShare's proposal that Kickstarter license the '887 Patent, under threat of an infringement suit should the parties fail to reach an agreement. Id. ¶¶ 15-17; Ans. at 8. After discussions between Kickstarter and ArtistShare failed to reach an amicable resolution, Kickstarter concluded that it is likely to be sued for patent infringement and instituted this declaratory judgment action. Compl. ¶ 21; see also Ans. at 8.

The disputed language is contained in claims 1, 17, 18, 35 and 36 of the '887 Patent.[1] See Def.'s Br. at 5. The claims read as follows, with emphasis added to the disputed terms:

Claim 1. A system for marketing and funding one or more projects of an artist comprising a server having applications programs operable from a remote site for:
provide **software tools** to an artist or Account Manager **to manage at least one project**, the project comprising at least one creative work;
receiving information from the artist or Account Manager regarding at least one Sales Container associated with the at least one project, each Sales Container including at least one of a product, a service, and a patronage, while the artist retains outright ownership of the project and the creative work;
transmitting offer data from a server to a **client** via a network, the offer data comprising an offer to **Fans** concerning the at least one Sales Container associated with at least one project, wherein the offer is for a Sales Container at a predetermined level of patronage in exchange for funds for the project;
receiving at the **client** such offer data and presenting the offer to the **Fan**;
transmitting acceptance data back to the server from the **client** accepting the offer;
registering contact and marketing information regarding **Patrons** in a database; and
providing the artist or Account Manager **software tools to manage communications, through said Patron database**, to **Patrons** regarding the sales and marketing of one or more projects.

Claim 17. A system for raising funds for and marketing one or more of an artist's projects to Patrons through the internet, without the necessity of a recording contract with a recording company and without the necessity of a production company, comprising a server having application programs operable from a remote site for:

---

[1]ArtistShare contends that Kickstarter infringes twenty-five claims of the '887 patent, but that only these five are independent claims. The rest are dependent claims, meaning that they cannot be infringed if the independent claims have not been infringed. Pl.'s Br. at 10 n.6 (citing Wolverine World Wide v. Nike, Inc., 38 F.3d 1192, 1196-99 (Fed. Cir. 1994)).

2

allowing Patrons to demonstrate interest in one or more projects prior to, during, and after creation and publication of the project's artistic work;

registering contact information regarding interested Patrons in a searchable database;

providing to the artist or Account Manager **software tools** to design, create, and implement **an artist-specific web page** for the purpose of marketing said artist's projects to existing and new Patrons[2] without the necessity of a contract with a recording company and without the necessity of a production company;

**managing communications**, through said patron database, from the artist or Account Manager to Patrons regarding sales and marketing of one or more projects; and

managing and viewing financial and marketing information relative to projects supported through the system.

Claim 18.  System for funding and marketing at least one project of an artist comprising:

a server having application programs operable for:

receiving data from an artist or Account Manager regarding at least one project by an Artist;

providing **tools** for the artist or Account Manager **to present the at least one project** to at least one of Fans and Patrons;

receiving data from the artist or Account Manager regarding at least one entitlement associated with at least one of the Artist and the project, said **entitlement including at least one of a product, a service, and patronage**, but not ownership in the project;

transmitting offer data to said Fans or Patrons, the offer data comprising an offer for said at least one entitlement at a predetermined level of patronage in exchange for funds for the project,

the project comprising at least one creative work; and

receiving acceptance data for an entitlement at a predetermined level of patronage from a Patron.

Claim 35.  System for funding and marketing at least one project of an artist comprising:

A server having application programs operable for:

receiving data from an artist or Account Manager regarding at least one project by an Artist;

providing **tools** for the artist or Account Manager, without the necessity of a recording company and without the necessity of a production company, **to present the at least one project** to at least one of **Fans** and **Patrons**;

receiving data from the artist or Account Manager regarding entitlements associated with at least one of the Artist and project;

transmitting offer data to said **Fans** and/or **Patrons**, the offer data comprising an offer for at least one entitlement at a predetermined level of patronage in exchange for funds for the project, the project comprising at least one creative work; and

receiving acceptance data for an entitlement at a predetermined level of patronage from a **Patron**.

Claim 36.  System for funding and marketing a plurality of projects of an artist, the system comprising:

a server having application programs operable for:

receiving data from an artist or Account Manager regarding a first project by an Artist;

providing tools for the artist or Account Manager to present the first project to **Fans** of the artist;

receiving data from the artist or Account Manager regarding at least one entitlement associated with the first project, said **entitlement including at least one of a product, a service, and patronage**;

---

[2] While the parties previously disputed the construction of the term "existing and new Patrons," they have subsequently agreed that it should be construed as "current and prospective Patrons."  Defs.' Br. at 10.

transmitting offer data to said **Fans**, the offer data comprising an offer for said at least one entitlement at a predetermined level of patronage in exchange for funds for the project, the project comprising at least one creative work;

receiving acceptance data from a **Fan** for an entitlement at a predetermined level of patronage;

registering the **Fan** as a **Patron** in a **Patron database** and storing contact information regarding the **Patron**; and

managing communications, through said Patron database, from the artist or Account Manager to **Patrons** regarding sales and marketing of one or more additional projects.

## DISCUSSION

### I.    Legal Standard

"The words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art . . . at the time of the invention." Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Id. at 1314. Additionally, "[a] patentee may act as its own lexicographer and assign to a term a unique definition that is different from its ordinary and customary meaning; however, a patentee must clearly express that intent in the written description." Helmsderfer v. Bobrick Washroom Equip., Inc., 527 F.3d 1379, 1381 (Fed. Cir. 2012).

A "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Phillips, 415 F.3d at 1313. Where the meaning of claim language is not readily apparent, courts "should also consider the patent's prosecution history" because, "[l]ike the specification, the prosecution history provides evidence of how the [Patent and Trademark Office ("PTO")] and the inventor understood the patent." Id. at 1317. Through "a clear disavowal in the specification or the prosecution history," Thorner v. Sony Computer

4

Entm't Am. LLC, 669 F.3d 1362, 1366 (Fed. Cir. 2012), a patentee may "limit[] the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Phillips, 415 F.3d at 1317; see also Thorner, 559 F.3d at 1366 ("Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal.").

## II.      "Person of Ordinary Skill in the Art"

The parties disagree as to whom is a "person of ordinary skill in the art."  Kickstarter would define it as "a hypothetical person with a bachelors [sic] degree in either business or computer arts, who has some practical experience and/or would include a team of members having such individual expertise," Pl.'s Opening Claim Construction Br. at 8 n.5, Nov. 6, 2012, Dkt. No. 42 ("Pl.'s Br."), while ArtistShare contends that it should be defined as "a self-taught computer programmer with some understanding of the music industry."  Def.'s Responsive Claim Construction Br. at 1 n.2, Dec. 10, 2012, Dkt. No. 52 ("Def.'s Opp'n").

The Court has been unable to find other decisions that define a person of ordinary skill in the art in similar contexts and neither side has provided "more than conclusory arguments concerning the issue."  Daiichi Sankyo Co., Ltd. v. Apotex, Inc., 501 F.3d 1254, 1257 (Fed. Cir. 2007); see also id. at 1256 (listing factors that may be considered).  In this instance, the Court finds that a combination of the definitions provided by both parties is appropriate.  First, given the breadth of fields that may make use of the patent for marketing and financing purposes, it makes little sense to restrict those skilled in the art only to people familiar with the music industry.  See, e.g., '877 Patent at 6; Compl. ¶ 9.  Rather, this seems an improper attempt to draw lines with sufficient specificity so as to include Camelio but to exclude others from similarly creative fields.  Second, it is clear that in the website programming and design realm in

5

particular, many entrepreneurs and inventors, like Camelio, are self-taught rather than having received formal education.  <u>See, e.g.</u>, Alex Williams, <u>The Old College Try? No Way</u>, N.Y. Times, Dec. 2, 2012, at Styles 1; <u>see also</u> <u>Keating v. N.Y.</u> 708 F. Supp. 2d 292, 293 n.1 (E.D.N.Y. 2011) (taking judicial notice of New York Times article); <u>Darvin v. Bache Halsey Stuart Shields, Inc.</u>, 479 F. Supp. 460, 462 n.1 (S.D.N.Y. 1979) (same); <u>Mamiye Bros. v. Barber S.S. Lines, Inc.</u>, 241 F. Supp. 99, 116-17 (S.D.N.Y. 1965) (same).  The Court determines that, for the purpose of this matter,  "a person of ordinary skill in the art" is an individual with (1) either formal or informal training in computer engineering and programming, and (2) either experience in or an understanding of artistic and creative industries.

## III.    Disputed Terms

### A.    Patron

The parties dispute whether a "patron" is someone who merely registers with the system in question, or whether they must also make some form of contribution to a project.  The claims do not provide guidance as to how "patron" should be interpreted, and the specifications provide some support for both arguments.  ArtistShare relies on the specification's explanation that "A Patron may be, but is not limited to, a fan . . . that registers with ArtistShare *and/or* contributes to or purchases an Artist's project, work or the actual Artist."  '887 Patent at 6:64-67 (emphasis added).  Nevertheless, the language "may be, but is not limited to" denotes that this was not meant to be either an exhaustive or exclusive definition.  Kickstarter's proposed definition is supported by a definition also contained in the specification, without similarly limiting language: "A patron is a fan who registers with an artist . . . and who provides a monetary contribution to a project of an artist."  <u>Id.</u> at 18:55-59.

6

Throughout the specification, "patron" and the related term "patronage" are more generally used to describe someone who has made a contribution to an artist.  See, e.g., id. at 13:24-28; id. at 13:41-45; id. at 14:20-23; 17:18-23.  Moreover, this comports with the general usage and common understanding of the term, which has been defined, *inter alia*, as "one who buys the goods or uses the services offered especially by an establishment," "one that uses wealth or influence to help an individual, an institution or a cause," and "a social or financial sponsor of a social function (as a ball or concert)."  Merriam-Webster Dictionary and Thesaurus, available at http://www.merriam-webster.com/dictionary/patron.  Accordingly, "patron" is construed as "a fan who registers with an artist and who provides a contribution to a project of an artist in exchange for certain entitlements."

### B.     *Patron Database*

The parties dispute whether the term "Patron database" needs to be specifically construed or whether it should be defined simply as a database containing information regarding patrons.  Claims must be interpreted from the perspective of "a person of ordinary skill in the art," Phillips, 415 F.3d at 1312-13, which, in the instant matter, means someone with formal or informal training in computer engineering and programming.  Such a person could not simply take the word "database" at face value, but would surely have specific questions regarding the size and scope of the database to be created.  Accordingly, a more specific definition would not "introduce unnecessary verbiage."  Stanacard, LLC v. Rebtel Networks, AB, 680 F. Supp. 2d 483, 495 (S.D.N.Y. 2010).

First, the claims establish that the database must contain both contact and marketing information regarding the Patrons.  See, e.g., '887 Patent 21:58-59.  The specifications and prosecution history further clarify that it is to contain demographic and sales-related information

as well.  Id. at 3:30-35, 11:56-60, 19:58-65; Bickham Decl. Ex. 2 ("Pros. Hist.") at 363, Dkt. No.

43.  Second, the specifications and prosecution history explain that ArtistShare's system does not

create one centralized database containing information regarding all patrons and to which any

artist has access, but rather it creates multiple databases, each containing information pertaining

to patrons of a specific artist, to which only that artist has access, and which applies across all

projects by that artist.  See, e.g., Pros. Hist. at 362, 437; '887 Patent at 12:45-48; see also id. at

23:34-35.  The term "patron database" will be construed as "an artist-specific database that

contains contact, marketing,[3] sales, and demographic information of the artist's patron gathered

from an artist's projects."

C.      Client

The Court finds that the ordinary meaning of this claim term applies and is self-

explanatory to a person of ordinary skill in the art.  This term will not be further defined, and

Kickstarter's preferred construction is rejected because it would "introduce unnecessary

verbiage," Stanacard, 680 F. Supp. 2d at 495, and deprive ArtistShare of the "full scope of [its]

claims."  Kara Tech., Inc. v. Stamps.com, Inc., 582 F.3d 1341, 1348 (Fed. Cir. 2009).

D.      Fan(s)

The parties dispute whether a "fan" can be "any individual" or whether it is limited to "a

consumer, admirer or follower, mentor, and any other individual(s) interested in the Artist's

work."  In contrast with the parties' arguments regarding the term "patron," supra, Kickstarter

now relies on the definition set out in the specification's terminology section, while ArtistShare

points to the limiting language that "[a] Fan may be, but is not limited to" the aforementioned

---

[3] Neither party's proposed definition includes the term "marketing," but it is included in the Patent's claims.  See, e.g., '887 Patent at 24:47-49.

description.  Id.  Unlike "patron," however, the specifications and prosecution history provide

little help in construing the term "fan."  While the prosecution history mentions the "general

nature of [the] term[]" and contrasts it with the "more narrowly defined" term "patron," the

argument that a fan should be defined as "any individual" is unavailing.[4]  Pros. Hist. at 382.

Despite the "may be, but is not limited to" language, the best guide to the intended definition of

"fan" remains the narrower definition set out in the patent's specification.  See '887 Patent at

6:61-63.  Moreover, the narrower definition accords with the general understanding of the term

and avoids the bizarre result that would occur if "fan" included any individual, including those

uninterested in or disdainful of the artist in question.  A person of ordinary skill in the art would

not understand an artist's "fans" to include those with no appreciation of or interest in their work.

Accordingly, the term "fan" is construed as "a consumer, admirer or follower, mentor, and any

other individual(s) interested in the Artist's work."  Id.

       *E.*       *Entitlement including at least one of a product, a service, and patronage*

       The parties disagree over whether the definition of what an entitlement is to include

should be construed in the disjunctive ("at least one product *or* service *or* patronage") or

conjunctive ("at least one product, *and* at least one service, *and* at least one patronage.").  This

precise question has been addressed by the Federal Circuit, which addressed a similarly worded

patent in which "[t]he phrase 'at least one of' precedes a series of categories of criteria," finding

that where "the patentee used the term 'and' to separate the categories of criteria . . . [it] connotes

a conjunctive list."  Superguide Corp. v. DirecTV Enters., Inc., 358 F.3d 870, 886 (Fed. Cir.

---

[4] This portion of the prosecution history, filed on May 5, 2010, Pros. Hist. at 384, appears to be responsive to a
March 18, 2010 telephone call between Camelio, his counsel, and the PTO, during which Camelio was instructed to
"better define the claims/terms."  Id. at 373.  Without a more specific record of what this conversation entailed, and
what was said regarding the term "fan" in particular, Camelio's appreciation of and purported agreement with "the
examiner's comments" is ambiguous.  Id. at 382.

2004).  Relying on William Strunk and E.B. White's classic treatise on grammar, The Elements of Style (4th ed. 2000), the term was construed "as requiring . . . at least one value for each category." Id.  Courts generally rely on Superguide, see, e.g., Civix-DDI, LLC v. Hotels.Com LP, 809 F. Supp. 2d 882, 900 (N.D. Ill. 2011); TouchTunes Music Corp. v. Rowe Intern. Corp., 727 F. Supp. 2d 226, 238-39 (S.D.N.Y. 2010); Inventio AG v. ThyssenKrupp Elevator Ams. Corp., 718 F. Supp. 2d 529, 552-56 (D. Del. 2010), rev'd in part on other grounds, 649 F.3d 1350 (Fed. Cir. 2011); except where a conjunctive construction "does not make any sense" in the context of the patent in dispute and would "render the claims utter nonsense." Joao v. Sleepy Hollow Bank, 348 F. Supp. 2d 120, 123-26 (S.D.N.Y. 2004).  This exception is not applicable to the '887 Patent.

Furthermore, the doctrine of "[p]rosecution history estoppel requires that the claims of a patent be interpreted in light of the proceedings in the PTO during the application process," Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722, 733 (2002), and precludes "a patentee from regaining, through litigation, coverage of subject matter relinquished during prosecution of the application for the patent." Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc., 103 F.3d 1571, 1577-78 (Fed. Cir. 1997).  Many amendments filed throughout the prosecution history focused on the term "entitlement."  For example, in an application amendment filed on April 28, 2008, a claim defined an entitlement as being "at least one of" several products or services "and any combination thereof," such that an entitlement did not necessarily include all of the enumerated products or services.  Pros. Hist. at 227.  This language was removed in an April 7, 2009, application amendment. Id. at 298.  Several subsequent amendments similarly defined entitlements in a disjunctive manner. See, e.g., id. at 348-49, 382.  The disputed term was added into the final amendment to the application, filed on September 7, 2010. Id. at 423,

10

426. Unlike previous versions of the application, the September 7, 2010 iteration does not include disjunctive language with regard to entitlements, nor does its "Remarks" section suggest that the finalized language regarding entitlements is meant to be read disjunctively. <u>See generally id.</u> at 427-38. That disjunctive language is used elsewhere in the patent's claims – specifically, the phrase "at least one of the following," followed by a list – suggests that this choice of language was intentional. <u>See, e.g.</u>, '887 Patent at 22:15-18; 24:10-13.

Accordingly, the term is construed as an "entitlement that includes at least one product, and at least one service, and at least one patronage."

### F. *Software-Related Terms*

The '887 Patent protects a system that uses various "software tools" for myriad purposes, without explicitly defining the term "software tools" generally or in the context of the term's specific usages. <u>See, e.g.</u>, '887 Patent at 21:37-38 1; 21:60-61; 23:28-30; 23:44-45. Throughout their papers, ArtistShare generally construes "software tools" as "computer aided features," itself a vague and amorphous term with no clear definition. Kickstarter prefers "computer programs," a widely used and easily understood term. ArtistShare argues that this construction is problematic because it does not account for the possibility of using web-based applications. The lone cite offered by ArtistShare in support of this assertion does not demonstrate that the use of web-based applications was meant to be encapsulated by "software tools," however; ArtistShare merely directs the Court to a section of the specifications discussing websites from which an artist or account manager "may obtain information." '887 Patent at 15:25. This hardly demonstrates that "computer programs" is not a proper or sufficiently broad construction. Accordingly, "software tools" and the related term "tools" are construed as "computer programs."

### 1. <u>Software tools . . . to manage at least one project</u>

ArtistShare asserts that the term should be construed "in a manner broad enough to

include the embodiments disclosed in the specification, without limiting the claims to a specific

embodiment." Def.'s Br. at 15. The prosecution history makes clear, however, that Figure 7,

'887 Patent at 9, contains "[t]he full listing of management tools available to the Artist," and that

the patent application was amended to include the eleven specified functionalities to

"differentiate the instant invention from all cited prior art." Pros. Hist. at 383; see also id. at 363-

64. Accordingly, the software tools for the management of projects are limited to those

enumerated in Figure 7 of the Patent itself, and the term is construed as "computer programs that

consist of a suite of features, including project information, inventory, auctions, patrons,

subscriptions, licensing, personnel, news, mailings, media shows and images."

> 2. Software tools . . . to manage communications, through said Patron database

The parties largely agree as to how "managing communications" should be construed,

compare Def.'s Br. at 17 and Pl.'s Br. at 12, but dispute whether "through said Patron database"

should be construed more liberally, as "with the aid of the Patron database," Def.'s Br. at 17, or

more literally, as requiring that "the Patron receives the information directly from the Patron

database." Pl.'s Br. at 17. The language of the claim itself provides support for the latter; the

choice of the word "through" suggests that the Patron database should play a larger role than

mere facilitation.

The latter interpretation of "directly from the patron database" is also clearly supported

by the prosecution history. An earlier draft of the patent application included a claim for

"providing the artist software tools to manage communications *directly* to Patrons regarding the

sales and marketing of one or more projects." Pros. Hist. at 358 (emphasis added). This was

rejected by the PTO, based on prior art, because "Massey discloses providing the artist or

12

Account Manager software tools . . . to manage communications directly to Patrons" and because "Boyle (an analogous art) discloses . . . providing software tools to an Artist or Account Manager . . . to manage communications directly to Patrons." <u>Id.</u> at 395-96. Camelio subsequently amended the claim by substituting the phrase "through said Patron database" in place of the word "directly." <u>Id.</u> at 419. This was meant to differentiate the instant patent from prior art, which did not provide "any mechanism for managing communication, through a Patron database, to Patrons regarding the sales and marketing of a project." <u>Id.</u> at 428. The specific choice of words, namely "through a Patron database," was thus used to distinguish the instant patent from one in which software tools, such as a database, might be used to facilitate direct communications with patrons. By now seeking to have the instant term construed as allowing the patron database to aid in communications, rather than to actually function as the means of communication, ArtistShare is attempting to recapture precisely what it previously disclaimed. The term is therefore construed as "computer programs that enable and control the exchange of information with a patron wherein the patron receives the information directly from the Patron database."

> 3.  <u>Software tools . . . to design, create, and implement an artist-specific web page</u>

The parties agree that this term should be construed as software tools[5] "to design, create and implement an artist-specific web page," but disagree as to the meaning of "artist-specific web page." Pl.'s Br. at 14. ArtistShare points to three distinctions between the parties' proposed constructions: (1) whether this is limited to a single web page, (2) whether the web page's purpose is limited to "marketing," and (3) whether web pages must be specific to a single artist.

---

[5] In its motion papers, Kickstarter argued that the term "should be construed as computer programs . . ." but also stated that it agrees with Artistshare's construction of "computer-aided features . . ." Pl.'s Br. at 14. At oral argument, Kickstarter clarified that, in the context of this term, software tools should be construed as "computer programs," as elsewhere. <u>See, e.g.</u>, Dec. 17, 2012 Hr'g Tr. at 66-67; <u>see also id.</u> at 81.

First, it is well established that the use of an indefinite article in a patent does not necessarily connote the singular. The Court of Appeals for the Federal Circuit has "'repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning 'one or more' . . . unless 'the language of the claims themselves, the specification, or the prosecution history necessitates a departure from the rule.'" SanDisk Corp. v. Kingston Tech. Co., Inc., 695 F.3d 1348, 1360 (Fed. Cir. 2012) (quoting Baldwin Graphic Sys., Inc. v. Siebert, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008)). The '887 Patent does not provide grounds for deviating from this general rule.[6] Accordingly, "an . . . web page" is properly read in this context as "one or more web pages."

Second, ArtistShare contends that "the artist-specific webpage may include multiple features" and "is not solely dedicated to the promotion of an artist's projects." Def.'s Br. at 20. However, Claim 17 explains that the "artist-specific web page [is] for the purpose of marketing said artist's projects." '887 Patent at 23:30. ArtistShare does not provide any reason to set this language aside in construing the term at issue.

Third, construing an "artist-specific web page" as a web page relating to multiple artists would conflict with the plain language of the claim. It is unclear how something relating to multiple artists could be described as "artist-specific." The term should therefore be construed as referring to a website for a single artist. This does not, however, "preclude[] joint-authorship of a project," Def.'s Opp'n at 9, because an artist is not synonymous with an individual; an "artist

---

[6] ArtistShare suggests that the specifications clarify that "artists can create 'one or more web-pages.'" Def.'s Br. at 19 (citing '887 Patent at 16:57-65). This is an incorrect reading of the patent. The specification in question refers to the "website/homepage of the artist," and a separate "web-page for managing such information" that the Artist has access to. '887 Patent at 16:57-58. It is this latter website, designed to enable the artist to manage their public website, that "may include . . . one or more web-pages." Id. at 16:59. Nevertheless, the fact that the patent discusses "A web-page" . . . [that] may include . . . one or more web-pages" provides support for the more general proposition that the '887 Patent was drafted with full knowledge of the rule that "a patentee must 'evince a clear intent' to limit 'a' or 'an' to 'one.'" Siebert, 512 F.3d at 1342; see also '887 Patent at 11:50-53.

may comprise a single person (musician, writer, actor, educator, programmer, artist, manager, and the like) or an entity (such as a band)." '887 Patent at 10:19-22. The possibility of joint-authorship is therefore recognized where the artist is a collaborative entity working together on a project or projects.

Accordingly, this term is construed as "computer programs to design, create and implement one or more web pages dedicated to the marketing of a single artist's one or more projects.

        4.    Tools . . . to present the at least one project

The meaning of the term "present the at least one project" is self-explanatory to a person of ordinary skill in the art. The Court therefore declines to further construe this term. Kickstarter's proposed construction is be rejected because it would deprive ArtistShare of the "full scope of [its] claims" by unnecessarily and improperly "limit[ing the patentee] to his preferred embodiment." Kara Tech., 582 F.3d at 1348.

## CONCLUSION

The foregoing constitutes the Court's ruling on all outstanding matters of claim construction. The Clerk of the Court is directed to terminate the motion at Docket No. 39.

Dated: New York, New York
      January 16, 2013

                              SO ORDERED

                              PAUL A. CROTTY

                              United States District Judge

15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

:
KICKSTARTER, INC.,                                      :
                                                        :
                                    Plaintiff,          :
                                                        :
                    v.                                  :
                                                        :
FAN FUNDED, LLC, *et al.*,                              :
                                                        :
                                    Defendants.         :
                                                        :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 29, 2015

11 Civ. 6909 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiff Kickstarter, Inc. ("Kickstarter") brought this action against Defendants Fan Funded, LLC ("Fan Funded") and ArtistShare, Inc. ("ArtistShare"), seeking declaratory relief that U.S. Patent No. 7,885,887 for "Method and apparatuses for financing and marketing a creative work" (the "'887 Patent") is invalid, and thus that Plaintiff does not (and, indeed, cannot) infringe it. Before the Court are the parties' cross-motions for summary judgment on the sole issue of the '887 Patent's validity. A careful read of that patent, and of recent decisions on patent eligibility from the Supreme Court and the United States Court of Appeals for the Federal Circuit, makes plain that the '887 Patent claims only the abstract and time-honored concept of patronage, and even the addition of an element of computer use is insufficient to render it valid under Section 101 of the Patent Act, 35 U.S.C. § 101. Plaintiff's motion for summary judgment on that ground is therefore granted, and Defendants' motion is denied.

# BACKGROUND[1]

## A.     The Parties

Plaintiff Kickstarter is a Delaware corporation with its principal place of business in New York.  (Compl. ¶ 2; Ans. ¶ 2).  It is a web-based funding platform for a wide variety of creative projects, including those relating to music, film, art technology, design, food, and publishing.  (Compl. ¶ 9; Cntrcl. ¶ 6).

Defendant ArtistShare is a Delaware corporation, also with its principal place of business in New York, that assists artists in acquiring funding to produce creative works by marketing their projects directly to individuals and entities interested in the projects.  (Compl. ¶ 4; Cntrcl. ¶¶ 1, 16).  ArtistShare was listed as the assignee on the patent at issue, the '887 Patent.  ('887 Patent

---

[1]     The Court notes that, insofar as the issue of patent eligibility is concerned, the instant summary judgment motions could have been, and perhaps should have been, styled as motions for judgment on the pleadings.  *See OIP Technologies, Inc.* v. *Amazon.com, Inc.*, No. 2012-1696, — F.3d —, 2015 WL 3622181, at *4 (Fed. Cir. June 11, 2015) (Mayer, J., concurring) ("Addressing 35 U.S.C. § 101 at the outset not only conserves scarce judicial resources and spares litigants the staggering costs associated with discovery and protracted claim construction litigation, it also works to stem the tide of vexatious suits brought by the owners of vague and overbroad business method patents.").  To forestall accusations of "Monday-morning quarterbacking," however, the Court notes that such a course may not have been as obvious prior to the Supreme Court's June 2014 decision in *Alice Corp. Pty.* v. *CLS Bank Int'l*, 134 S. Ct. 2347 (2014), and the Federal Circuit jurisprudence that has developed in its wake.  In any event, the parties have engaged in considerable discovery (particularly relating to invalidity contentions unrelated to eligibility), resulting in a substantial record on summary judgment.  In ruling on these motions for summary judgment, the Court considered the entire record before it; however, the Court here sets forth only those facts pertinent to its decision, which is made on eligibility grounds.  The facts set forth herein are drawn primarily from the '887 Patent itself (on the record as Joint Appendix ("JAX") Ex. 1); Plaintiff's Complaint ("Compl.") (Dkt. #1); Defendants' Answer ("Ans.") and Counterclaim ("Cntrcl.") (Dkt #30); Plaintiff's Answer to the Counterclaim ("Cntrcl. Ans.") (Dkt. #31); and other documents as cited.  For convenience, Plaintiff's opening brief is referred to as "Pl. Br."; Defendants' opening brief and opposition is referred to as "Def. Br."; Plaintiff's opposition and reply is referred to as "Pl. Opp."; and Defendants' reply is referred to as "Def. Reply."

at [73]).  Defendant Fan Funded is a Delaware limited liability company with its principal place of business in Delaware; it is a wholly-owned subsidiary of ArtistShare.  (Compl. ¶ 3; Cntrcl. ¶¶ 3, 17).  ArtistShare has assigned the '887 Patent to Fan Funded.  (Cntrcl. ¶ 4).

## B.    The '887 Patent

The '887 Patent, entitled "Method and Apparatuses for Financing and Marketing a Creative Work," was issued by the U.S. Patent and Trademark Office (the "PTO") on February 8, 2011.  ('887 Patent at [45], [54]).  The '887 Patent claims "a system and method for raising financing and/or revenue by [an] artist for a project, where the project may be a creative work of the artist." (*Id.* at [57]).  The '887 Patent recites 37 claims, which includes six independent claims (Claims 1, 15, 17, 18, 35, and 36) and 31 dependent claims (Claims 2-14, 16, 19-34, 37).[2]

Claim 1 of the '887 Patent is representative:[3]

[2]    Defendant originally contended that Plaintiff infringed 25 claims of the '887 Patent, only five of which (1, 17, 18, 35, and 36) were independent claims.  (*See* Jan. 18, 2013 Opinion and Order ("Jan. 18, 2013 Op.") 2 n.1) (Dkt. #53).  Following the Court's claim construction opinion (*see id.*), Defendant stipulated that Plaintiff did not infringe the '887 Patent as construed (*see* Dkt. #56 at 1 n.2).

[3]    Having reviewed the '887 Patent, the Court agrees with Plaintiff that Claim 1 is representative.  (*See* Pl. Br. 10 & n.4).  Defendants are correct that each claim contained in the '887 Patent is presumptively valid.  (Def. Br. 11 (citing 35 U.S.C. § 282)).  *But cf. Ultramercial, Inc.* v. *Hulu, LLC*, 772 F.3d 709, 720-21 (Fed. Cir. 2014) (Mayer, J., concurring) ("Although the Supreme Court has taken up several section 101 cases in recent years, it has never mentioned — much less applied — any presumption of eligibility.  The reasonable inference, therefore, is that while a presumption of validity attaches in many contexts, ... no equivalent presumption of eligibility applies in the section 101 calculus." (citation omitted)).  However, where, as here, the claims are "substantially similar and linked to the same abstract idea," the Court may dispose of the other claims in less detail.  *Content Extraction & Transmission LLC* v. *Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) ("*CET*"); *see id.* (finding the district court "correctly determined that addressing each claim of the asserted patents was unnecessary" and approving the court's selection of a representative claim); *id.* (rejecting patentee's argument that failure to address each claim individually was

Claim 1. A system for marketing and funding one or more projects of an artist comprising a server having applications programs operable from a remote site for:

providing software tools to an artist or Account Manager to manage at least one project, the project comprising at least one creative work;

receiving information from the artist or Account Manager regarding at least one Sales Container associated with the at least one project, each Sales Container including at least one of a product, a service, and a patronage, while the artist retains outright ownership of the project and the creative work;

transmitting offer data from a server to a client via a network, the offer data comprising an offer to Fans concerning the at least one Sales Container associated with at least one project, wherein the offer is for a Sales Container at a predetermined level of patronage in exchange for funds for the project;

receiving at the client such offer data and presenting the offer to the Fan;

transmitting acceptance data back to the server from the client accepting the offer;

processing the acceptance data by the server;

registering contact and marketing information regarding Patrons in a database; and

providing the artist or Account Manager software tools to manage communications, through said Patron database, to Patrons regarding the sales and marketing of one or more projects.

inconsistent with statutory presumption of validity of each claim); *see also Bilski* v. *Kappos*, 561 U.S. 593, 611-12 (2010) (determining that 11 claims in a patent application were invalidly abstract after analyzing only two of the claims in detail). Additionally, the dependent claims of the '887 Patent "recite only slight variations of the independent claims," and so the Court need not consider them distinctly. *Planet Bingo, LLC* v. *VKGS LLC*, 576 F. App'x 1005, 1007 (Fed. Cir. 2014) (unpublished decision); *see also CET*, 776 F.3d at 1349 ("[W]hile [the dependent] claims may have a narrower scope than the representative claims, no claim contains an 'inventive concept' that transforms the corresponding claim into a patent-eligible application of the otherwise ineligible abstract idea.").

('887 Patent col.21 l.35-63).[4]  The Patent describes the invention as, *inter alia*, a method for "generating capital for a project of an artist" by offering "entitlement[s[5]] which may be related to the artists at a predetermined level of patronage among a plurality of levels of patronage."  (*Id.* at col.4 l.28-34).  It describes several mechanisms for offering consideration (i.e., an "entitlement") in exchange for funds for a project, referring to these mechanisms as "Sales Containers."  The "Sales Container" may consist of an auction, a sales item, a subscription series, subscription access, pay-per-view, licensing, and patron sponsorship.  (*Id.* at col.10 l.43-53).  A "sales item" may include, for example, downloadable music, sheet music, an hour-long telephone lesson from the artist on songwriting, or some other "inventory item."  (*Id.* at col.11 l.3-25).  A subscription may include access to recording session videos, recorded jam sessions, and other production-related media or products.  (*Id.* at col.12 l.9-19).  The Patent describes making offerings to "fans" — a term construed to include "a consumer, admirer or follower, mentor, and any other individual(s) interested in the Artist's work."  (Jan. 18, 2013 Op. 9).  Once a "fan" accepts an offer, that fan becomes a "patron."  (*Id.* at 7).  Such acceptance data and information is stored on a "Patron database."  ('887 Patent col.21 l.60-63).

The "Field of the Invention" portion of the '887 Patent indicates, in part:

> The invention is directed to a new business and distribution paradigm for creative works.   More

---

[4]    The Court assumes familiarity with Judge Paul A. Crotty's January 18, 2013 Opinion and Order (Dkt. #53) construing disputed terms of this and other claims.

[5]    As it is used in the '887 Patent, an "entitlement [ ] includes at least one product, and at least one service, and at least one patronage."  (Jan. 18, 2013 Op. 11).

> particularly, the invention is directed to methods and
> systems for obtaining financing from interested
> individuals to produce a creative work in exchange for
> an entitlement from the author of the work. The
> invention is also directed to methods and systems for
> presenting an artist-centered business model paradigm
> (using the entertainment industry as an example).

('887 Patent col.1 l.14-21). The "Background of the Invention" section describes the "problem[s] with the current recording business model" (*id.* at col.2 l.11-12) and the consequent "need for a method and/or system which will allow artists … to raise capital on their own and profit for producing a creative work, preferably prior to producing the work, and preferably without a recording contract with a recording company" (*id.* at col.2 l.18-22). The "Summary of the Invention" section indicates that the invention is intended to fill this need (*id.* at col.2 l.34-39), and explains, "The invention may make use of a combination of existing proven business models including banking, patron systems, merchandising partnerships, direct marketing, publishing, file sharing and internet networking, file compression, audio/video technologies, and online auctions (for example)" (*id.* at col.4 l.11-15).

The "Detailed Description of the Preferred Embodiments" portion of the '887 Patent describes the overall system plus three embodiments, each with a different focus. ('887 Patent col.6-21). In describing the embodiments of the patent, this section notes:

> One of skill in the art will appreciate that the computer
> systems outlined above which may be used with any of
> the embodiments of the invention, may include various
> hardware and operating software … for running
> software programs, browsing the Internet,
> communicating and/or operating with any device,

> including, for example, a printer, a display, a keyboard, a mouse, a modem, a phone, a wireless device, the Internet, a computer network, a sound system, and any other internal or external device. Such computer system may also include … internal and external components which may be used for carrying out the operations of the computer and the embodiments of the present invention.

(*Id.* at col.8 l.54-67).

In sum, Claim 1, as a representative claim, has the following relevant limitations: (i) a computer operating either on the Internet or other network with access to a server; (ii) providing software tools with a suite of features allowing management of one or more creative projects; (iii) making certain types of offers associated with the project in exchange for funds for the project; (iv) facilitating the acceptance of offers by fans; (v) storing contact and marketing information of those who have accepted offers in exchange for funds in a database; and (vi) providing software tools that enable and control the exchange of information with a fan through the database. (*See generally* Jan. 18, 2013 Op.).

## C.    Procedural History

On September 30, 2011, Kickstarter commenced this action against ArtistShare and Fan Funded for declaratory judgment of patent invalidity and non-infringement. (Dkt. #1). On February 3, 2012, Defendants moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, arguing that there was no case or controversy because the parties were in a business negotiation that did not involve a claim of infringement or threat of suit. (Dkt. #20). On April 10, 2012,

Judge Paul A. Crotty, to whom this case was originally assigned, denied that motion, finding sufficient controversy between the parties that was both immediate and real. (Dkt. #29). On April 24, 2012, Defendants submitted an Answer to the Complaint and a Counterclaim of infringement (Dkt. #30), and on May 15, 2012, Plaintiff answered the Counterclaim (Dkt. #31).

The case proceeded to discovery. (Dkt. #33). About midway through discovery, in late 2012, the parties submitted claim construction briefing and a *Markman* hearing was held. (*See* Dkt. #42-52). *See generally Markman* v. *Westview Instruments, Inc.*, 517 U.S. 370 (1996). On January 18, 2013, Judge Crotty issued an Opinion and Order construing disputed terms. (Dkt. #53). In February 2012, because they were of the view that the Court's claim construction was determinative of the issue of non-infringement, Defendants requested that the Court enter at least partial final judgment so that they could appeal the Court's claim construction opinion. Judge Crotty denied that request. (Dkt. #55). Defendants therefore stipulated as to Plaintiff's non-infringement under the Court's claim construction, and the parties pursued discovery limited to the validity *vel non* of the '887 Patent. (Dkt. #56).

The case was reassigned to the undersigned on June 25, 2013 (Dkt. #67), and discovery continued. The parties submitted cross-motions for summary judgment on the validity of the '887 Patent beginning June 16, 2014. (Dkt. #92). Those motions, which are now before the Court, were fully briefed on September 10, 2014. (Dkt. #96-107, 110). Plaintiff moves for judgment of invalidity of the '887 Patent on four grounds, and Defendant moves for

judgment of validity on those same grounds: (i) patentability of the subject matter; (ii) correctness of the named inventor; (iii) obviousness in light of prior art; and (iv) definiteness of claims.

## DISCUSSION

### A.     The Summary Judgment Standard[6]

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986) (internal citation and quotation marks omitted); *see also Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).

It is well-established that "[s]ummary judgment is as appropriate in a patent case as in any other." *Barmag Barmer Maschinenfabrik AG* v. *Murata*

---

[6]     When deciding issues in a patent case, a district court applies the law of the Circuit in which it sits to non-patent issues and the law of the Federal Circuit to issues of substantive patent law. *See In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1368 (Fed. Cir. 1999). Accordingly, a district court decides summary judgment motions under the jurisprudence of its regional circuit. *See Digitech Image Techs., LLC* v. *Electronics for Imaging, Inc.*, 758 F.3d 1344, 1348 (Fed. Cir. 2014).

*Mach., Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984). While the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact," *Celotex*, 477 U.S. at 323, the party opposing the motion must point to an evidentiary conflict created on the record with facts set forth in detail, using affidavits or similar documents, *Anderson*, 477 U.S. at 248, 250. "Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation and alterations omitted); *see also Anderson*, 477 U.S. at 248, 250. On the other hand, the established facts, as well as any inferences of fact drawn from such facts, must be viewed in the light most favorable to the opposing party. *See Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003); *Anderson*, 477 U.S. at 255. When deciding cross-motions for summary judgment, such as the motions pending before the Court, a district court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Children First Found., Inc.* v. *Fiala*, No. 11-5199, — F.3d —, 2015 WL 2444501, at *4 (2d Cir. May 22, 2015) (citing *Byrne* v. *Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)).

## B. Applicable Law

### 1. Patent Eligibility Under Section 101 of the Patent Act

"Whether a claim is drawn to patent-eligible subject matter under [Section] 101 is a threshold inquiry[.]" *In re Bilski*, 545 F.3d 943, 950 (Fed. Cir. 2008) ("*Bilski I*"), *affirmed sub nom. Bilski* v. *Kappos*, 561 U.S. 593 (2010)

("*Bilski II*"). If a claim is not drawn to patent-eligible subject matter, it "must be rejected even if it meets all of the other legal requirements of patentability." *Id.* The determination of whether a claim is drawn to patent-eligible subject matter is a pure question of law. *See Fort Properties, Inc.* v. *Am. Master Lease LLC*, 671 F.3d 1317, 1320 (Fed. Cir. 2012); *see also Bilski I*, 545 F.3d at 951 (explaining that patent validity under § 101 is an "issue of law").[7] Under the

---

[7]    Defendants argue that this Court must apply a "clear and convincing" standard to determine whether Plaintiff has met its burden of proof as to each of its invalidity contentions. (*See* Def. Br. 4, 11-12; Def. Opp. 7-8). While it is true that, to the extent the Court as factfinder must make *factual* determinations, the "clear and convincing" standard applies (e.g., whether a patent's elements existed in prior art), to the extent that the Court is drawing legal conclusions (e.g., whether the subject matter is patent-eligible under Section 101), no such standard applies. In arguing that the Court must apply a "clear and convincing" standard to determine subject matter eligibility, Defendants conflate an evidentiary burden with legal analysis. The case Defendants cite for this argument is *Ultramercial, Inc.* v. *Hulu, LLC*, 722 F.3d 1335, 1342 (Fed. Cir. 2013) ("*Ultramercial I*"), which the Supreme Court vacated and remanded to the Federal Circuit for further consideration in light of *Alice*. *See WildTangent, Inc.* v. *Ultramercial, LLC*, 134 S. Ct. 2870 (2014). On remand, in keeping with *Alice*, the Federal Circuit did not mention, much less apply, a "clear and convincing" standard in coming to its legal conclusion that the claims at issue were directed at a patent-ineligible abstract idea. *See Ultramercial, Inc.* v. *Hulu, LLC*, 772 F.3d 709, 713-17 (Fed. Cir. 2014) ("*Ultramercial II*"). In a recent concurrence, Justice Breyer offered useful guidance concerning application of the "clear and convincing" evidentiary standard in this context:

> [I]n this area of law as in others the evidentiary standard of proof applies to questions of fact and not to questions of law. ... Thus a factfinder must use the "clear and convincing" standard where there are disputes about, say, when a product was first sold or whether a prior art reference had been published. Many claims of invalidity rest, however, not upon factual disputes, but upon how the law applies to facts as given. Do the given facts show that the product was previously "in public use"? 35 U.S.C. § 102(b). Do they show that the invention was "nove[l]" and that it was "non-obvious"? §§ 102, 103. Do they show that the patent applicant described his claims properly? § 112. Where the ultimate question of patent validity turns on the correct answer to legal questions — what these subsidiary legal standards mean or how they apply to the facts as given — today's strict standard of proof has no application. ... Courts can help to keep the application of today's "clear and convincing" standard within its proper legal bounds by separating factual and legal aspects of an invalidity claim, say, by using instructions based on case-specific circumstances that help the jury make the distinction or by using interrogatories and special verdicts to make clear which specific factual findings underlie the jury's conclusions. *See* Fed. R. Civ.

Patent Act, all patents are "presumed valid," and "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) [is] presumed valid independently of the validity of other claims."  35 U.S.C. § 282(a).

Section 101 defines the categories of inventions eligible for patent protection.  It provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  Section 101 thus "recites four categories of patent-eligible subject matter: processes, machines, manufactures, and compositions of matter."  *Bilski I*, 545 F.3d at 951.  The Supreme Court recognizes "three specific exceptions to [Section] 101's broad patent-eligibility principles: 'laws of nature, physical phenomena, and abstract ideas.'"  *Bilski II*, 561 U.S. at 601 (quoting *Diamond* v. *Chakrabarty*, 447 U.S. 303, 309 (1980)).  Although absent from the text of Section 101, "these exceptions are ... consistent with the notion that a patentable process must be

<div style="margin-left: 2em; font-size: smaller;">

[P.] 49 and 51.  By isolating the facts (determined with help of the "clear and convincing" standard), courts can thereby assure the proper interpretation or application of the correct legal standard (without use of the "clear and convincing" standard).  By preventing the "clear and convincing" standard from roaming outside its fact-related reservation, courts can increase the likelihood that discoveries or inventions will not receive legal protection where none is due.

*Microsoft Corp.* v. *i4i Ltd. P'ship*, 131 S. Ct. 2238, 2253 (2011) (citations omitted); *see also Alice*, 134 S. Ct. at 2355 (setting forth the legal framework for determining whether a claim is ineligible as an abstract idea without reference to the "clear and convincing," or any, evidentiary standard).  Because this Court determines that as a matter of law the '887 Patent is drawn to patent-ineligible subject matter, and is thus invalid under Section 101, it does not have occasion to weigh facts using the "clear and convincing" evidentiary standard.

</div>

'new and useful.'" *Id.* The Supreme Court has construed Section 101 and its predecessors in this manner for 150 years. *See Alice*, 134 S. Ct. at 2354.

As the Court has explained, "the concern that drives this exclusionary principle [i]s one of pre-emption." *Alice*, 134 S. Ct. at 2354; *see also Mayo Collaborative Servs.* v. *Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012) (stating, in finding process not patent-eligible, that "upholding the patents would risk disproportionately tying up the use of the underlying natural laws, inhibiting their use in the making of further discoveries"); *Bilski II*, 561 U.S. at 611-12 (finding concept not patent-eligible because allowing patent "would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea"). "Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work," *Gottschalk* v. *Benson*, 409 U.S. 63, 67 (1972) ("*Benson*"), and "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it," thereby undermining the Patent Act's purpose, *Mayo*, 132 S. Ct. at 1293; *accord Alice*, 134 S. Ct. at 2354-55.

On the other hand, the Court has also cautioned against too broadly interpreting the Section 101 exceptions, "[f]or all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo*, 132 S. Ct. at 1293; *see id.* ("The Court has recognized ... that too broad an interpretation of this exclusionary principle could eviscerate patent law."); *see also Alice*, 134 S. Ct. at 2354 ("[W]e tread

carefully in construing this exclusionary principle lest it swallow all of patent law."). Although laws of nature, natural phenomena, and abstract ideas are themselves not patentable, the Court has made clear that "'[a]pplications' of such concepts 'to a new and useful end' ... remain eligible for patent protection." *Alice*, 134 S. Ct. at 2354 (quoting *Benson*, 409 U.S. at 67 (alterations omitted)). Accordingly, in applying the Section 101 exceptions, courts "must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, ... thereby transforming them into a patent-eligible invention." *Id.* (citations, internal quotation marks, and brackets omitted).

### 2. The Two-Step *Alice* Framework

The Supreme Court in *Alice* clarified the two-step framework, first set forth in *Mayo*, that courts must use in "distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. First, the court must determine whether the claims at issue are directed to one of those patent-ineligible concepts. *Id.* Second, if so, then the court must determine whether there is something else in the claims — an "inventive concept" — "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* Before applying this framework to the '887 Patent, however, the Court reviews *Alice*, its predecessors, and its progeny, all of which provide guidance to district courts in differentiating between eligible and ineligible subject matter.

### 3. Evolving Jurisprudence on Unpatentable Ideas

In 1972, the Supreme Court rejected as ineligible patent claims involving an algorithm for converting binary-coded decimal numerals into pure binary form, holding that the claimed patent was "in practical effect ... a patent on the algorithm itself." *Benson*, 409 U.S. at 71-72; *see also id.* at 71 ("The mathematical formula involved here has no substantial practical application except in connection with a digital computer."). Several years later, in *Parker* v. *Flook*, 437 U.S. 584, 594-95 (1978), the Supreme Court held that a mathematical formula for computing "alarm limits" in a catalytic conversion process was also a patent-ineligible abstract idea. *See also id.* at 586-87 (explaining that "[t]he only difference between the conventional methods of changing alarm limits and that described in [the] application ... [is] the mathematical algorithm or formula"); *id.* at 591 (holding that to be patentable, "[t]he process itself, not merely the mathematical algorithm, must be new and useful"). *But see Diamond* v. *Diehr*, 450 U.S. 175, 177 (1981) (applying *Benson* and *Flook* to uphold a patent claiming a "process for curing synthetic rubber which includes in several of its steps the use of a mathematical formula and a programmed digital computer"); *id.* at 187-88 (reasoning that unlike in *Benson* and *Flook*, the claims in the *Diehr* patent "d[id] not seek to pre-empt the use of that equation," but instead the equation plus additional specific steps rendered the combination patentable as "an application of a law of nature or mathematical formula to a known structure or process").

In 2010, the Supreme Court reaffirmed these principles in *Bilski,* rejecting the eligibility of a patent that claimed "the concept of hedging risk and the application of that concept to energy markets." *Bilski II*, 561 U.S. at 609. The *Bilski* Court held that "[t]he concept of hedging, described in claim 1 and reduced to a mathematical formula in claim 4, is an unpatentable abstract idea, just like the algorithms at issue in *Benson* and *Flook*. Allowing petitioners to patent risk hedging would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea." *Id.* at 611-12; *see also id.* at 612 (explaining that "limiting an abstract idea to one field of use or adding token post-solution components did not make the concept patentable").

Following *Bilski II*, the Court of Appeals for the Federal Circuit had several opportunities to consider the patent-eligibility of arguably abstract ideas, particularly computer-implemented ideas. From these decisions, it is clear that simply involving a computer in a process does not necessarily ground that process in a tangible, patentable form. For example, in *CyberSource Corp.* v. *Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011), the Federal Circuit concluded that a method of detecting credit card fraud was patent ineligible, notwithstanding the fact that the patent recited the use of existing computers and the Internet. The Court emphasized "that the basic character of a process claim drawn to an abstract idea is not changed by claiming only its performance by computers, or by claiming the process embodied in program instructions on a computer readable medium." *Id.* at 1375; *see also*

*Dealertrack, Inc.* v. *Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) ("Simply adding a 'computer aided' limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible."); *id.* at 1333-34 (concluding that claims drawn to a "computer-aided" method of processing information through a clearinghouse fell outside the ambit of Section 101); *Bancorp Servs., L.L.C.* v. *Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1280 (Fed. Cir. 2012) (rejecting patent as ineligible where "without the computer limitations nothing remains in the claims but the abstract idea of managing a stable value protected life insurance policy by performing calculations and manipulating the results"); *cf. MySpace, Inc.* v. *GraphOn Corp.*, 672 F.3d 1250, 1267 (Fed. Cir. 2012) (Mayer, J., dissenting) ("While running a particular process on a computer undeniably improves efficiency and accuracy, cloaking an otherwise abstract idea in the guise of a computer-implemented claim is insufficient to bring it within section 101.... Given the ubiquity of computers in contemporary life, allowing a process to become patentable simply because it is computer-implemented or invokes the use of the Internet would render the subject-matter eligibility criteria contained in section 101 virtually meaningless." (citations omitted)).

In 2012, the Supreme Court again considered patent eligibility in *Mayo Collaborative Servs.* v. *Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012), and drew a line between patent-ineligible concepts and patent-eligible applications of those concepts. In doing so, the Court set out the two-step framework (later

clarified in *Alice*, as set forth above) to determine on which side of that line a given concept fell.  At issue in *Mayo* were

> patent claims covering processes that help doctors who use[d] thiopurine drugs to treat patients with autoimmune diseases determine whether a given dosage level [wa]s too low or too high.  The claims purport[ed] to apply natural laws describing the relationships between the concentration in the blood of certain thiopurine metabolites and the likelihood that the drug dosage w[ould] be ineffective or induce harmful side-effects.

*Id.* at 1294.  In step one of the framework, the Court found that the at-issue patent claims were directed to patent-ineligible laws of nature.  Proceeding to step two, the Court held that the combination of steps recited in the patent application was not enough to render the claimed process a novel application of the law of nature.  It reasoned that "the steps in the claimed processes (apart from the natural laws themselves) involve well-understood, routine, conventional activity previously engaged in by researchers in the field," *id.*, and "simply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable," *id.* at 1300.  Accordingly, the Court held that the claimed process was patent-ineligible.

The Supreme Court most recently applied the two-step framework in *Alice*, where it considered a patent claiming "a method of exchanging financial obligations between two parties using a third-party intermediary to mitigate settlement risk," in which "[t]he intermediary creates and updates 'shadow' records to reflect the value of each party's actual accounts held at 'exchange

institutions,' thereby permitting only those transactions for which the parties have sufficient resources." 134 S. Ct. at 2356.[8] At step one, the Court held the claims were directed at an abstract idea, explaining that "[l]ike the risk hedging in *Bilski*, the concept of intermediated settlement is 'a fundamental economic practice long prevalent in our system of commerce.'" *Id.* In so holding, the Court emphasized that a "method of organizing human activity" may be impermissibly abstract if it is grounded in a fundamental practice. *Id.* at 2356-57.

Turning to the second step, the Court held that "the method claims, which merely require generic computer implementation, fail to transform that abstract idea into a patent-eligible invention." 134 S. Ct. at 2357. The Court explained that "[t]he introduction of a computer into the claims does not alter the analysis at *Mayo* step two." *Id.*; *see also id.* at 2360 (finding claims merely invoked generic computer functions where they described a "data processing system with a communications controller and data storage unit," which were "purely functional and generic" components for "performing the basic calculation, storage, and transmission functions required by the method claims" (internal quotation marks omitted)).[9]

---

[8] *Alice* was issued June 19, 2014, just days after Plaintiff's opening brief was due on June 16, 2014. Defendants discussed *Alice* in their opening brief (Def. Br. 11-18), and Plaintiff had an opportunity to address it in its opposition/reply brief (Pl. Opp. 1-10).

[9] There is no material difference between the "system" claims set forth in the '887 Patent and the "method" claims discussed in *Alice* and other cases. *See Alice*, 134 S. Ct. at 2360 ("[T]he system claims are no different from the method claims in substance. The method claims recite the abstract idea implemented on a generic computer; the system claims recite a handful of generic computer components configured to implement the same idea.").

The Federal Circuit has since had several opportunities to apply the framework and reasoning of *Alice*. Following *Alice*, the Federal Circuit reversed course in its decision after remand in *Ultramercial II*, 772 F.3d 709. The district court had invalidated the patent-in-suit as a patent-ineligible abstract idea; the invention was directed to a method for distributing copyrighted media products over the Internet where a consumer received a copyrighted media product at no cost in exchange for viewing an advertisement, and the advertiser paid for the copyrighted content. *See id.* at 712-13.[10] The Federal Circuit had originally reversed, finding, *inter alia*, that the invention "involve[d] an extensive computer interface." *Ultramercial I*, 722 F.3d at 1352. On remand for reconsideration in light of *Alice*, however, the Federal Circuit affirmed the district court's invalidation, noting, "The Court in *Alice* made clear that a claim that is directed to an abstract idea does not move into [Section] 101 eligibility territory by 'merely requir[ing] generic computer implementation.'" *Ultramercial II*, 772 F.3d at 713.

In a "straightforward" application of *Alice* in *buySAFE, Inc.* v. *Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014), the Federal Circuit affirmed a district court's invalidation of claims directed to "methods and machine-readable

---

[10]  The Court listed the invention's pertinent steps as including: "[i] receiving copyrighted media from a content provider; [ii] selecting an ad after consulting an activity log to determine whether the ad has been played less than a certain number of times; [iii] offering the media for sale on the Internet; [iv] restricting public access to the media; [v] offering the media to the consumer in exchange for watching the selected ad; [vi] receiving a request to view the ad from the consumer; [vii] facilitating display of the ad; [viii] allowing the consumer access to the media; [ix] allowing the consumer access to the media if the ad is interactive; [x] updating the activity log; and [xi] receiving payment from the sponsor of the ad." *Ultramercial II*, 772 F.3d at 714-15.

media encoded to perform steps for guaranteeing a party's performance of its online transaction." 765 F.3d at 1351.[11] First, the Court found the claims were aimed at an abstract concept: "The claims are squarely about creating a contractual relationship — a 'transaction performance guaranty' — that is beyond question of ancient lineage." *Id.* at 1355. The fact that dependent claims narrowed the claims to "particular types of such relationships" made no difference. *Id.*; *see also id.* ("This kind of narrowing of such long-familiar commercial transactions does not make the idea non-abstract for Section 101 purposes."). Next, the Court found that the claims' invocation of computer functionality — by which a computer "receiv[ed] a request for a guarantee and transmit[ted] an offer of guarantee in return" — added "no inventive concept." *Id.*

More recently, in *OIP Techs., Inc.* v. *Amazon.com, Inc.*, No. 2012-1696, — F.3d —, 2015 WL 3622181 (Fed. Cir. June 11, 2015), the Court considered claims directed to the concept of "offer-based price optimization" that recited a "method of pricing a product for sale." 2015 WL 3622181, at *3.[12] Finding

---

[11]    The Court summarized the representative claim as "a method in which [i] a computer operated by the provider of a safe transaction service receives a request for a performance guarantee for an 'online commercial transaction'; [ii] the computer processes the request by underwriting the requesting party in order to provide the transaction guarantee service; and [iii] the computer offers, via a 'computer network,' a transaction guaranty that binds to the transaction upon the closing of the transaction." *buySAFE*, 765 F.3d at 1351.

[12]    The Court found the relevant limitations of the representative claim were: "[i] testing a plurality of prices; [ii] gathering statistics generated about how customers reacted to the offers testing the prices; [iii] using that data to estimate outcomes (i.e. mapping the demand curve over time for a given product); and [iv] automatically selecting and offering a new price based on the estimated outcome." *OIP Techs.*, — F.3d —, 2015 WL 3622181, at *2.

that "offer based pricing" was "similar to other 'fundamental economic concepts' found to be abstract ideas by the Supreme Court and this court," the Court held that "[c]onsidered individually or taken together as an ordered combination, the claim elements fail to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* (internal quotation marks omitted). The Court agreed with the district court that patent-in-suit claimed "no more than an abstract idea coupled with routine data-gathering steps and conventional computer activity," and upheld invalidation. *Id.* at *1; *see also CET*, 776 F.3d at 1345 (affirming invalidation of method patent using "automated digitizing unit," i.e., computer scanner, for extracting, recognizing, categorizing, and storing information from hard-copy documents, e.g., checks by ATM machines); *Planet Bingo*, 576 F. App'x at 1006 (invalidating, in "straightforward application" of *Alice*, computer-aided methods and systems for managing the game of bingo).

In only one case since the issuance of *Alice* has the Federal Circuit held a computer-implemented method patent to be eligible, and there it was a divided panel. *DDR Holdings, LLC* v. *Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014). In *DDR Holdings*, the Federal Circuit held that claims covering "systems and methods of generating a composite web page that combines certain visual elements of a 'host' website with content of a third-party merchant" passed muster under Section 101. 773 F.3d at 1248. The composite web page prevented third-party merchants from luring visitor traffic away from a host website. *Id.* Rather than being redirected to a merchant's website, a linked

advertisement would take the visitor to a composite web page that displayed product information from the third-party merchant while maintaining the host website's "look and feel."  *Id.*

The Federal Circuit adverted to, but did not fully engage in, the first step of *Alice*: while acknowledging that the claims were directed to an abstract idea, it did not identify the precise nature of that idea.  *Id.* at 1257.  Instead, it observed that, however characterized, *Alice*'s second step was met because the claims did "not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet," but instead, "the claimed solution [was] necessarily rooted in computer technology to overcome a problem specifically arising in the realm of computer networks."  *Id.*  The Court found the claims at issue distinguishable from ineligible computer-implemented methods because they "[did] not broadly and generically claim 'use of the Internet' to perform an abstract business practice (with insignificant added activity)," and the claims "specif[ied] how interactions with the Internet are manipulated to yield a desired result — a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink."  *Id.* at 1258.  In other words, "the limitations of the ... asserted claims [ ] taken together as an ordered combination ... recite[d] an invention that [wa]s not merely the routine or conventional use of the Internet."  *Id.* at 1259.  *But see id.* at 1263-66 (Mayer, J., dissenting) (lamenting the "staggering" scope of DDR's patents, which "describe[d] a goal — confusing consumers by making two web pages look

alike — but disclose[d] no new technology or inventive concept for achieving

that goal," and "arguably cover[ed] vast swaths of Internet commerce" (citations

omitted)).

## C.   Application of the Two-Step *Alice* Framework to the '887 Patent

In broad summary, Plaintiff argues that the claims of the '887 Patent fall

outside Section 101 because they teach the "abstract idea of crowd-based

funding" (Pl. Br. 10), or of "raising money from fans to support an artistic work"

(Pl. Opp. 1), or of "raising money from patronage" (*id.* at 5); the addition of a

computer does not render the material patentable, inasmuch as the Patent only

"recites generic steps and tools for implementing the abstract idea" on a

computer.  (Pl. Br. 11).  Defendants assert that the '887 Patent is not directed

towards an abstract idea, and counter that because Plaintiff has "fail[ed] to

provide any definition for crowd-based funding," there is "no way for the Court

to assess whether the claims are directed to that undefined concept."  (Def. Br.

13).  Defendants further argue that the '887 Patent would not preempt other

applications of the idea of crowd-based funding, necessitating the conclusion

that it is not abstract, and that its claims cover "particular systems for

managing, marketing, and financing a creative work" (*id.* at 13-14), or "a

particularized and novel system for providing software tools for preparing,

launching, and managing a fan funded project" (Def. Reply 11).  As a fallback

position, Defendants assert that even if the '887 Patent is directed to an

abstract concept, its elements — when considered as "an ordered

combination" — transform its claims into patent-eligible applications of that

idea.  (Def. Br. 15-18; Def. Reply 11-12).  Applying the Supreme Court's two-step framework, and guided by the recent precedent discussed above, the Court agrees with Plaintiff that the '887 Patent claims a patent-ineligible abstract idea.

### 1.    The Claims of the '887 Patent Are Directed Toward a Patent-Ineligible Concept

The '887 Patent's claims are directed to the concept of crowd-funding or fan-funding, i.e., raising funds for a project from interested individuals in exchange for incentives.  Whether the abstract idea in play here is defined as "crowd-funding," "crowd-based funding," "fan-funding," "incentive-based patronage," "incentivized crowd-funding," or some other combination of these words is of no moment: the abstract concept at play in the Patent remains the same.  Claim 1 broadly recites a "system for marketing and funding one or more projects of an artist" ('887 Patent col.21 l.35-36) and the specification describes the invention as "methods and systems for obtaining financing from interested individuals to produce a creative work in exchange for an entitlement from the author of the work" (*id.* at col.1 l.15-20).  These claims are squarely about patronage — a concept that is "beyond question of ancient lineage."  *buySAFE*, 765 F.3d at 1355.  (*See also* JAX Ex. 44 (Expert Report of Ethan Mollick) at ¶ 10 (noting that "offering rewards for various levels of financial support" has a "history dating back centuries" and is the "same approach taken by [the Public Broadcasting Service] and [National Public Radio]")).

Moreover, this concept of incentive-based funding is incontestably similar to other "fundamental economic concepts," and to other types of "organizing human activity," both of which have been found to be abstract ideas by the Supreme Court and the Federal Circuit.  *See*, *e.g.*, *Alice*, 134 S. Ct. at 2357 (intermediated settlement); *Bilski II*, 561 U.S. at 611 (risk hedging); *OIP Techs.*, — F.3d —, 2015 WL 3622181, at *3 (offer-based price optimization); *buySAFE*, 765 F.3d at 1355 (transaction performance guarantee); *Ultramercial II*, 772 F.3d at 715 (using advertising as an exchange or currency); *CET*, 776 F.3d at 1347 (data collection); *Accenture Global Servs., GmbH* v. *Guidewire Software, Inc.*, 728 F.3d 1336, 1346 (Fed. Cir. 2013) (generating tasks in an insurance organization); *Planet Bingo*, 576 F. App'x at 1008 (managing a game of bingo).  Just because the claims do not preempt all crowd-funding does not make them any less abstract.  *See Bilski*, 561 U.S. at 612 ("*Flook* established that limiting an abstract idea to one field of use or adding token postsolution components did not make the concept patentable."); *OIP Techs.*, — F.3d —, 2015 WL 3622181, at *3 ("And that the claims do not preempt all price optimization or may be limited to price optimization in the e-commerce setting do not make them any less abstract."); *see also buySAFE*, 765 F.3d at 1355 (collecting cases).[13]

---

[13]    Curiously, in arguing that the '887 Patent does not preempt all crowd-based funding, Defendants provide as an example that "none of the prior art references produced by Kickstarter would have been preempted" (Def. Br. 14), but Defendants do not point to any present-day crowd-funding platform that would not be preempted.

### 2. There Are No Additional Elements Sufficient to Transform the Nature of the Claim

Nothing about the '887 Patent transforms the concept of crowd-funding into patent-eligible subject matter. Beyond the abstract idea of patronage, the claims merely recite "well-understood, routine conventional activities," by requiring either conventional computer activities or routine data-gathering steps. *Alice*, 134 S. Ct. at 2359 (alterations omitted). Considered individually or taken together as an ordered combination, the claim elements fail "to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 2357 (citation omitted). For example, Claim 1 recites "application programs" providing "software tools" to manage projects, transmitting and receiving "offer data" and "acceptance data," "registering contact and marketing information" of individuals in a database, and providing "software tools" to communicate with those in the database. ('887 Patent col.21 l.35-63). Just as in *Alice*, "all of these computer functions are well-understood, routine, conventional activities previously known to the industry." *Alice*, 134 S. Ct. at 2359 (internal quotation marks and alterations omitted); *see id.* (finding that the "use of a computer to create electronic records, track multiple transactions, and issue simultaneous instructions" was not an inventive concept); *buySAFE*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network — with no further specification — is not even arguably inventive."); *Ultramercial II*, 772 F.3d at 716 ("[T]he steps of consulting and updating an activity log represent insignificant 'data-gathering steps,' ... and thus add nothing of practical significance to the underlying abstract idea." (citation omitted)); *Bancorp Servs.*,

687 F.3d at 1278 (holding a computer "employed only for its most basic function ... does not impose meaningful limits on the scope of those claims").

Even this "ordered combination of steps recites an abstraction." *Ultramercial II*, 772 F.3d at 715. The process of posting a project online, providing different levels of incentives for different levels of funds, storing the information of individuals who accept offers for incentives in a database, and providing software tools to contact the individuals through the database "all describe an abstract idea, devoid of a concrete or tangible application." *Id.* Defendants' arguments that the claim limitations spell out "a particular system that allows users to automatically create, manage, and fund their own projects using a specific collection of software tools that are operable from a remote site" are simply unavailing. (Def. Br. 14). More to the point, Defendants' repetition of words like "particular" and "specific" in bold italics when referring to the claims in the '887 Patent does not make them so. (*See id.* at 14-15). And while limitations like "operable from a remote site" and the construction of "entitlement" to include "at least one product and at least one service and at least one patronage," might add some degree of particularity, the concept embodied by the majority of the limitations describes[14] only the abstract idea of incentive-based funding or patronage implemented online. *See Ultramercial II*, 772 F.3d at 715; *see also Flook*, 437 U.S. at 593 (rejecting the argument "that

---

[14]    Defendants' semantic sleight-of-hand that the claims do not "describe" an abstract idea, but instead are "directed toward" a system incorporating software for managing a fan-funded project (*viz.*, what this Court has determined is an abstract idea), has no basis in the law and will not be addressed further. (Def. Reply 10-11).

if a process application implements a principle in some specific fashion, it automatically falls within the patentable subject matter of [Section] 101"); *cf. DDR Holdings*, 773 F.3d at 1258 (finding claims eligible where they recited specific manipulation that "over[rode] the routine and conventional sequence of events" preventing the "computer network [from] operating in its normal, expected manner").  Indeed, Defendants' own expert acknowledges that the '887 Patent is a "business model" implemented with a "network-based software solution."  (JAX Ex. 46 (Expert Report of Marshall Monroe) at ¶ 58 ("The '887 Patent describes a system that combines the business model of soliciting funds directly from interested individuals to finance the creation, completion, or distribution of a creative work, among other things, with a network-based software solution.")).

Moreover, the language of the '887 Patent itself belies Defendants' arguments about a "particular system" and "specific software tools."  As Plaintiff points out (Pl. Opp. 5-6), the '887 Patent specification expressly does not limit the invention to any particular system, software, or hardware:

> the computer systems ... may include various hardware and operating software ... for running software programs, browsing the Internet, communicating and/or operating with any device, including, for example, a printer, a display, a keyboard, a mouse, a modem, a phone, a wireless device, the Internet, a computer network, a sound system, and any other internal or external device.

('887 Patent at col.8 l.54-67).  The specification further admits that the invention "may make use of a combination of existing proven business models including banking, patron systems, merchandising partnerships, direct

marketing, publishing, file sharing and internet networking[.]"  (*Id.* at col.4 l.11-15).  It broadly asserts that the patented system "may be set up and run on the World-Wide-Web, thus using a plurality of websites and web pages, using, for example, html, xml, and java programming[.]"  (*Id.* at col.9 l.15-17).

At best, the claims of the '887 Patent describe the use of the Internet or a computer network to make identifying and soliciting funds from potential patrons easier and more efficient.  "But relying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible."  *OIP Techs.*, — F.3d —, 2015 WL 3622181, at *3.  While the concept of fan-funding may have been made a more realistic and fruitful endeavor with the advent of widespread Internet access, "cloaking [that] otherwise abstract idea in the guise of a computer-implemented claim" does not bring it within Section 101.  *Cf. MySpace*, 672 F.3d at 1267 (Mayer, J., dissenting).  Quite to the contrary, permitting this type of claim would "render the subject matter eligibility criteria in Section 101 virtually meaningless" given "the ubiquity of computers in contemporary life."  *Id.*  Accordingly, because the '887 Patent claims the abstract idea of incentive-based fan-funding and lacks an "inventive concept" sufficient to "transform" the claimed subject matter into a patent-eligible application of that idea, it is invalid under Section 101.[15]

---

15    Because the "threshold inquiry" of patent-eligibility is dispositive of invalidity, the Court need not, and indeed should not, decide the parties' other validity contentions related to obviousness, inventorship, and definiteness.  *See Bilski I*, 545 F.3d at 950 (holding that if a claim is not drawn to patent-eligible subject matter, it "must be rejected even if it meets all of the other legal requirements of patentability"); *Bilski II*, 561 U.S. at 602 (holding that the patent-eligibility inquiry is a "threshold test").  The Court observes that many of the arguments made for invalidity on these other grounds only bolster the eligibility determination.  Notably, for example, much of the prior art evidence was not

## CONCLUSION

For the foregoing reasons, the '887 Patent is drawn to patent-ineligible subject matter. Plaintiff's motion for summary judgment of invalidity of the '887 Patent is GRANTED, and Defendants' motion for summary judgment of validity of the '887 Patent is DENIED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

    SO ORDERED.

Dated:      June 29, 2015
         New York, New York

                                     KATHERINE POLK FAILLA
                                  United States District Judge

itself patented, suggesting that this evidence operated in the province of ideas. And it would not be surprising that a purported second inventor would disclaim having "invented" an abstract idea.

(12) **United States Patent**
    Camelio

(10) **Patent No.:** **US 7,885,887 B2**
(45) **Date of Patent:** **Feb. 8, 2011**

(54) **METHODS AND APPARATUSES FOR FINANCING AND MARKETING A CREATIVE WORK**

(75) Inventor: **Brian Camelio**, New York, NY (US)

(73) Assignee: **ArtistShare, Inc.**, New York, NY (US)

( * ) Notice:    Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1539 days.

(21) Appl. No.: **10/403,398**

(22) Filed: **Mar. 31, 2003**

(65) **Prior Publication Data**

US 2004/0015427 A1    Jan. 22, 2004

**Related U.S. Application Data**

(60) Provisional application No. 60/394,974, filed on Jul. 9, 2002.

(51) **Int. Cl.**
**G06Q 40/00**    (2006.01)

(52) **U.S. Cl.** ............................. **705/37**; 705/35; 705/36; 705/38; 705/1; 705/2; 705/22; 705/26; 705/27; 713/156; 709/214

(58) **Field of Classification Search** .................... 705/7, 705/35–38, 1, 26–27; 709/214; 713/156
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,826,024 A * 10/1998 Higashimura et al. ....... 709/214
6,240,415 B1    5/2001 Blumberg ..................... 707/9

| | | | |
|---|---|---|---|
| 6,285,989 | B1 | 9/2001 | Shoham ........................ 705/37 |
| 6,792,411 | B1 * | 9/2004 | Massey, Jr. .................. 705/35 |
| 6,973,439 | B1 * | 12/2005 | Wilk ........................... 705/35 |
| 7,451,103 | B1 * | 11/2008 | Boyle et al. .................. 705/35 |
| 2002/0032626 | A1 * | 3/2002 | DeWolf et al. ................ 705/35 |
| 2002/0099611 | A1 * | 7/2002 | De Souza et al. ............. 705/26 |

(Continued)

FOREIGN PATENT DOCUMENTS

JP    2001325471    * 11/2001    ................. 82/214

(Continued)

OTHER PUBLICATIONS

Ronnie Gul ("Finding pic coin online"; Daily Variety, Jul. 6, 1998).*

(Continued)

*Primary Examiner*—Harish T Dass
(74) *Attorney, Agent, or Firm*—Rissman, Hendricks & Oliverio, LLP

(57)    **ABSTRACT**

The present invention is directed to a system and method for raising financing and/or revenue by artist for a project, where the project may be a creative work of the artist. The method including registering, by at least one artist, with a centralized database, at least one or more projects, offering, by the at least one artist, an entitlement related to the artist in exchange for capital for the project of the artist. The method and system may also include searching, by an interested party, the centralized database, for the least one artist, registering, by the interested party, with the centralized database and accepting the offer by the interested party for the entitlement related to the project. The capital may then be forwarded to the artist and the entitlement provided to the interested party.

**37 Claims, 63 Drawing Sheets**



**US 7,885,887 B2**

Page 2

| U.S. PATENT DOCUMENTS | | | | |
|---|---|---|---|---|
| 2002/0174035 | A1* | 11/2002 | Stern et al. ..................... | 705/27 |
| 2002/0198723 | A1* | 12/2002 | Mowry ......................... | 705/1 |
| 2003/0038099 | A1* | 2/2003 | Bauman et al. .......... | 211/71.01 |
| 2005/0075956 | A1 | 4/2005 | Artis | |

FOREIGN PATENT DOCUMENTS

| WO | WO 02/25547 A1 | 3/2002 |
|---|---|---|

OTHER PUBLICATIONS

Surfview web pages.*
Electronic book.*
Low-buget movie.*
"McLachlan court ruling a lesson for songwriters ; Collaborations should be noted, judge's ruling says; [1 Edition]"; Greg Quill. Toronto Star. Toronto, Ont.: Dec. 14, 1999. p. 1.*

* cited by examiner

Fig. 1





FIG. 2

Fig. 3





FIG. 4



ARTIST CREATES IDEA FOR PROJECT
ARTIST ESTABLISHES ARTISTSHARE ACCOUNT
502
ARTIST CREATES PROJECT ON ACCOUNT PROPOSING PROJECT TO FANS AND OTHER INTERESTED PARTIES
504
PRE-SALE ACCEPTANCE OF FUNDS FOR PROJECT
TRADTIONAL SALE
SUBSCRIPTION ACCESS
SUBSCRIPTION SERIES
AUCTION
PATRON SPONSOR SHIP
LICENSING
506
DEVELOP FAN BASE: EMAIL, PHONE, ADDRESS LISTS OF FANS, FANS CONTRIBUTING TO PROJECT BECOME PATRONS
508
PROVIDE PATRONS WITH PERKS, ENTITLEMENTS OR INCENTIVES PENDING RELEASE OF THE PROJECT
510
RELEASE OF ALBUM EMBODYING PROJECT
512
DISTRIBUTE ALBUM TO PRE-SALE PATRONS
514
ADD ALBUM TO POOL OF AVAILABLE CREATIVE WORKS FOR SALE/LICENSE OFRIGHTS ASSOCIATED WITH THE ALBUM
516
POST-RELEASE PURCHASES
TRADTIONAL SALE
SUBSCRIPTION ACCESS
SUBSCRIPTION SERIES
AUCTION
PATRON SPONSOR SHIP
LICENSING
ALBUM MAY BE SAME OR A VARIATION
518
DISTRIBUTION OF ALBUM VIA DOWNLOAD OR DELIVERY OF HARD MEDIA EMBODYING ALBUM (E.G., COMPACT DISC)
520
DEVELOP FAN BASE: EMAIL, PHONE, ADDRESS LISTS OF FANS, FANS CONTRIBUTING TO PROJECT BECOME PATRONS
522

FIG. 5

# Fig. 6

# Fig. 7



Fig. 8



Fig. 9



Fig. 10



Case: 15-1886    Document: 21    Page: 136    Filed: 10/02/2015

Fig. 11



Fig. 12



Fig. 13



Fig. 14



Fig. 15



Fig. 16.

Artist
Login/Security
Logon Failed
Reminder
Logon Succeeded
Artist Account Management
Main Pages
Manage Projects
Project Management Pages
Project Info
Inventory
Auctions
Patrons
Subscriptions
Licensing
Personnel
News
Mailing
Media Shows
Images
Sales Containers
Manage Homepage
Generate Reports
Manage Account
Page Attributes
•Mailing list dropdown
•Import names
•Create Mailing
•Send announcement
•Export names
•Click thru tracking/reports

Fig. 17

Artist
Login/Security
Logon Failed
Reminder
Logon Succeeded
Artist Account Management
Main Pages
Manage Projects
Project Management Pages
Project Info
Inventory
Auctions
Patrons
Subscriptions
Licensing
Personnel
News
Mailing
Media Shows
Images
Sales Containers
Manage Homepage
Generate Reports
Manage Account
Page Attributes
•All Media Shows list
•Edit selected Media Show
•Create new Media Show
•Delete Media Show
•See Fig 21 for details

Fig 18



Fig. 19

Artist
Login/Security
Logon Failed
Reminder
Logon Succeeded
Artist Account Management
Main Pages
Manage Projects
Page Attributes
•Manage/Upload Artist Photos
•Add/Remove/Edit links
•Add/Remove/Edit promotional Media Shows
•Add/Remove/Edit promotional Audio
•Add/Remove/Edit promotional Video
•Add/Remove/Edit Featured Project
•Add/Edit/Remove Feature Article
•Add/Edit/Remove Bio
•Add/Edit/Remove Events calendar
•Add/Edit/Remove specialized items such as Discography/Scores and Parts/ Photo Galleries etc…
•Much of the Artist's content is made available for syndication via Web Service. This availability is at the sole discretion of the Artist or managing agent.
Manage Homepage
Generate Reports
Manage Account



# Fig. 20



## Fig. 21



Fig. 22

Artist
Login/Security
Logon Failed
Reminder
Logon Succeeded
Artist Account Management
Main Pages
Manage Projects
Manage Homepage
Generate Reports
Manage Account
Page Attributes
•View/Manage Billing info
•Credit Card info
•Mailing Address
•Subscription info
•Add/Remove Account features
•Purchase additional storage space
•Add publishing titles to management list.
•Add Users To Account
•Add/Edit Admin info
•Add/Edit/Remove additional user information
•Affilliate program management
•Merchant account management
•All other ArtistShare account management is done here



## Fig. 23A



Case: 15-1886    Document: 21    Page: 149    Filed: 10/02/2015

## Fig. 23B



Fig. 24



Fig. 25

Fan
Login/Security
Logon Failed
New Account
Reminder
Logon Succeeded
ArtistShare Public Pages
ArtistShare Member Area
Patron Account Management
Homepage
Feature Projects
Downloads
Member Log-In
Media Shows
Featured Artist
Featured Auction
Artist Homepage
Artist Project Page
News and Events
Page Attributes
•Main Navigation Menu
•List of Feature Projects
•Links to Artist Homepage and Join Project (make a purchase) and descriptive information for each file

Case: 15-1886    Document: 21    Page: 152    Filed: 10/02/2015

Fig. 26



Fig. 27



Fig. 28



New Account

Fan → Login/Security

Logon Failed

Reminder

Logon Succeeded

ArtistShare
Public Pages

ArtistShare
Member Area

Patron Account
Management

Homepage

Feature Projects

Downloads

Member Log-In

Media Shows →

Featured Artist

Featured Auction

Artist Homepage

Artist Project Page

News and Events

Page Attributes

• Main Navigation Menu

• Choose from all available free media
broadcasts

• Search by keyword

Fig. 29



## Fig. 30



Fig. 31

Fan
Login/Security
Logon Failed
New Account
Reminder
Logon Succeeded
ArtistShare Public Pages
ArtistShare Member Area
Patron Account Management
Homepage
Feature Projects
Downloads
Member Log-In
Media Shows
Featured Artist
Featured Auction
Artist Homepage
Artist Project Page
News and Events
Page Attributes
•Main Navigation Menu
•Artist Photo
•Links to featured products
•Links to Free Downloads
•Links to Free Audio/Video
•Links to all open projects
•Links to archived projects
•Links to externally hosted pages

Fig. 32



Fig. 33



Fig. 34



Fig. 35



Fig. 36



Fig. 37



Fig. 38



Fig. 39

Fan
Login/Security
Logon Failed
New Account
Reminder
Logon Succeeded
ArtistShare Public Pages
ArtistShare Member Area
Patron Account Management
Homepage
Feature Projects
Downloads
Member Log-In
Media Shows
Featured Artist
Featured Auction
Artist Homepage
Artist Project Page
News and Events
Page Headers
Description
Listen
Watch
Downloads
Read
Personnel
Patrons
Media Shows
Join
Page Attributes
•Main navigation panel
•Project navigation panel
•Project Progress Meter
•List of Project Patrons divided by sponsorship level
•Optional links to pages related to the personnel name

Fig. 40



# Fig. 41

Fan
Login/Security
Logon Failed
New Account
Reminder
Logon Succeeded
ArtistShare Public Pages
ArtistShare Member Area
Patron Account Management
Homepage
Feature Projects
Downloads
Member Log-In
Media Shows
Featured Artist
Featured Auction
Artist Homepage
Artist Project Page
News and Events
Page Headers
Description
Listen
Watch
Downloads
Read
Personnel
Patrons
Media Shows
Join
Page Attributes
•Main navigation panel
•Project navigation panel
•Project Progress Meter
•List of Project Products with buy/bid buttons, product descriptions ,optional patron levels, optional limited quantities, optional links to Product-Item descriptions if the product is a bundle of items.

Fig. 42

Fig. 43





Fig. 44

Fig. 45



Fig. 46



Fig. 47



# Fig. 48



Fig. 49



Fig. 50



Fig. 51



Fig. 52



Fig. 53



Fig. 54



Fig. 55



Fig. 56



Fig. 57



## Fig. 58



Fig. 59



Fig. 60

Client
Login/Security
Logon Failed
New Account
Reminder
Logon Succeeded
ArtistShare
Industry Member Area
Artist Account
Management
Choose Media
Statistics
Private Auctions
Page Attributes
•Select Media Type/Types
• Search By
•Sales
•Hits per page
•Demographics
•Number of people
on mailing list

Fig. 61



Fig. 62



US 7,885,887 B2

**1**

## METHODS AND APPARATUSES FOR FINANCING AND MARKETING A CREATIVE WORK

### CLAIM TO PRIORITY

The present application claims benefit under 35 U.S.C. §119(e) of U.S. provisional patent application No. 60/394, 974, filed Jul. 9, 2002, the entire disclosure of which is herein incorporated by reference.

### FIELD OF THE INVENTION

The invention is directed to a new business and distribution paradigm for creative works. More particularly, the invention is directed to methods and systems for obtaining financing from interested individuals to produce a creative work in exchange for an entitlement from the author of the work. The invention is also directed to methods and systems for presenting an artist-centered business model paradigm (using the entertainment industry as an example). The invention is also further directed to a portal for allowing industry (industry professionals and other interested individuals or groups of individuals) to shop for new talent and/or purchase or license rights for particular works (for example). Such rights may include manufacturing rights, distribution rights, merchandising rights, and intellectual property (IP) rights.

### BACKGROUND OF THE INVENTION

A substantial majority of artists, authors and performers have difficulty in producing and/or distributing creative works which are economically beneficial to the artist without losing the rights (and therefore much of the royalties) of the creative works or sacrificing a significant portion of the sale price. Specifically, with regard to musical creations, the majority of musicians find it incredibly difficult, if not impossible, to record, market and distribute a song/album to their fans and make a profit, unless the artist has a recording contract with a record company, and the song/album is well received (well sold) by fans and/or the public. In fact, even if the artist has a recording contract, artists generally make little to no money from recording an album since artists are either required to pay for producing the album up front, or through sales of the album. If the latter, most times sales of the album do not cover those costs. Thus, artists generally don't make any money from making albums and often times are never able to recoup the costs of making the album.

For example, according to the publication, "This Business of Music" the artist royalty on a typical record album is as follows: new artists usually typically receive 7 to 12 percent of the suggested retail list price for domestic sales. In the case of a superstar, the royalty on domestic sales may start at 15 percent or more of the suggested retail price. Accordingly, here is a typical all-in royalty calculation on a $14.98 compact disc where the artist's base royalty is 12 percent:

> 12 percent−3 percent (producer's royalty)=9 percent

> 9 percent×0.75 (25 percent reduction for packaging) =6.75 percent

> 6.75 percent×0.85 (15 percent for "free goods")=5.74 percent

> 5.74 percent×0.80 (20 percent reduction for CDs)=4.59 percent

**2**

> 4.59 percent×0.65 (35 percent reduction for reserves) =2.98 percent

> 2.98 percent of $14.98=$0.447.

The profit per album for superstars is only modestly more, about $0.56. However, superstars generally sell enough albums to cover recording and distribution costs. However, the above royalty calculations do not take into account items charged against an artist's royalty account, such as video production costs or independent promotion costs.

Another problem with the current recording business model is copyright infringement from the trading of digital copies of artists' creations over the Internet (for example) using peer-to-peer file sharing networks. Currently, both artists and the recording industry are losing millions (or perhaps billions) of dollars in lost sales due to the piracy of copyrighted works.

Accordingly, there exists a need for a method and/or system which will allow artists, for example, to raise capital on their own and profit for producing a creative work, preferably prior to producing the work, and preferably without a recording contract with a recording company.

Another problem for up-and-coming artists is the lack of exposure to a broad audience. Without signing a contract with a record company, it has been virtually impossible for new artists to gain the exposure they need to sustain grow financially and creatively. Accordingly, there is a need for a broader more effective method for artists to develop a larger fan base without sacrificing the majority of their profits or their intellectual property.

### SUMMARY OF THE INVENTION

Accordingly, the invention addresses the above-noted problems with the current business model of different artist industries (especially the recording industry) and presents systems and methods for financing creative works, marketing creative works, and addresses the needs of artists, fans, industry and investors.

The invention may also include a web based application, ArtistShare, which may provide products and services to artists, fans/patrons, industry and investors that enable them to either separately or collectively, create, finance, sell, buy, distribute or invest in new or existing creative works. The invention may also offer artists a unique way to develop their audience and enhance relationships with their fans and/or patrons using, for example, existing file-sharing networks.

The advantages for artists may include:

Increased revenue. Musicians, for example, may realize greater revenue than a traditional recording contract with a recording company—all proceeds after expenses go to the artist;

A smaller fan/patron base is needed to generate greater revenue and produce a profit;

Reduced risk and recoup time on investment and/or the elimination of any personal out of pocket expenses;

Artist retains ownership and control of all rights associated with the creative work and/or the artist;

No prohibiting or unfair contracts (recording contracts for example);

A single system that may provide all necessary services to market their creative works to the public and collect financing for their creative works;

Direct exposure to other industries;

Freedom to be creative in many ways (e.g., creating incentives for patrons);

**3**

Lesser known artists or artists of different genres may have the opportunity to gain more exposure and thus build a larger fan base through an Artist Affiliate program where an artist of any level or genre (preferably artists of a higher or more diverse profile) can advertise or promote another artist to their existing fan base in exchange for a percentage of each sale generated by the promotion. The sales may be tracked by special variables contained in the links, or any other means familiar to those of ordinary skill in the art.

Any artist big or small may enjoy increased revenue by advertising or recommending fellow artists from any genre and collecting referral fees for each sale generated through the Artist Affiliate program.

The advantages for the fan or patron may include:

Opportunities to obtain one-of-a-kind and/or collectable items from the artist, as well as an opportunity to establish a more personal relationship with the artist;

The ability to maintain an account which allows them access to purchase items, services, special offers, contests, and the like, offered by participating artists

A client specific application(s) operable on a computer system of a fan which may act as a private portal to ArtistShare artists, projects and products.

Industry, industry professionals and other interested individuals also receive benefits from the invention, which may include:

Reduction in risk of investment due to the increased ability to predict the success of a product based on the results of the initial online offering by the artist;

Increased effectiveness of direct target marketing through the analysis of popularity and demographic statistics generated by ArtistShare system;

Decreased overhead expenses by purchasing physical inventory directly from ArtistShare thus eliminating the middle tier.

Reduced or eliminated need to purchase and stock physical inventory.

Obtain a competitive edge by partnering with ArtistShare or an artist to offer unique proprietary or exclusive merchandise to their customers.

Access to a large and convenient searchable pool of licensable content for resale, distribution, syndication etc. . . .

Opportunities to purchase or bid on an artist's work for commercial resale. Record distributors, for example, may be provided with opportunities to purchase rights for printing and distributing compact discs;

Retail sales outlets, for example, may be provided with opportunities to purchase or bid on merchandising rights directly from the artist or a participating recording/publishing company/distributor;

Industry and Industry professionals may also be provided with tools for analyzing patterns of online sales, so that the interested party may make an informed decision to develop products while reducing risk and production expenses;

Industry may be provided branding services and corporate sponsorship opportunities for linking their products and/or services to an artist and their work (music for example) to reach their respective demographic market.

Investors and other interested individuals also receive many benefits from the invention, which may include:

The ability to re-sell (outright sale or auction) their rights at any time;

**4**

Reduction in risk of investment due to the increased ability to predict the success of a product based on the results of the initial online offering by the artist.

Investors may be provided with means to buy, sell and trade publishing rights, copyrights and intellectual property rights in new or existing works so that the investor may collect licensing royalties for, in turn, licensing the creative work.

Investment tools may also be provided which allows the investor to determine the value of such rights.

The invention may make use of a combination of existing, proven business models including banking, patron systems, merchandising partnerships, direct marketing, publishing, file sharing and internet networking, file compression, audio/video technologies, and online auctions (for example).

Accordingly, in a first aspect of the present invention, a method for generating capital for a project of an artist may include transmitting data from a server to a client via a network for presenting an offer from the artist, for example, to an interested party, the offer for an entitlement related to a project in exchange for capital for the project, for example, and the project includes at least one or more creative works by the artist or other party. The method also includes receiving at the client such data and presenting the offer to the interested party, accepting the offer by the interested party, receiving data at the server from the client accepting the offer and processing of the acceptance data by the server.

In another aspect of the invention, a method for generating capital for a project of an artist is provided and may include communicating an offer by an artist, for example, to an interested party for an entitlement which may be related to the artist at a predetermined level of patronage among a plurality of levels of patronage in exchange for a corresponding predetermined amount of capital for the project. The project may include at least one creative work. The method may also include acceptance of the offer by the interested party for patronage in the project at one of the levels of patronage among the plurality of levels and providing the entitlement in exchange for the capital.

In another aspect of the present invention, a system for generating capital for a project of an artist may include transmitting means for transmitting data from a server to a client via a network for presenting an offer from the artist, for example, to an interested party. The offer may be for an entitlement related to the artist in exchange for capital for the project, where the project may include one or more creative works of the artist. The system may also include receiving means for receiving at the client such data and presenting the offer to the interested party, transmitting means for transmitting data back to the server from the client accepting the offer and processing means for processing the acceptance data by the server.

In yet another aspect of the invention, a system for raising capital by an artist for a project is provided, where the project may include one or more creative works of the artist. The system may include communicating means for communicating an offer by an artist to an interested party for patronage in the project at a predetermined level of patronage among a plurality of levels of patronage in exchange for a corresponding predetermined amount of capital for financing the project, for example. Each level of patronage may include an associated entitlement related to the artist. The system may also include acceptance means for accepting the offer by a patron for patronage in the project at one of the levels of participation among the plurality of levels.

In another aspect of the present invention, a method of managing a right in a creative work is provided and may

US 7,885,887 B2

**5**

include collecting information on a plurality of creative works, each creative work having one or more corresponding rights for sale or license, storing the information in a searchable database, offering individuals an opportunity to purchase at least one of the one or more right in at least one of the creative works of the plurality of creative works and purchasing the one or more rights.

In another aspect of the present invention, a system for generating capital for a project of an artist is provided, where the project may include one or more creative works. The system may include a database for storing information related to a plurality of creative works where each creative work having a respective owner. The system also includes a server hosting an application for presenting an offer from the owner of a respective creative work to an interested party. The offer may be for an entitlement related to the creative work in exchange for capital for the project. The server communicates with a client for presenting the offer to the interested party.

In another aspect of the invention, a method of creating capital for an artist, for example, is provided and may include registering, by at least one artist, with a centralized database, at least one or more of a completed creative work and/or one or more of an uncompleted creative work. The method also may include offering, by the at least one artist, an entitlement related to the at least one of the completed creative work and/or the at least one of the uncompleted creative work in exchange for capital, for example, for a project of the artist or other party, where the project may include at least one or more second creative works. The method further may include searching, by an interested party, the centralized database, for the least one artist, registering, by the interested party, with the centralized database, accepting the offer, by the interested party, for the entitlement, forwarding of the capital to the artist and receiving the entitlement by the interested party.

In yet another aspect of the invention, a system for creating capital for an artist or other party is provided and may include a server having one or more application programs operable from a remote client for registering, by at least one artist, with a centralized database, at least one or more of a completed creative work and/or one or more of an uncompleted creative work, presenting an offer, by the at least one artist, to an interested party for an entitlement related to, for example, the at least one of the completed creative work and/or the at least one of the uncompleted creative work in exchange for capital for a project of the artist, the project comprising one or more second creative works. The application programs may also be operable to present a query interface for allowing a search, by an interested party, of the centralized database, for the least one artist, registration, by the interested party, with the at least one artist found in a query of the centralized database and/or a second database of interested parties and accepting of the offer by the remote client, by the interested party, for the entitlement.

In another aspect of the present invention, a web page for generating capital for a project of a first artist is provided and may include an advertisement for the project of the first artist, the project comprising at least one creative work of the first artist and a link regarding an offer for an entitlement related to the first artist in exchange for capital for the project, wherein the link allows the interested individual to accept the offer and provide the capital.

Other aspects of the invention include computer application programs and computer readable media, for performing one or more of the methods recited in the above-noted aspects, as well as web pages and the like for presenting the various aspects of the invention over the Internet (for example).

**6**

These and other advantages, objects and features of the invention will be apparent through the detailed description of the embodiments and the drawings attached hereto. It is also to be understood that both the foregoing general description and the following detailed description are exemplary and not restrictive of the scope of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a diagram depicting an overview of the Artist-Share system according to the invention.

FIG. **2** illustrates an exemplary computer system operational for performing the methods and process according to embodiments of the invention.

FIG. **3** illustrates a business logic diagram of ArtistShare system according to one embodiment of the invention.

FIG. **4** illustrates a kiosk system according to an embodiment of the invention.

FIG. **5** illustrates a flowchart of a process flow for an artist promoting and funding a project.

FIGS. **6-22** are block diagrams illustrating attributes of one or more web pages and/or one or more links for managing an artist account in an embodiment of the present invention.

FIG. **23**A is a block diagram illustrating attributes of one or more web-pages and/or one or more links for fans accessing the ArtistShare system according to an embodiment of the invention.

FIGS. **23**B-**42** are block diagrams illustrating attributes one or more web pages and/or one or more links for public web pages of the ArtistShare system according to an embodiment of the present invention.

FIGS. **43-49** are block diagrams illustrating attributes one or more web pages and/or one or more links for member pages of the ArtistShare system according to an embodiment of the present invention.

FIGS. **50-57** are block diagrams illustrating attributes one or more web pages and/or one or more links for the management of fan accounts according to an embodiment of the invention.

FIGS. **58-62** are block diagrams illustrating attributes one or more web pages and/or one or more links for industry accounts according to an embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The invention will be described with reference most times to the musical recording industry and musical recording artists. However, the present invention has much broader application to industries related to creative works in art, writing, film, photography and any other creative project or work and corresponding industry.

Terminology:

An Artist may be, but is not limited to, an author, musician, composer, painter, sculptor, filmmaker, actor/actress, software engineer, architect and any other individual(s) who authors or creates a new work.

A Fan may be, but is not limited to, a consumer, admirer or follower, mentor and any other individual(s) interested in the Artist's work.

A Patron may be, but is not limited to, a fan (a consumer, admirer or follower, mentor and the like) that registers with ArtistShare and/or contributes to or purchases an Artist's project, work or the actual Artist.

US 7,885,887 B2

7

An Investor may be, but is not limited to a patron or group of patrons, corporations, private companies, and any individual(s) interested, for example, in IP investment, corporate branding through advertising, partnership or any other business relationship with an artist or an artist's work.

An Industry individual of entity may be, but is not limited to investors, record companies, publishers, movie production companies, retail outlets, product distributors, and the like, or any individual(s) interested in financing, marketing, advertising, selling, licensing or distributing an artist's work.

Overview of Some of The Embodiments The Invention

The invention may be directed to the following embodiments which may be inter-related and may be used separately or may be used to complement one another to form a systematic and comprehensive system for funding, marketing, purchasing, licensing and distributing creative works and talent.

Group I. In a first grouping of embodiments, methods and systems are provided which may allow artists to raise capital for funding a project (e.g., song, album, etc.), or market an existing work (or service) to fans and users (industry professionals, other artists, and the like) through an Internet (for example) portal.

In some related embodiments of Group I, a system and method for lesser-known artists or artists of different genres for increasing their exposure is provided. This allows the lesser-known artist or an artist of a different genre to build a larger fan base. Specifically, this embodiment may allow an artist of any level or genre (preferably artists of a higher or more diverse profile) to advertise or recommend on a home page of the artist (or other web page) another artist to their existing fan base in exchange for a percentage of each sale generated by the recommendation. The sales are tracked by one or more variables contained in one or more links to the associated artist. Thus, any artist big or small can enjoy increased exposure and/or revenue by advertising or recommending fellow artists from any genre and collecting referral fees for each sale generated through the system.

Group II. In a second group of related embodiments, the invention may include an industry portal where industry professionals including, for example, retailers, wholesalers, distributors, producers, industry executives, corporate management, investors and the like, or other interested parties may browse and shop for talent, available creative content and associated rights thereto for purchase or license directly from the artist or an owner of the right. The associated rights may include manufacturing of compact discs and other media for playing the finished recordings, distribution of the media, publishing rights, merchandising rights, as well as the copyright, trademark and/or other IP right in the creative work.

The rights may be outright sold or auctioned according to any online/offline auction system. This group of embodiments may thus allow users (individuals, corporate entities and the like) to peruse a database of artistic creations (old, new and existing, finished and unfinished) to find particular works to purchase or license any one or more of the associated rights. For example, a movie producer may search the database to find songs to license for use in an upcoming movie. A record distributor might want to obtain the distribution rights to a song for distributing through a retail outlet. A book publisher may review a database of fiction to obtain the rights to distribute the book (e.g., Barnes and Noble, Inc., Simon Schuster, etc.).

Group III. A third group of related embodiments is directed to a distribution system (kiosk) for retail establishments, for example (shopping malls, grocery stores, and the like) and/or

8

wholesale distributors. The kiosk may be a computer-based system, which may access completed artist works (or works in progress) for purchase/licensing by a patron or client. The system may be linked to a master database of artists' works, in which a patron can select and receive the work through any means of distribution offered. For example, the patron can have a CD custom made to his or her individual tastes. A record outlet could feasibly eliminate inventory and print CD's to order for their customers. Moreover, the kiosk may be used by fans/patrons/other individuals to participate in projects.

Overall System

As shown in FIG. 1, the ArtistShare system invention may include four main components: ArtistShare 100, a network (internet) server based system to which artists may post creative works and other projects, ArtistWare 104, which may be a client based application for authors and artists to interact with ArtistShare, IndustryWare 106, preferably a client based application for industry personnel, for example, including executives from the designated industries associated with various creatively produced products, and FanWare 102, a client application for fans and patrons. One skilled in the art will appreciate, however, that invention may only include the ArtistShare component to which artists, fans and industry can access and interact with through an Internet portal using, for example, a web browser.

FIG. 2 illustrates a system which may be used for operating the methods according to the various embodiments, and may follow, for example, the client/server network architecture. Examples of client/server network architecture can be seen in U.S. Pat. Nos. 6,397,253 and 6,466,937, for example, the disclosures of which are herein incorporated by reference. As shown, a centralized ArtistShare system includes a host 202 in communication with one or more databases 203. The database may be provided with the host or may be a separate database and database management system in communication with the host either directly or via a network. The host may be in communication with any one or more of a client computer 204 of an artist, a client computer 206 of an Investor, a client computer 208 of a fan (patron), a client computer 210 of a retail establishment, a client computer 212 of an Industry Professional (individual, entity, or company) and a client computer 214 of a manufacturer (compact discs for example). Each of the clients may communicate with the host via a computer network which may comprise the Internet. Communications 218 between the various clients and the Internet may be of any wired or wireless protocol familiar to one of skill in the art. Moreover, the clients may be any wired or wireless device including but not limited to telephones, personal digital assistants (PDAs), an email device (e.g., Blackberry device), personal computer, kiosk, television, any future means of communication and the like.

One of skill in the art will appreciate that the computer systems outlined above which may be used with any of the embodiments of the invention, may include various hardware and operating software, familiar to those of skill in the art, for running software programs, browsing the Internet, communicating and/or operating with any device, including, for example, a printer, a display, a keyboard, a mouse, a modem, a phone, a wireless device, the Internet, a computer network, a sound system, and any other internal or external device. Such computer system may also include RAM memory, ROM memory, at least one hard-drive, other storage media, and other internal and external components which may be used for carrying out the operation of the computer and embodiments of the present invention. Moreover, such com-

US 7,885,887 B2

**9**

puter systems may include one or more processors for processing and controlling the operation of the computer system, thus, embodying the processes of the various embodiments of the present invention. To that end, the processor, associated hardware and/or communications may be a means for carrying out the various method embodiments.

The ArtistShare system may provide products and services to any one or more of artists, fans, patrons, investors, industry (retail outlets, distributors, recording companies, corporations, and the like) or other interested parties. The interaction among these groups enables each of the groups either separately or collectively to create, finance, sell, buy, distribute and invest in new creative works (music, film, photography, paintings, books, software and the like).

The ArtistShare system may be setup and run on the World-Wide-Web, thus using a plurality of websites and web pages, using, for example, html, xml and java programming, to establish the system according to the invention and perform the methods according to the embodiments. Overviews of web pages for these embodiments are shown in FIGS. **6-62**, and the associated written description included below. Using such websites and associated web pages and services, the respective users of the system may register a respective account with the ArtistShare host to access content of Artists, for example. However, public web pages and web services of the ArtistShare system, which may not require an account, may be available so that an individual can peruse publicly available material of artists. This public material allows the individual to make a determination on whether they should register an account with an artist. In some embodiments, for example, fans may create fan accounts, industry professionals may create industry accounts, and artists may create artist accounts and the like. Each account may be type specific, in that services offered by one account are only available to that type of account. For example, artist accounts may only allow projects to be posted for funding. Fan/Patron accounts may only allow purchasing of patronage to artist websites associated with the ArtistShare system and the purchase of associated goods. Industry accounts may only allow access to web pages for investing, licensing, purchasing of rights to created works. Information entered on the web pages or through web services for each account is tracked and stored in one or more databases.

Each of the client-based applications may also include an audio and video file management system/software (AV system) which may be used in conjunction with or operate complimentary to the ArtistShare system. The AV system allows for creation of streaming and downloadable media in any available or future format including MP3, WindowsMedia, WAV, AIRR, AVI, MPEG, and Flash (for example), from files and from audio CDs. The AV system for ArtistWare, for example, may also allow uploading of media from an artist directly to an artist account on the ArtistShare system. Artist-Ware may also manage a locally stored database of the artist's creations, which, though additional features such as CD burning capabilities, may be archived and physically distributed.

### Group I Embodiments

The computer system utilizing a client-server architecture, as outlined above, may be used in the embodiments of Group I to operate application software for presenting offers to users on a client computer, for entitlements and/or patronage levels from the artist in exchange for capital for a project of the artist. The capital may be used to fund the project, where the project may include one or more creative works of the artist (or other artists). Entitlements may be any product, service

**10**

and/or benefit conferred from the artist or other party to the user. The users, through the client computer, can accept (or reject) the offer, thereby sending data back to the server for such acceptance. The server application then processes the acceptance, thereby the capital may be provided from the user via the client by using a credit card, debit card, check, wire transfer, or any other Internet payment method familiar to those of skill in the art. The entitlement may be provided at any time dictated by a specific offer—thus, it may be provided at a predetermined times, or at various predetermined intervals. Accordingly, these embodiments (along with other embodiments) are detailed below with reference to a web-based system for providing the offers for different entitlements to clients.

To that end, the various components of the ArtistShare system allow for a business paradigm that focuses on the artist. Accordingly, as shown in FIG. **3**, an artist account **300** may include an artist account manager **302**, and one or more artist members **304, 306, 308** and **310**. The artist may comprise a single person (musician, writer, actor, educator, programmer, artist, manager, and the like) or an entity (such as a band). In addition, the artist also preferably designates at least one individual (Artist Member) to be an Account Manager who acts as an Administrator on the account. The Account Manager may create artist Member accounts of people associated with the artist. Artist Members may be anyone authorized by the artist or the Account Manager to manipulate the artist account.

A project may be private (for Artist Members) and may be public (for Fans/Patrons/Industry/Investor), and preferably, a combination thereof. In that way, the artist may use the private portion to organize his thoughts and goals (both creatively and financially), and either allow the public to see this process or keep it private.

The artist may create one or more projects **312, 314** and **316**, each representing a creative work or works being developed or promoted by the artist. It is these projects for which the artist may seek to either finance or market to fans, industry professionals and like. Each project is preferably owned outright by the artist and may include, for example, one more sales containers **318, 320** and/or **322**, which may represent products and services which may be sold or licensed to interested parties. These products and services may also be included as entitlements to a user. The cost of a product or service (i.e., entitlement) may be used then to fund a project.

Sales containers, which may include but are not limited to:

auction containers,

sales item containers,

subscription series containers,

subscription access containers,

pay-per view containers,

licensing containers, and

patron sponsorship containers,

which may be used to organize and present artist works and entitlements to interested parties.

Each sales container may include a core set of information describing the offering, the pricing structure, as well as any additional attributes specific to the container type. The products and services offered in the sales containers may be comprised of one or more inventory items **324** and **330**, for example. The completed sales container becomes the product.

For example a subscription series container may include services which deliver news, information, products and services to an individual on a regular basis. Accordingly, song bytes, video bytes, press-releases, and other assorted artist

**11**

information may be delivered to an individual daily, weekly, monthly, and quarterly, for example.

A sales item container, for example, may include a combination of inventory items such as downloadable songs, sheet music for the songs and a one hour telephone lesson by the artist on songwriting techniques which is purchased once and delivered to the patron both immediately (download songs and scores) and at a later date (scheduled time for telephone lesson).

Inventory items may include two parts: an inventory record (database) **326**, **332**, and an associated physical item (computer file, page, actual physical item that can be delivered to the customer through any means available). In the database each inventory item may be associated with a given sales type. A sales type may be, for example, available item (the item already exists) or pre-sale item (the item does not yet exist).

Thus, as shown in the figure, inventory items may include (for example) downloadable files **328** (such as an MP3 file of a song the artist has produced or a text document on a chapter of a novel if the artist is a writer). An inventory item may also be a physical product **334** such as a compact disc or work of art, which may be delivered via courier to the individual making the purchase. An inventory item could be a service **337** offered by the artist such as a private lesson over the telephone or a personalized birthday phone call.

To create an inventory item, for example, a first step may be to create an inventory item record in an inventory database by an artist. The database may include respective fields for the inventory item including a sales type, the name of the item, the description, the copyright information, product category, delivery method, item availability date, and a shipping size and weight, if required (for example). Next, the artist may upload an associated inventory file (for a product concerning a file download, streaming media or any other computer based delivery method).

Moreover, each inventory item may be obtained either freely (for promotion), or may be purchased as specified by the artist (for example). Accordingly, a shopping cart feature is preferably incorporated with the ArtistShare system for fans to purchase such inventory items via sales containers from the Artists.

Accordingly, embodiments of the invention center around the ArtistShare web-based application. As briefly described earlier, ArtistShare is an application which allows artists to list projects to solicit financing and/or market to their fans, industry professionals, investors and/or the public at large. By registering an account with ArtistShare, an artist may set up projects (the authored works), for fans/patrons to contribute financing and/or set up access for currently available projects. Registering with the ArtistShare application may also include other features for an artist including, for example, facilities and processes for designing and implementing a website/home page (and associated web-pages) for the artist for fans and the public to view. Fans and the public may be able to view such artist home pages upon registration with the ArtistShare system. Registration allows administrators of the network to collect data on the individuals viewing the site so that operators/owners of the ArtistShare system, as well as the artist, industry professional and other interested parties can gain useful demographic, marketing and other information.

The basic flow of an artist raising capital for a project is illustrated in FIG. **5**. Using this system, a musical artist (for example) having an idea for creating a new musical work **501** for registers with ArtistShare and obtains an artist account **502** so that he may raise the capital for financing the new work through his current and future fans. With his ArtistShare account, he may create a new project for his idea **504**, and

**12**

present it to fans. For the new project, the artist may devise a plan for financing the new work. He may create one or more levels of participation for a fan to contribute money for the project. For each level of participation, the artist may also create corresponding entitlements for the fan in exchange for the contribution. Alternatively, the artist may have already produced the musical work, and has instead listed the completed work as a new project for fans to purchase.

With regard to a project not yet produced, an artist may accept funds in a "pre-sale" **506** environment (i.e., prior to the musical work being completed and ready for distribution to the public). The pre-sale contributions may be a traditional sale, where a predetermined cash amount is contributed, or the sale may be a subscription service, where the fan pays for access to, for example, recording session videos, jam sessions and the like. Such subscription access may be a subscription series where there are a series of media about the production of the work which the fan may be able to review at different points in the development/production cycle.

Entitlements **510** may also be auctioned off to fans. For example, a "day in the studio" with the artist may be sold or auctioned to the highest bidder. Or, tickets to the artist on his next tour, an autographed "limited edition" digital disc, and the like, may all be auctioned for obtaining the resulting capital that an artist wishes for the particular project.

Other methods of raising the capital may include patron sponsorship, where for a predetermined (preferably a large amount) amount of capital, the sponsorship would enable the contributing fan to be listed as a "producer" of the project of the artist.

The contributions to the project may also be obtained through a licensing model. In such an arrangement, generally, the results of the project, i.e., rights to the recorded work, are licensed, for example, to a record company, a distribution company, merchandising company, and the like.

Additional incentives and perks may be provided to the registered, contributing patrons prior to the release of the project.

Some of the embodiments described above may be used to raise capital and exemplify the many capabilities of the ArtistShare system. One skilled in the art will appreciate, however, that any method of raising capital may be incorporated for use with the invention.

Through the registration of fans, the artist builds a fan database **508**, which may include the names, addresses, phones and email addresses of fans. Such a database may be shared/sold/licensed to others artists or third parties.

The released project may be added to a pool of creative work to sell or license the corresponding rights to the work **516**.

Upon the completion of the project, the creative idea is brought to fruition and is now a product (e.g., a song or collection of songs—album) **512**, which may then be distributed to the patrons who contributed to the project (pre-sale customers) **514**. The product may then be distributed post release in at least the methods described for the pre-release sales (i.e., traditional sales item, subscription access, subscription series, auction, patron sponsorship, licensing and the like) **518**. The product may be the same as the product that was purchased pre-sale, or may be a different product. For example, the pre-sale product may contain special content for those fans that contributed to the project. Specifically, the special content may be enveloped in a "limited edition" digital disc which includes video footage of the recording sessions, or special tracks not available in the post-release product.

US 7,885,887 B2

**13**

What the present embodiments allows for in this example is the artist to pay for recording, producing and mastering costs, and collect a profit, with only a limited number of products sold. For example, an artist estimates that he will need $30,000 to record, produce, mix, create a master recording and burn compact discs to distribute. He also would like to make a $70,000 profit on the project by the end of the first year of sales. Thus, a total financial goal for the project is $100,000. If the artist used a recording company for the project, in order to recoup the recording and production cost and collect a profit of $70,000, at a rate of $0.45 per CD, the artist would need to sell about 155,555 CDs. However, if the artist used the ArtistShare system according to the invention, the artist would only need to sell about 7,370 CDs to recoup recording and production costs and collect the $70,000 profit. This figure depends only on the sales of CDs alone, and does not take into account other sources of revenue (e.g. subscription services, merchandising) from the project for the artist. To that end, the number of CD sales needed for an artist to profit $70,000 may be far less if the artist takes advantage of patron sponsorships, fan subscriptions, auctions and corporate sponsorship opportunities available through the ArtistShare system.

One of the features of the present invention is a patronage level system. Accordingly, for projects (or other completed works), there may be levels of patronage/sponsorship, with each level of patronage reflecting a minimum/maximum predetermined monetary contribution and corresponding entitlement(s).

For example, an artist having an ArtistShare account decides to embark on a new recording project which they list on ArtistShare using the mechanisms associated with the various web pages described above. Fans/patrons are then allowed to join the project at various levels of participation to become patrons). For example, for $15, a fan/patron may be guaranteed a downloadable recording of the final project. At higher participation levels, the fan/patron might, say, receive an autographed picture of the artist, or even be invited to attend the recording sessions and participate as an executive producer in the project.

Below is an example of a list of levels of patronage of a project according to an embodiment of the invention. The following examples include possible products/entitlements which an artist may provide to fans in exchange for a preferably predetermined cash amount (or other contribution):

Basic Patron $10—Entitlements may include:
First to download the artist's latest release;
A listing on the album page as making the recording possible, personalized correspondence from the band.
Discounted CDs.
Auto email notification of artist concerts near you.
Level II Sponsor $20—Entitlements may include:
Same entitlements as the $10 level, but also include special T-shirt, Cap, Lighter, and Coffee Mug only for patrons of the latest record.
Level III Sponsor $40—Entitlements may include:
Same entitlements as the $20 level, and also includes limited edition monogrammed CD packaging for patrons with name listed on artist's website. Collector's item quality packaging.
Level IV Sponsor: $60—Entitlements may include:
Same entitlements as the Level III patron, but also includes listing on artist's home page as sponsor.
Level V Sponsor: $100—Entitlements may include:
Same entitlements as the Level IV, but also includes two tickets to a concert near the patron.
Sponsorships (corporate/patron or otherwise):

**14**

An individual or entity donating $10,000 (for example) for patron sponsorship may be listed as executive producer. This may be limited to a predetermined number of sponsors.

Contest Entry: $15—Entitlements may include:
enter to win and spend a day in the recording studio with the artist and be listed as a platinum sponsor;
access to special section of artist's website where the fan can listen to streamed unreleased live or studio performances;
view the live 'Studio Cam' to see how the record is going;
preview new songs before anyone; and/or
view a video guitar lesson from the band's guitarist.

Still other levels of patron sponsorship may include displaying patron names dynamically on the artist's web page, giving patrons a choice of limited edition album covers, special vinyl releases (which are difficult to pirate), and an album cover design contest.

Money contributed by fan/patron may be placed in an escrow, to protect the interests of both the fan/patron and the artist. If an escrow is used, upon completion of the project and upon the patron receiving the entitlement(s) corresponding to the patronage level, the capital in the escrow account is turned over to the artist. Alternatively, each artist may be established as a merchant, where the sales/contributions/entitlements are managed as the sale of products and services with a, for example, shopping cart feature. Under the merchant sales model, the artist may receive the contribution directly.

For a new project, when the artist has reached his financial goal (for example) for the project, the project may be then produced. Daily updates on the process may be available to patrons of the project, which for this example may include rough mixes from the recording session and video clips. Once the recording, mixing and mastering of the project is complete, the artist may upload their newly finished album to the ArtistShare system. In some embodiments of the present invention, the project may be started prior to completing the artist's financial goal, and/or prior to any patronage to the project.

For this example, Patrons may receive downloadable files of the finished compact discs. Patrons may also receive a file which allows them to burn an enhanced CD/DVD (enhanced disc), containing the complete album plus outtakes, photos, and video. The enhanced disc may only available to those who subscribed to the project (e.g., patrons). Any commercial release of the recording will only contain the music, and thus the enhanced disc becomes something of a "collector's item", although the enhanced version may be released commercially as well.

One of skill in the art will appreciate that an owner and/or operator of the ArtistShare system, in order to operate the network, may collect fees from artists and/or users (fans, patrons, industry, investors, etc.) to use the system. Alternatively, or in addition thereto, a percentage of one or more transactions carried out between users and the artist may be collected by the operator of the ArtistShare account. The transactions may include, for example, the contribution made to an artist by a fan, the license fees for a work paid by the industry professional in distributing the work to the general public in a retail location, promotional material, and whatever else the artist may sell/license to users of the ArtistShare system.

FIGS. **6-62** illustrate, for example, attributes of one or more web pages and/or one or more links for embodiments of the present invention. One of skill in the art will appreciate, that access to some pages may be dictated by registering an

US 7,885,887 B2

**15**

account with the ArtistShare system. The registration process may use existing security-logon features, where a user may succeed logging onto the system or fail. Accordingly, such logon attributes are shown in the figures as illustrative and example purposes only, and may or may not be used with the other attributes illustrated in the respective figure.

Accordingly, FIG. **6** illustrates a block diagram of one or more web pages and/or one or more links for management of the artist account according to an embodiment of the present invention. As shown, the artist logs into the account, which may be at the ArtistShare home page. With a successful login, an individual is preferably designated by the artist to have administrative rights for managing the account (Manager).

When the Manager then gains access to the account, the link to the administrative pages may be active. This link may lead the Manager to other links for opening existing projects, creating new projects, managing a home page for the artist, generating reports, managing media that the artist has collected or created, and managing other aspect of the account (e.g., financials, promotion, and the like).

FIG. **7** illustrates attributes one or more web pages and/or one or more links of Open Projects. When directed to the associated web-pages corresponding to this link, the Manager may obtain information such as overall Project Information (FIG. **8**) which includes, for example, the project name and type of project the project type (e.g., song, album, book, photo, painting, video, movie), language of the project, project description, start date and estimated completion date, prospective release date, the project status and progress (e.g., a diary of what has been completed/planned), a revenue goal and revenue to date.

An inventory link directs the ArtistManager to web pages related to the inventory items of the project. As shown in FIG. **9**, such web-pages may include identification information for the inventory item (name and description), the sales type of the inventory item (pre-sale, existing item, etc.), copyright information (e.g., has a copyright registration been applied for, who holds the copyright, and the like), the category of the item (e.g., text, mp3, mpeg, pdf and the like), the delivery method for the item (e.g., download, courier, telephone, etc.), shipping information if a directly shipped item (size and weight), and a link for allowing a file (e.g., music, text, photo, video) to be uploaded to the artist's account.

FIGS. **10-13** describe different possible sales containers. With sales containers the ArtistManager can create products to offer by adding selected inventory items to the selected Sales Container type and defining the specific Sales Container attributes. These attributes may differ depending on the type of Sales Container chosen.

FIG. **10** illustrates the attributes one or more web pages and/or one or more links of the auction sales container link for an open project. Such a web-page(s) may include information such as a name for the auction, description, the inventory item or items involved in the auction, quantities, the starting and ending dates (duration), a starting price, reserve price and instant purchase price (e.g., "buy now"), and corresponding photo/text to be posted for the auctioned item. Any number of currently available online auction techniques may be employed with invention, as well as proprietary techniques and newly developed techniques reverse auctions.

FIG. **11** illustrates the attributes one or more web pages and/or one or more links of the patron sponsor sales container link for an open project. Such a web-page(s) may include information such as a patron sponsor title, a description of the entitlement(s), a list of inventory available to add to the sales

**16**

container, the quantities, limits, the base unit price, quantity or priority discounts, a photo and the like for the patron sponsor sales container.

The artist project may also include subscription services for fans/patrons. Accordingly, FIG. **12** illustrates attributes one or more web pages and/or one or more links of information on subscriptions for an open project. Such information generally includes a display name for the subscription, description of the subscription(s) available, inventory available for subscription, the quantities, limits, access times, delivery schedules and the like for the subscription.

FIG. **13** illustrates the attributes one or more web pages and/or one or more links for the licensing sales container link contained on the open projects web page. Similar to the information available on the other open-project web-pages, the information may include a display name or title, the inventory available to add to the sales container, information regarding all available inventory, and information regarding the quantities, prices, discounts and the like may also be included.

The account Manager may also access and manage personnel for the account (FIG. **14**). Specifically, the Manager may add, delete, and edit personnel for the project in one or more categories. Such personnel may include band members of the artist (if the artist is a band), production crew, producer(s), instrument playing personnel, and the like. The Manager may also use this link to add, edit or delete personnel categories.

A News link for an open project allows the Manager to manage press releases, the artist's daily journal, and other news information regarding the artist for the project (FIG. **15**). Thus, such information may include the available article list (to promote the artist), the ability to added, edit, create, delete and or remove an article from the news section.

FIG. **16** illustrates attributes one or more web-pages and/or one or more links for mailing list management, where the Manager can import and export names for a mailing list, direct announcements and also create different mail list categories. The ability to manage such information may be performed using dropdown menus and the like. One skilled in the art will appreciate, however, that any method of managing mailing lists may be incorporated with the other features of the invention.

One of the features of an artist account with ArtistShare, is the ability to create, edit and delete media shows (audio, video etc. . . . preferably pre-recorded, but may also be live) which preferably is related to the artist. This, of course, is very convenient for all artists, especially musical recording artists who wish to create Internet radio shows. The overview of the attributes one or more web pages and/or one or more links for a project in this regard is illustrated in FIG. **17** and FIG. **21**.

For creating a new project, as shown in FIG. **18**, the Account Manager may select a link directing him to a "Create Project" web page. This link may direct the manager to a web page where the Manager may enter information related to a new project's name, description, type, goals, estimated start date, finish date and release date.

The link for managing a website/home page of the artist is illustrated in FIG. **19**. A web-page for managing such information may include attributes for one or more web-pages and/or one or more links associated with guidance for uploading photos, music, video and the like to the artist's web account, and links for adding, editing, and deleting web-links to be included on the artist's home page, and links for adding, editing and removing text, news articles, feature projects, biographical and event information on the artist homepages. This information, for example, could be syndicated via Web Services to provide content other web sites, possibly in a

US 7,885,887 B2

**17**

variety of languages, or to the Artist's own pre-existing web site. The Artist Share database may be used as the one centralized location for storing all data relating to an artist.

Other management features include the ability to manage the generation of reports for the various aspects of the account. For example, through the link "Generate reports" on the account management page for the artist, the manager may generate, view and or print reports related to sales of current items, including sales history and the like, personnel reports, patron reports, reports on streaming requests (audio and video), feedback reports, and the like. An overview of the attributes for the one or more web pages and/or one or more links is illustrated in FIG. **20**.

More specifically the Manager may also link to a web page to view information about patrons of the artist (FIG. **20**). Patron information may be made available to industry personnel, investors, or other interested parties to determine the popularity, for example, of the artist. Such information generally may include the name and description (age, sex, photo, location) of the patron, inventory to which a respective patron (or all patrons) have selected either through direct purchase of a completed project, or financing the project in some way. The information contained on this page may also include description of all the inventory available to patrons, the ability of the Manager to limit purchased quantities of inventory items, discounts to the patrons.

The Manage Media Shows link may direct a Manager to a web page and/or links (FIG. **21**) having attributes where the manager can create, edit, remove and delete media shows created from uploaded streaming media inventory content.

The Manage Account link may direct the Manager to a web-page and/or links (FIG. **22**) having attributes for one or more web-pages and/or one or more links for viewing and managing billing information including credit card and mailing address information of the Artist. This page may also include attributes for managing the Artist's affiliate program, as well as the ability to add users to the account (e.g., add/edit administrative information, add/edit/remove other user information). This page may also include attributes to perform any other Artist account management feature.

FIG. **23**A illustrates attributes of one or more web-pages and/or links for patrons and fans who access a home page of the ArtistShare system. Accordingly, a fan can access the ArtistShare home page and view public web pages of the Artists. Upon registration with ArtistShare, the fan, (now a patron) may then access a member area which generally includes more features and content. Patrons, of course, may change their account information or a level of membership upon selection of an account management link which directs the patron to a web page for changing such information (for example).

As shown in FIG. **23**B, ArtistShare public pages may include a home page, which links to direct the non-member to one or more web-pages including featured projects, downloads, a member login area, media shows, featured artists, featured auctions, artist home pages, artist project pages, and a news and events page. The home page (FIG. **24**) generally includes a main navigation menu with the above-described links. The featured project page (FIG. **25**) may include a list of links to such featured projects, which may comprise links to the artist's homepage whose project is being featured. The download page (FIG. **26**) may include links for downloading various files, with each link including a descriptive component for information about the file (e.g., song, movie trailer). Of course, the login link may direct a user to a login screen (FIG. **27**) where a registered member may enter username and password information to login to the ArtistShare member

**18**

areas. The media show link may direct a user to a menu of links (FIG. **28**), or a searchable database, of freely available media shows. Similar to the featured project web page, the featured artist link would direct the user to a web page (FIG. **29**), for example, having a listing of links to web-pages of the featured artists; such pages may be the home page of the artist, or other predetermined web-page of the artist.

FIG. **30** illustrates attributes of one or more web pages and/or one or more links regarding featured auctions. The attributes may include a main navigation menu, a description/summary of the featured auction, and a link to the auction (e.g., to the selected artist's auction product page).

FIG. **31** illustrates the attributes of one or more web pages and/or one or more links to artists' homepages. Accordingly, these attributes may include a main navigation menu, photo of the artist, a link to featured products of the artists, links to free downloads, free audio/video (streaming), links to open projects, links to archived projects and links to externally hosted pages of artists.

FIG. **32** illustrates attributes of one or more web-pages and/or one or more links to project pages of artists, including descriptions, streaming audio ("Listen"), and video ("Watch"), downloads, news ("Read"), personnel (e.g., band members, collaborators, etc.), patrons, artists' media shows, and to a page for registering with an artist ("Join").

FIGS. **33-41** illustrate the attributes of one or more web pages and/or one or more links to the various web-pages/links associated with the attributes of the artists project pages (FIG. **32**). Thee attributes generally include a main navigation panel, project navigation panel, and a project progress meter, for tracking the progress of a project. Other attributes include lists for projects which include: streaming audio (FIG. **34**), streaming video (FIG. **35**), downloads (FIG. **36**), news articles (FIG. **37**), project personnel (FIG. **38**), patrons (FIG. **39**)—including optional links to patron web-pages (which may be part of the ArtistShare system), media shows (FIG. **40**), lists of products to purchase/bid on—which may include product descriptions, patron levels and quantities.

FIG. **42** illustrates the attributes of one or more web pages and/or one or more links for ArtistShare News and Events public pages and may include a main navigation link and a short description and a listing of current ArtistShare news and events thereof.

Member ArtistShare pages (FIGS. **43-49**) may be similar to the public pages (and may be arranged the same as the public available pages), except that they may offer premium content and higher levels of access to media including news, downloads, offers and events. Member pages may also include shopping cart and auction pages for e-commerce transactions, as well as the purchase of artist products and associated merchandise. FIGS. **43-49** illustrate examples of the attributes that may be associated with web pages for member pages.

However, members of ArtistShare may be able to sign-up with various artists to become patrons of the artists. A patron is a fan who registers with an artist (for example through the ArtistShare system) and who provides a monetary contribution to a project of an artist in exchange for certain entitlements. Although an embodiment of the invention includes monetary contribution, other contributions are possible for certain fans who may contribute to the production of the project by either providing production assistance, including, for example, providing musical instruments, a studio, vocals, playing ability, musical arrangement, song writing, mixing, mastering and the like. Also, a fan, patron, or any interested individual, may purchase inventory items associated with completed projects.

FIGS. **50-57** illustrate the attributes for one or more web pages and/or one or more links which may be used to manage accounts for fans and/or patrons. These attributes include a web-page(s) and/or link(s) to personal information (FIG. **51**), purchased subscriptions (FIG. **52**), mailing list subscribe and unsubscribe functions (FIG. **53**), a list of purchases (FIG. **54**), current and closed auctions the patron is involved in (FIG. **55**), a feedback form to give feedback to ArtistShare or directly to the Artist (FIG. **56**) and stored payment information such as credit card or wire transfer information for purchases (FIG. **57**).

FIGS. **58-62** illustrate attributes of one or more web pages and/or one or more links associated with accounts for industry professionals, investors, and the like. These attributes may include perusing and selecting media of artists (FIG. **59**), accessing statistics associated with an artist, project and/or media (for example) including sales, hits on web pages, demographics, and fan base statistics (FIG. **60**). A web-page (s) and/or link(s) may also be provided to host private auctions by artists to industry professionals or investors. (FIG. **61**). One or more web-pages and/or one or more links for account management (FIG. **62**), allows an industry individual or investor to manage his account and may be similar to those of a Fan Account Management pages (FIGS. **50-57**).

### Group II Embodiments

Rather than turning over the copyright, publishing right, manufacturing rights, merchandising rights and/or distribution rights to a third party (a record company in this example), other related embodiments of the invention include the selling/auctioning or licensing rights of a project by the artist through ArtistShare.

Interested parties may access one or more databases of completed projects via the ArtistShare server (host), for example, which specify the availability of various rights for sale, auction or license, which may be interacted with via a client computer of an interested party. Thus, the interested party (e.g., industry professional, investor) may query the database to find particular projects and apply the query to a field of the database which in this case may include the type of music, the name of the artist, the age of the artist, the gender of the artist, lengths of songs, lengths of albums, and the like. The results may return a list of available projects having rights available for sale or license. Each project may include a hyperlink to a webpage for the project, which may include the rights available for sale or license, and a detailed description of the project.

Thus, record companies, distributors, merchandisers and retail stores may either buy outright or bid on the exclusive manufacturing, distribution, publishing rights to ArtistShare projects. This allows them to release a packaged, commercial product (compact disc of the recording) in retail outlets (record stores). Parties purchasing or licensing such rights reduce risk of investing as they'll be able to monitor a product's potential success based upon it's online success (e.g., artist popularity with fans, hits on pages, etc.).

The ArtistShare system may include one or more software based tools (for example) for allowing an interested party in gauging whether the rights to a project may be worth purchasing or licensing. Specifically, in an embodiment of the invention, the tools may analyze certain aspects of the projects and artist (e.g., tracking such aspects). These aspects may include but are not limited to past sales of other projects, number of patronage, demographics of patronage, hits associated with the project and/or other web-pages of the artist, and the like. These aspects, as one of skill in the art will appreciate, are

tacked by various databases (remote or local) upon which the ArtistShare server communicates with. Accordingly, these aspects may be also be queried to return results of the degree of popularity amongst fans, industry professionals, other artist, etc. Thus, by using such queries, an interested party may determine the likely success of a project.

Accordingly, in the present group of embodiments, a method of managing a right in a creative work is provided and may be operable on a client-server computer system as previously described. The method may include collecting information on a plurality of creative works in a database. Each of the creative works may include one or more corresponding rights (distribution, publishing, IP, and the like) for sale or license. The database may then be searched by interested individuals for specific creative works having rights being offered for sale or license. Upon finding a particular creative work, the interested individual can purchase or license a corresponding right.

### Group III Embodiments

FIG. **4** illustrates one possible embodiment of Group III, which may include a system provided in a retail or distribution setting, which is linked to an ArtistShare database (preferably a live-online connection, however, a localized database which is routinely updated may also be used). The system may include a library of available content from Artists of ArtistShare. Such a system may be a kiosk.

As shown in FIG. **4**, a kiosk **400** includes a processing system **402** that may be any computing device capable of being interconnected with the ArtistShare host server **418** and an associated one or more databases **420**, via, for example, the Internet **422**. According, the computing device may be a personal computer with a high-speed connection (DSL, cable, T-1), containing the usual computer hardware (e.g., processor, RAM and ROM memory, hard-drive, removable media drive(s), keyboard, mouse, display, loudspeaker, and the like), or a custom designed kiosk system having similar equipment to allow processing of information (e.g., processing system **402**. The equipment allows graphical-user-interface software to produce a graphical user interface **404** on a display to operate thereon so that users of the system can interact with the ArtistShare system and query the relevant databases to find media (songs and albums for example) for any artist and/or media type. Customers may then select one or more media items for preview or purchase. Accordingly, after the media items are selected, a media creator **406** may be provided (e.g., software for creating digital copies onto readable mediums like, for example, burning CDs and the like) allowing the digital information of the selected items to be placed on media for purchase. Accordingly, the items may be stored on any type of media storage device having sufficient memory. Thus, the kiosk may include a floppy drive **408** to store media on 3½" disks, a DVD burner **410** to burn DVDs, a CD burner **412** to burn CDs, and a chip "burner" **414**, which may store information to a memory chip, including, for example, smartmedia, memory stick, and compactflash cards, for example, or any other future medium for data storage. Alternatively, via the media creator **406**, or via the processor, the digital media may be downloaded via an output **416** to a user device such as an MP3 player, for example. The connection between the user device and the kiosk may be any digital connection including serial, parallel, fireware, USB and the like or any future method of transferring and/or storing data.

Thus upon the kiosk being placed in any retail/distribution environment (a consumer music store or distribution warehouse for example), a customer or client using the graphical-

US 7,885,887 B2

21

user-interface may be able to select songs from a database of available content where the system may establish the number of songs to be copied based on each song that is selected (e.g., 1-20) and then have them burned onto a CD, right there. The completed product is presented to the user within a short period of time (e.g., 5-15 minutes,—as technology progresses, this time is likely to be substantially shortened.), sent via courier to a specified address, available for immediate transfer to a personal device or delivered using any present or future technology.

The kiosk system may be used in the alternative to a client workstation for a fan, patron or other individual, allowing one using the kiosk system to register with an artist on the Artist-Share system, and make contributions and/or receive entitlements (burned CD/DVD). The kiosk system may also be any computer system configuration which allows anyone (artist or industry) to present artists' works for license or sale where the artist and artist's work information is accessed, media is presented for preview or purchase, requests for media and information are tracked and sales are generated.

Having now described a few embodiments of the invention, it should be apparent to those skilled in the art that the foregoing is merely illustrative and not limiting, having been presented by way of example only. Numerous modifications and other embodiments are within the scope of ordinary skill in the art and are contemplated as falling within the scope of the invention as defined by the appended claims and equivalents thereto. The contents of any references cited throughout this application are hereby incorporated by reference. The appropriate components, processes, and methods of those documents may be selected for the invention and embodiments thereof.

What is claimed is:

1. A system for marketing and funding one or more projects of an artist comprising a server having applications programs operable from a remote site for:

   providing software tools to an artist or Account Manager to manage at least one project, the project comprising at least one creative work;

   receiving information from the artist or Account Manager regarding at least one Sales Container associated with the at least one project, each Sales Container including at least one of a product, a service, and a patronage, while the artist retains outright ownership of the project and the creative work;

   transmitting offer data from a server to a client via a network, the offer data comprising an offer to Fans concerning the at least one Sales Container associated with at least one project, wherein the offer is for a Sales Container at a predetermined level of patronage in exchange for funds for the project;

   receiving at the client such offer data and presenting the offer to the Fan;

   transmitting acceptance data back to the server from the client accepting the offer;

   processing the acceptance data by the server;

   registering contact and marketing information regarding Patrons in a database; and

   providing the artist or Account Manager software tools to manage communications, through said Patron database, to Patrons regarding the sales and marketing of one or more projects.

2. The system according to claim 1, wherein the funds are used to finance the project.

3. The system according to claim 1, wherein the project is an incomplete project or a completed project.

22

4. The system according to claim 1, wherein the level of patronage comprises a particular sales container containing at least one entitlement for delivery to the interested party.

5. The system according to claim 4, wherein the funds are provided at a predetermined time.

6. The system according to claim 5, wherein the sales container containing at least one entitlement is provided to the interested party at a predetermined time.

7. The system according to claim 1, wherein the project is selected from the group consisting of: music/audio projects, film projects, printed/written projects, services project, visual art projects, multimedia projects, syndicated content projects and any creative work or service and any combination of the foregoing.

8. The system according to claim 1, wherein the offer is presented in at least one of the following manners: an auction, a point of sale, a subscription, a license, a pre-sale of the creative work, and a sponsorship.

9. The system according to claim 1, wherein the acceptance data comprises an acceptance to the offer at a level of participation among a plurality of levels.

10. The system according to claim 1, wherein the project upon completion is forwarded to the interested party via at least one of streaming media, at least one downloadable file, mail order, in person and/or by telephone.

11. The system of claim 1, wherein the server further includes at least one application program operable from a remote site for allowing Patrons to demonstrate interest in one or more projects prior to, during, and after creation and publication of the artist's completed project.

12. The system of claim 11 wherein the software program allowing Patrons to demonstrate interest in one or more projects specifies one or more sales containers which offer to Patrons the opportunity to be involved in the artist's creative work process.

13. The system of claim 12, wherein the opportunity to be involved in the artist's creative work process may include at least one of access to rough mixes, photos or videos from recording sessions or outtakes, invitations to recording sessions, and access to sheet music accompanying the work.

14. The system of claim 12, wherein sales containers are comprised of inventory items including access to downloadable songs, sheet music or scores, music lessons, custom song writing, personal interaction between artist and Patron, or digital and/or physical access to the creative work process of a work not yet created, partially created, or fully created.

15. A system for an artist to fund and market one or more projects comprising:

   processing means for providing software tools to an artist or Account Manager to manage at least one project, the project comprising at least one creative work;

   receiving means for receiving information from the artist or Account Manager regarding at least one Sales Container associated with the at least one project, each Sales Container including at least one of a product, a service, and a patronage, while the artist retains outright ownership of the project and the creative work;

   transmitting means for transmitting offer data from a server to a client via a network, the offer data comprising an offer to Fans, wherein the offer is for a Sales Container at a predetermined level of patronage in exchange for funds for the project;

   receiving means for receiving at the client such offer data and presenting the offer to at least one of Fans and Patrons;

   transmitting means for transmitting acceptance data back to the server from the client accepting the offer;

US 7,885,887 B2

processing means for processing the acceptance data by the server;

transmitting means for transmitting to the artist or Account Manager information pertaining to the acceptance data and Patrons; and

communication means for receiving from the artist or Account Manager at least one communication regarding the creative work process and directing said communication to at least one Patron,

wherein the entitlement allows the interested party to participate in the project by receiving physical and/or digital content relating to the project.

**16**. The system of claim **15**, wherein said communication means includes data base records pertaining to Patrons, said data base records being managed by the system.

**17**. A system for raising funds for and marketing one or more of an artist's projects to Patrons through the internet, without the necessity of a recording contract with a recording company and without the necessity of a production company, comprising a server having application programs operable from a remote site for:

allowing Patrons to demonstrate interest in one or more projects prior to, during, and after creation and publication of the project's artistic work;

registering contact information regarding interested Patrons in a searchable database;

providing to the artist or Account Manager software tools to design, create, and implement an artist-specific web page for the purpose of marketing said artist's projects to existing and new Patrons without the necessity of a contract with a recording company and without the necessity of a production company;

managing communications, through said patron database, from the artist or Account Manager to Patrons regarding sales and marketing of one or more projects; and

managing and viewing financial and marketing information relative to projects supported through the system.

**18**. System for funding and marketing at least one project of an artist comprising:

a server having application programs operable for:

receiving data from an artist or Account Manager regarding at least one project by an Artist;

providing tools for the artist or Account Manager to present the at least one project to at least one of Fans and Patrons;

receiving data from the artist or Account Manager regarding at least one entitlement associated with at least one of the Artist and the project, said entitlement including at least one of a product, a service, and patronage, but not ownership in the project;

transmitting offer data to said Fans or Patrons, the offer data comprising an offer for said at least one entitlement at a predetermined level of patronage in exchange for funds for the project, the project comprising at least one creative work; and

receiving acceptance data for an entitlement at a predetermined level of patronage from a Patron.

**19**. The system according to claim **18**, wherein the project is an incomplete project or a completed project.

**20**. The system according to claim **18**, wherein the level of patronage comprises a particular sales container containing at least one entitlement for delivery to the interested party.

**21**. The system according to claim **18**, wherein the server further includes at least one application program operable from a remote site for receiving funds from a Patron.

**22**. The system according to claim **21**, wherein the accepted entitlement is made available to the Patron at or after the time of receiving funds from the Patron.

**23**. The system according to claim **18**, wherein the project is selected from the group consisting of: music/audio projects, film projects, printed/written projects, services project, visual art projects, multimedia projects, syndicated content projects and any creative work or service and any combination of the foregoing.

**24**. The system according to claim **18**, wherein the offer is presented in at least one of the following manners: an auction, a point of sale, a subscription, a license, a pre-sale of the creative work, and a sponsorship.

**25**. The system according to claim **18**, wherein the acceptance data comprises an acceptance to the offer at a level of participation among a plurality of levels.

**26**. The system according to claim **18**, wherein the project upon completion is forwarded to the interested party via at least one of streaming media, at least one downloadable file, mail order, in person, and by telephone.

**27**. The system according to claim **18**, wherein the server further includes at least one application program operable from a remote site for registering contact and marketing information regarding Fans and/or Patrons in a database.

**28**. The system according to claim **18**, wherein the server further includes at least one application program operable from a remote site for transmitting data regarding at least one of the Artist and the project to at least one of Fans and Patrons.

**29**. The system according to claim **18**, wherein the step of providing tools includes providing content management software accessible by the Account Manager.

**30**. The system according to claim **18**, wherein the server further includes at least one application program operable from a remote site for receiving an artist's completed project.

**31**. The system according to claim **18**, wherein the server further includes at least one application program operable from a remote site for receiving at least one entitlement associated with at least one of the project and artist.

**32**. The system according to claim **31**, wherein the server further includes at least one application program operable from a remote site for converting the received entitlement into a digital format so as to be accessible by at least one Patron.

**33**. The system according to claim **18**, wherein the at least one entitlement comprises at least one product associated with the artist's creative work process of the project.

**34**. The system according to claim **18**, further comprising:

registering contact and marketing information regarding Patrons in a database; and

providing the artist or Account Manager software tools to manage communications directly to Patrons regarding the sales and marketing of one or more projects.

**35**. System for funding and marketing at least one project of an artist comprising:

a server having application programs operable for:

receiving data from an artist or Account Manager regarding at least one project by an Artist;

providing tools for the artist or Account Manager, without the necessity of a recording company and without the necessity of a production company, to present the at least one project to at least one of Fans and Patrons;

receiving data from the artist or Account Manager regarding entitlements associated with at least one of the Artist and the project;

transmitting offer data to said Fans and/or Patrons, the offer data comprising an offer for at least one entitlement at a predetermined level of patronage in

US 7,885,887 B2

| 25 | 26 |

exchange for funds for the project, the project comprising at least one creative work; and

receiving acceptance data for an entitlement at a predetermined level of patronage from a Patron.

**36**. System for funding and marketing a plurality of projects of an artist, the system comprising:

a server having application programs operable for:

receiving data from an artist or Account Manager regarding a first project by an Artist;

providing tools for the artist or Account Manager to present the first project to Fans of the artist;

receiving data from the artist or Account Manager regarding at least one entitlement associated with the first project, said entitlement including at least one of a product, a service, and patronage;

transmitting offer data to said Fans, the offer data comprising an offer for said at least one entitlement at a predetermined level of patronage in exchange for funds for the project, the project comprising at least one creative work;

receiving acceptance data from a Fan for an entitlement at a predetermined level of patronage;

registering the Fan as a Patron in a Patron database and storing contact information regarding the Patron; and

managing communications, through said Patron database, from the artist or Account Manager to Patrons regarding sales and marketing of one or more additional projects.

**37**. System according to claim **36**, further comprising:

receiving data from an artist or Account Manager regarding a second project by the Artist;

providing tools for the artist or Account Manager to present the second project to Fans of the artist;

receiving data from the artist or Account Manager regarding at least one entitlement associated with the second project, said entitlement including at least one of a product, a service, and patronage; and

transmitting offer data to said Fans and/or Patrons, the offer data comprising an offer for said at least one entitlement at a predetermined level of patronage in exchange for funds for the project, the project comprising at least one creative work.

\*    \*    \*    \*    \*

# CERTIFICATE OF COMPLIANCE WITH FED. R. CIV. P. 32(E)(7)(B)

The undersigned, Counsel of Record for Defendants-Appellants, hereby certifies that this ***Brief of Defendants-Appellants Fan Funded, LLC and ArtistShare, Inc.*** complies with the type-volume limitation provided in Rule 32(e)(7)(B) of the Federal Rules of Appellate Procedure. In preparing this Certificate, I relied on the word-count function of Microsoft Word 2010. This Brief contains 13,772 words.

Dated: September 29, 2015        Respectfully submitted,

By:   */s/ Craig R. Smith*
       Craig R. Smith
       LANDO & ANASTASI, LLP
       Riverfront Office Park
       One Main Street – 11th Floor
       Cambridge, MA 02142
       Tel: (617) 395-7000
       Fax: (617) 395-7070
       csmith@lalaw.com

       ***Attorney for Defendants-Appellants***
       ***Fan Funded, LLC and ArtistShare, Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2015, I caused the foregoing **Brief of Defendants-Appellants Fan Funded, LLC and ArtistShare, Inc.** to be electronically filed with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the following persons:

Peter J. Brann
Stacy O. Stitham
David Swetnam-Burland
Brann & Isaacson
184 Main St. P.O. Box 3070
Lewiston, ME 04243-3070
pbrann@brannlaw.com
sstitham@brannlaw.com


*/s/  Craig R. Smith*
Craig R. Smith